**FINANCIAL INFORMATION**
**TECHNOLOGIES, LLC,**

     **Plaintiff,**

**v.**                             **CASE NO. 8:17-cv-00190-T-23MAP**

**ICONTROL SYSTEMS, USA, LLC,**

     **Defendant.**

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**MATERIAL RECORD FACTS**

From ▮▮▮▮▮▮, Fintech paid over $▮▮▮▮▮ to its development team to design its proprietary software platform, which processes Electronic Funds Transfer ("EFT") transactions between retailers and distributors of alcoholic beverages ("regulated commerce"). [Ex. A, Glenn Jones 12/15/2016 depo: 33:3-19, 86:4-89:21, 106:9-12, 154:12-155:1, Exs. 7, 20].[1] Sanderson worked for Fintech from about August of 2008 through January of 2012 as a regional account executive until he was promoted to National Accounts Director, where he was responsible for managing many of Fintech's major accounts. [Ex. B, Sanderson 10/07/2016 depo: 8, 9, Ex. 2]; [Ex. B, Sanderson 10/16/2017 depo: Ex. 34 at icontrol003179]. Lopez worked for Fintech on two occasions between 2000 and 2012, ultimately serving as Vice President of Operations. [Doc. 68 at 2]; [Ex. D, Lopez 12/13/2016

---

[1] Deposition transcripts and exhibits thereto are cited in this Response by the same exhibit letter, e.g., the deposition transcript of Glenn Jones and its exhibits are all cited as "[Ex. A]." Thus, "[Ex. A, Glenn Jones 12/15/2016 depo: Exs. 7, 20]" refers to exhibits 7 and 20 of the deposition of Glenn Jones. Similarly, "[Ex. A, Glenn Jones 12/15/2016 depo: 33:3-19]" refers to page 33, lines 3-19 of the deposition transcript.

depo: 57:19-58:2, 58:21-59:9, 60:3-60:16, 61:3-62:9, 66:16-19, Ex. 8], [Doc. 44-1 / S-47, Zatkovich Report: 14-16]. Lopez managed the activities of Fintech's activation department and technology department, developed and maintained Fintech's proprietary customer applications and data interfaces, and had access to every aspect of Fintech's confidential business information and trade secrets. [Ex. D, Lopez 12/13/2016 Depo: 68:9-72:11, 73:22-74:3, 74:21-79:24, 80:18-82:19, 88:9-13, 94:11-22, 95:24-96:21, 97:5-98:12, 102:15-106:1, 107:14-111:8, 111:25-116:9, 117:12-120:2, 121:11-25, 123:12-124:7]; [Ex. E, Kwo depo: 8:2-11, 12:21-24, 58:4-7, 60:14-61:12]; [Ex. A, Jones 12/15/2016 Depo: 89:10-14]; [Doc. 44-1 / S-47, Zatkovich Report: 14-16, 31-38, 122-143].

Lopez and Sanderson each executed a Confidentiality and Non-Compete Agreement ("Confidentiality Agreement") which prohibited them from unauthorized use, disclosure, or retention of Fintech's confidential information, including all "███████████ ████████████████████████████████████████████████████████ ██████" [Doc. 1-1 at ¶¶ 1, 2]; [Ex. C, Sanderson 10/07/2016 Depo: 31, 32, Ex. 2 at ¶¶ 1, 2]. Fintech's Employee Handbook contained similar provisions, as did a Consulting Agreement signed by Lopez. [Doc. 1-2 at 3]; [Ex. A, Jones 12/15/2016 Depo: 120:2-121:13, Ex. 10 at PPLOP000041].

Lopez admitted that, after he resigned from Fintech, he retained two e-mails containing detailed technical information about Fintech's software, including diagrams of Fintech's "████████████████" ("████"). [Doc. 68-4 at 25:12-26:8]; [Ex. D, Lopez 12/13/2016 Depo: 157:1-158:19, Exs. 18 & 19]; [Doc. 44-1 / S-47, Zatkovich Report: 36]. Lopez also admitted that he retained Fintech e-mail correspondence from 2009 describing the

development of Fintech's "████████," i.e., ████████████████████████ ████████████, which he developed at Fintech. [Ex. D, Lopez 12/13/2016 Depo: 109:19-110:9, 154:19-156:2, Ex. 16]; [Doc. 44-1 / S-47, Zatkovich Report: 14, 17, 29, 30, 94, 107-109, 113, 123-126].

### A.    Sanderson's Misappropriation Of Confidential Information

Fintech was the only third party processor of alcoholic beverage EFTs until June or July of 2012, when iControl's co-CEOs interviewed Sanderson and began developing a plan to enter the market for alcohol third-party payment processing.   [Ex. B, Sanderson 10/16/2017 Depo: Ex. 34 at icontrol003169, 3176]; [Ex. F, iControl Corp. Rep. Depo: 66:2-22, 77:19-22]; [Ex. G, Harris 01/23/2018 Depo: 160]; [Ex. D: 67:1-6]. In early 2013, Sanderson began working for iControl as its National Sales Director and then Senior VP of payment solutions. [Ex. C, Sanderson 10/07/2016 Depo: 16-18].  He misappropriated several of Fintech's confidential documents.  [Ex. H, Glenn Jones 01/30/2018 Depo:  Ex. 7 (P's Resp. to Sanderson's Roggs), No. 8)]; *see, e.g.*, [Ex. C, Sanderson 10/07/2016 Depo: Ex. 5 at 2, Ex. 10 at 2, Ex. 12, Ex. 18, Ex. 13, Ex. 25, Ex. 26, Ex. 28]; [Ex. I, Byrum Depo: 25-27, 34]; [Ex. J: Hardwick Depo: 38-40, 54:9-16].  For example, he obtained, during employment with iControl, Fintech's map and chart of alcohol regulations by state by personal e-mail from a Fintech employee.  [Ex. C, Sanderson 10/07/2016 Depo: 154-162, Ex. 23].

### B.    iControl's Engagement Of Lopez As An Independent Contractor

iControl argues that it "developed its ACH process for the alcohol industry **before** hiring Lopez and that its process has not changed."  [Doc. 68 at 10] (emphasis in original). The evidence tells a different story.  As early as June of 2013, Robert Noe, senior vice

president of iControl, recommended that iControl engage Lopez as an independent contractor because Noe wanted "an IT experienced individual who could help me with the next generation of what I needed the software and the platform to do." [Ex. K, Noe Depo: 9:9-17, 13:23-14:18]; [Ex. G, Harris 01/23/2018 Depo: 23:14-24:12, Ex. 1, Ex. 2]; [Ex. F, iControl Corp. Rep. Depo: 91:6-18, 95:2-10]. Lopez's independent contractor agreement expressly required Lopez to



[Ex. L, Lopez 04/21/2017 Depo: Ex. 27 at 000894] (emphasis added).

Former iControl Chief Operating Officer Bill Harris described Lopez as a developer and software engineer who was integral to the development of iControl's regulated commerce product and worked closely with iControl's software development team, including Gilad Keren, iControl's Chief Technical Officer. [Ex. M, Harris 10/10/2016 Depo: 28:20-32:9, 54, 55, 152, 153]; [Ex. G, Harris 01/23/2018 Depo: 27-32, 35-38]. Lopez admitted that he reviewed iControl's regulated commerce applications, including the distributor and retailer onboarding application, and wrote software code for iControl to match and report invoices and receiving records. [Ex. L, Lopez 04/21/2017 Depo: 201:11-20, 224:20-226:15, Ex. 33]. He also admitted he came up with, and implemented, the concept of how to reconcile invoices and records of receipt. [Ex. D, Lopez 12/13/2016 Depo: 152]. These

68:9-72:11, 73:22-74:3, 74:21-79:24, 80:18-82:19, 88:9-13, 94:11-22, 95:24-96:21, 97:5-98:12, 102:15-106:1, 107:14-111:8, 111:25-116:9, 117:12-120:2, 121:11-25, 123:12-124:7]; [Ex. E, Kwo Depo: 8:2-11, 12:21-24, 58:4-7, 60:14-61:12]; [Ex. A, Jones 12/15/2016 Depo: 89:10-14]; [Doc. 44-1 / S-47, Zatkovich Report at 26-40, 122-143].

A series of PowerPoint presentations given to iControl's Board of Advisors from 2013 to 2014 shows that iControl was requested to make extensive changes to its regulated commerce software suite from the time Lopez was hired through late 2014. [Ex. AA, icontrol003190, 003192] (reflecting "███████████" and updated "███████████ ███████" in ███████); [*id.* at Ex. 4, icontrol003653, 003654, 003657] (reflecting that as of September 30, 2013, iControl was ████████████████████████████;" had "███████████" about "███████████████████████" "█ ██████████████████████," and "███████████████;" and indicating "███████████" "███████████████"); [*id.* at Ex. 5, iControl 003945, 003964] (September 30, 2013, indicating that "████████████████████████████ ███████████"); [*id.* at Ex. 6, icontrol003976, 003994] (reflecting that as of ████ ████████████████████████" were potential ███████████); [*id.* at Ex. 7, icontrol003279, 003285] (reflecting that as of ███████████, "███████████████" "███████"); [*id.* at Ex. 8, icontrol003511, 003514] (reflecting that iControl's expectations for ███████████ included, "███████████████████"); [Ex. AB, icontrol003907, 003913] (referring to ongoing "███████████").

During this same time period, Lopez participated in several conference calls related to iControl's regulated commerce software. [Ex. D, Lopez 12/16/2016 Depo: Ex. 1]; [Ex. L,

Lopez 04/21/2017 Depo: Ex. 2]. On February 24, 2014, iControl paid Lopez to fly from California to Maryland for a "███████████████" to review and provide input on iControl's computer architecture, an element of software design which iControl's computer expert admitted can be confidential and proprietary information. [Ex. F, iControl Corp. Rep. Depo: 109:18-21]; [Ex. L, Lopez 04/21/2017 Depo: 266:18-25]; [Ex. B, Sanderson 10/16/2017 Depo: Exs. 37, 38]; [Ex. N, Depo of Malek: 118-121]. Eight people, including several iControl officers, attended the meeting, at which Lopez offered input. [Ex. L, Lopez 04/21/2017 Depo: 267:1-3]; [Ex. F, iControl Corp. Rep. Depo: 109:5-12, 280:6-18]; [Ex. B, Sanderson 10/16/2017 Depo: Ex. 38].

**C.    Lopez Taught iControl How To Solve Technical Issues Based On Fintech's Methods**

From at least October 31, 2013, through November of 2014, several sets of e-mail correspondence establish that Lopez was informing iControl how Fintech had overcome certain technical issues so that iControl could implement Fintech's features in iControl's software. iControl has admitted that the processes described in these e-mails were not in the public domain, despite the conclusory arguments to the contrary in iControl's motion for summary judgment. [Ex. F, iControl Corp. Rep. Depo: 63:10-16]. iControl argues that this correspondence discussed only "minor aspects of Fintech's system that do not qualify as trade secrets, and Fintech is unable to establish that the alleged trade secrets were utilized by iControl." [Doc. 68 at 14]. This conclusory assertion is unsupported by any citation to the record and directly contradicted by Joseph Kwo, Fintech's CTO. [Ex. O, Kwo Declaration].

For example, ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

On ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

In ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[redacted]

On [redacted]

In [redacted]

**D. iControl Developed Virtually All Of The Relevant Software After Engaging Lopez**

iControl argues that it "developed the software it utilizes to service alcohol clients and was competing with Fintech prior to Lopez working for iControl." [Doc. 68 at 10]. However, the argument addresses only two of the many trade secrets iControl misappropriated: Fintech's "ACH process" and "no title to funds" process." [*Id.* at 10]. Fintech's expert identifies at least nine other trade secrets that iControl misappropriated from May of 2015 through July of 2016, not including the e-mail correspondence detailed above in Section C. [Doc. 44-1 / S-47, Zatkovich Report: 13, 14, 16, 17, 19-30].

Almost all of iControl's regulated commerce software development occurred after it engaged Lopez as a contractor. *See generally* [*id.* at 12-14].

[REDACTED]

[REDACTED]

In 2015, iControl hired Lopez as Executive VP of Operations, and later Chief Operating Officer with oversight over all of iControl's business. [Ex. D, Lopez 12/13/2016: 46-53]. From January of 2016 to July of 2016, iControl released many new software features

similar or identical to ones Lopez developed or maintained at Fintech. [*Id.* at 89:2-25, 150:5-11, 152: 2-25, Exs. 10-15]; [Doc. 44-1 / S-47, Zatkovich Report: 14, 17, 26-41, 40, 86-88, 90-113, 116-143]. ███████████████████████████████████████████████

████████████████████████████████████████████████

     In about ███████████, Lopez ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

### E.    iControl's misdirection regarding Lopez's independent contractor period

Fintech did not learn that Lopez was performing any services for iControl until February 18, 2015, when iControl sent Fintech a "courtesy" letter stating that iControl had hired Lopez as its Executive Vice President of Operations. [Ex. R]. Conspicuously absent from the letter, however, was any mention of the fact that Lopez had already been performing services for iControl as a "████████████████" for ████████████. [Ex. F, iControl Corp. Rep. Depo: 95:2-14]; [Ex. G, Harris 01/23/2018 Depo: Ex. 2 at icontrol003789]. It was not until October 10, 2016, almost a year after Fintech sued Lopez, that Fintech first learned, from the deposition of Bill Harris, that Lopez had worked as an independent contractor for iControl for some eighteen months before he was hired in 2015. [*Id.* at 27:8-11]; [Ex. A, Jones 12/15/2016 Depo: 117-12-21]. Later that day, Keren confirmed having had e-mail communications with Lopez while Lopez was an independent

contractor. [Doc. 44-2 / S-47, Depo of Keren: 13]. The next day Noe confirmed that Lopez was signatory to a written independent contractor agreement. [Ex. K, Noe Depo: 17].

About a week later and based on this information, Fintech (in its litigation against Lopez) served a request/subpoena for production on Lopez and iControl to request Lopez's independent contractor agreements and all communications, including e-mails, between Lopez and iControl during his consulting period. [Ex. S at Ex. A]; [Ex. T at Ex. A]. (Incidentally, this was information that Fintech had already requested. [Ex. U at No. 14].) No documents were produced until almost two months later, on December 9, 2016. [Ex. S at 2]; [Ex. T at 2]. Lopez had no explanation for the untimeliness of the production, despite the fact that there were notations on the documents indicating that they were compiled on November 9, 2016. [Ex. D, Lopez 12/13/2016: 17]. In sum, iControl produced 293 pages, many missing attachments. With the exception of just two documents, all were dated in late 2014 and early 2015, over a year after iControl engaged Lopez as an independent contractor. The dearth of e-mails from Lopez's independent contractor period was conspicuous because at that time Lopez was working remotely in California while iControl was located in Maryland. [*Id.* at 5:21-6:11]; [Ex. L, Lopez 04/21/2017 Depo: 194:19-195:4]; [Ex. M, Harris 10/10/2016 Depo: 57:19-58:2]; [Ex. F, iControl Corp. Rep. Depo: 108:8-109:21]; [Ex. B, Sanderson 10/16/2017 Depo: Ex. 38]. Lopez had no explanation as to why no earlier e-mails were produced. [Ex. D, Lopez 12/13/2016 Depo: 28, 29]. Lopez also admitted that although he began sending iControl consulting invoices in 2013, he had no explanation as to why he did not produce any invoices prior to December 2014.[2] [*Id.* at 19, 26].

---

[2] iControl later produced an invoice Lopez submitted to iControl in July of 2013.

Significantly, the production did not include any of Lopez's independent contractor agreements or correspondence relating thereto. Lopez and iControl took the position that no such agreements existed. [Ex. S at 3, 4]; [Ex. T at 3, 4]. By letter dated December 15, 2016, Fintech reminded them of the deposition testimony to the contrary. After Lopez's deposition and in response to conciliation efforts, Lopez and iControl finally produced on January 3, 2017, an additional 220 pages of documents. The supplemental production contained no additional e-mails and only a single independent contractor agreement dated October 3, 2014, although Lopez admitted that he began working for iControl at least as early as 2013 and that he signed about two other independent contractor agreements, which iControl's corporate representative admitted it was standard operating procedure for iControl to maintain. [*Id.* at 3, 4]; [Ex. L, Lopez 04/21/2017 Depo: 193:15-25]; [Ex. F, iControl Corp. Rep.: 43]. Fintech's motion to compel resulted in an order recalling Lopez back for a second deposition. [Ex. V].

## ARGUMENT

### A.    Lopez's Confidentiality Agreements cover the misconduct at issue

iControl appears to argue that Lopez's September 2009 Contractor Confidentiality Agreement does not prohibit him from using or disclosing Fintech's "technical processes or software" because those terms are not specifically included in the agreement's definition of confidential information. [Doc. 68 at 2, 3]. However, the language of the agreement speaks for itself. [Doc, 1-1 at ¶¶ 1, 2]. Also, *Florida Statutes* § 542.335(1)(h) requires courts to construe ambiguous restrictive covenants "in favor of providing reasonable protection to all legitimate business interests," not against the drafter. This statutory provision applies to

confidentiality agreements. *See Lubkey v. CompuVac Sys., Inc.*, 787 So.2d 121, 124 (Fla. 2d DCA 2001).

iControl also argues that it did not tortiously interfere with Lopez's confidentiality agreements because the agreements were no longer in effect at the time of the alleged interference. [Doc. 68 at 22-25]. However, Lopez's September 2009 Confidentiality Agreement provided that it would be operative during "the term of the Contractor's engagement, *and following termination of the Contractor's engagement,* whether the Contractor's termination is voluntary or involuntary, or with or without cause . . . ." [Doc. 1-1 at ¶¶ 1, 2] (emphasis added). Nothing that has happened since then has voided that provision, even if, as iControl argues, Lopez failed to fulfill a condition precedent to his December 2009 offer of employment. [Doc. 68 at 24]. Also, Lopez admitted by e-mail to iControl that he was bound by a confidentiality agreement. [Doc. 68, Ex. I].

## B.  The DTSA And FUTSA Claims Are Not Time-Barred

iControl argues that Fintech's DTSA claim fails because iControl's misappropriation occurred before the enactment of the law on May 11, 2016. [Doc. 68 at 7, 8]. That is false. In ████████, iControl released the "████████████" and "████████████" features, which Zatkovich found are "████████████████████████████████████████████████

████"[3] [Doc. 44-1 / S-47, Zatkovich Report: 14, 15, 17, 24, 112, 113, 121-126, 135, 137,

---

[3] iControl also neglects to mention several other misappropriations that are actionable under DTSA. For example, Zatkovich found that "████████████" iControl released its "████████████████" feature, exhibiting "████████████████████████████████████████████" [Doc. 44-1 / S-47, Zatkovich Report: 14, 17, 27, 28, 110, 111]; [Ex. D, Lopez 12/13/2016 Depo: 152:1-25, Ex. 15]; [Ex. L, Lopez 04/21/2017 Depo: 197:13-24, 221:19-223:10, Ex. 27 at 6]. Lopez did not remember when it was first released, but it is first mentioned on iControl's website in a blog post by "iControl Marketing" on May 13, 2016. [*Id.* at 237:13-23]; [Ex. W at 76]; [Ex. X at 1]. On these facts, a reasonable jury could conclude that the feature was released on or after May 11, 2016.

14

138].   Nonetheless, iControl argues that the alleged misappropriation of those features occurred not when they were commercially released, but when they were first acquired and developed through Lopez, and any damages resulting from their subsequent commercial constitutes a "continuing misappropriation" that relates back to the date iControl first acquired the trade secrets, which "necessarily occurred prior to" May 11th.  [Doc. 68 at 8].

However, courts have held that even if a trade secret was acquired or developed prior to May 11th, a plaintiff may recover where, as here, disclosure to the public occurred after that date.  *Adams Arms, LLC v. Unified Weapon Sys., Inc.*, 2016 WL 5391394, at *5-*7 (M.D. Fla. Sept. 27, 2016).  *Avago Techs. U.S. Inc. v. Nanoprecision Prod., Inc*.  2017 WL 412524, at *8, *9 (N.D. Ca. Jan. 31, 2017) relied upon by iControl, is not to the contrary.  It merely held that if public disclosure of a trade secret first occurred prior to May 11, 2016, then repeated disclosures after that date would not render the misconduct actionable under DTSA.

iControl also argues that Fintech's claims under the FUTSA and DTSA are time-barred.  Under both FUTSA and DTSA, an action for misappropriation must be brought within three years after the misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered."  § 688.007, *Fla. Stat.* (2017); 18 U.S.C. § 1836(d) (2017).   Fintech filed the complaint against iControl on January 25, 2017, so its

---

In addition, iControl's "May 2016 Release Notes" announce the release of several functions including "███████" which Zatkovich found had the same "████████████" [Doc. 44-1 / S-47, Zatkovich Report: 14, 17, 29, 108-109]; [Ex. D, Lopez 12/13/2016 Depo: 149:23-151:24, Exs. 13, 14].  Lopez testified that he "d[id]n't know exactly when" in ██ iControl added these functions.  [*Id.* at 148:18-149:4, 149:23-150:11, Exs. 13, 14].  iControl has failed to meet its burden on summary judgment to show that these features were added before May 11, 2016.

misappropriation claims are timely if the misappropriation occurred, or should reasonably have been discovered, on or after January 25, 2014. iControl has the burden of showing untimeliness.

According to iControl, Fintech's cause of action accrued in April of 2013, as soon as "Fintech knew of iControl's entry into the marketplace as a competitor," because Fintech "was closely monitoring iControl's marketing and sales activities." [Doc. 68 at 9]. However, "'concerns and suspicions rather than knowledge' of trade secret misappropriation 'do not start the clock of the statute of limitations.'" *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 636 F. Supp. 2d 1283, 1293 (M.D. Fla. 2009), *aff'd*, 654 F.3d 1179 (11th Cir. 2011). There are disputed issues of fact as to whether Fintech should have known before January 25, 2014, that iControl misappropriated trade secrets. As discussed above, iControl had ███████████████████████████████████████, and ███████████████████████ ████████████████████████████████████████████████████████. As of ███████████████████, iControl was ███████████████████████," and ██████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████. [Ex. F, iControl Corp. Rep. Depo: 120:9-12].

As discussed above, it seems that iControl actively concealed Lopez's services as an independent contractor from 2013 to 2015. While Fintech might have suspected that iControl was using Fintech's trade secrets to develop its competing software, Fintech was not in a position to confirm that suspicion until obtaining the necessary facts. *See Telex Corp. v. Int'l Bus. Machines Corp.*, 510 F.2d 894, 912 (10th Cir. 1975) (trial court properly "held that

[statute of limitations] did not apply because Telex had fraudulently concealed the fact that they had misappropriated IBM's trade secrets."); *see also Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1258, 1266 (N.D. Cal. 1991) ("[a]nd while plaintiff believed that defendants would be compelled to use plaintiff's secrets to accomplish the product goals defendants had set, plaintiff was not in a position to eliminate the possibility that defendants could achieve their ends in some other way").

## C.  Disputed Issues Of Fact Exist As To Whether Fintech Disclosed Its Trade Secrets

iControl argues that Fintech disclosed and failed to protect the secrecy of its misappropriated information, but iControl's argument addresses only five of the numerous trade secrets at issue, including a vague reference to the "Fintech Process," which fails to identify any process at all.  [Doc. 68 at 11, 12].  Conspicuously absent from the list, for example, is any discussion of the Fintech's reconciliation or analytics features, or its pricing schedule.  [Ex. A, Jones 12/15/2016 Depo: 143:3-4] ("[w]e've never published, on the website, our prices").  iControl argues that Fintech disclosed its reports because "Fintech customers can utilize reports prepared by Fintech in any way they want because 'it's their own information'" and because Fintech described the reports in a webinar.  [Doc. 68 at 12]. However, it is not the reports that are trade secrets, but the software design that creates the reports.

## D.  Fintech Has Adequately Identified Its Trade Secrets

On November 6, 2017, iControl moved to compel a more complete answer to an interrogatory asking Fintech to identify the trade secrets that iControl misappropriated.  [Doc.

31 at 7-9]. iControl filed its Motion for Summary Judgment while the motion was pending, arguing that the lack of specificity in Fintech's answer is fatal to Fintech's trade secrets claim. [Doc. 68 at 12, 13] (*citing* Doc. 31-4 at 15, No. 6). However, shortly thereafter the Court denied the motion to compel as moot because Fintech agreed to serve a more complete answer to the interrogatory. [Doc. 75]. The amended interrogatory response is attached, and Fintech trusts it will provide the specificity iControl demands. [Ex. Y]. Zatkovich's expert report further describes the trade secrets in exhaustive detail, [Doc. 44-1 / S-47, Zatkovich Report at 12-16, 19-25], and additional trade secrets are clearly articulated in the 2013 and 2014 e-mail correspondence in which Lopez taught iControl how Fintech had overcome many technical issues.[4] [Ex. O, Kwo Declaration]; [Doc. 44-4 / S-47, Zatkovich Rebuttal Report: 11-14].

## E.  **There Is Record Evidence Of Misappropriation.**

iControl argues that Lopez did not retain Fintech documents containing trade secrets and instead maintained all of the trade secrets "in his head." [Doc. 68 at 14]. Even if that were true, it is irrelevant. A "defendant's reliance on memory is not a defense if the information is in fact a trade secret." RESTATEMENT (3D) OF UNFAIR COMPETITION, § 42 cmt. d (collecting cases). Regardless, Lopez admitted that he retained confidential Fintech e-mails, as discussed above.

---

[4]The only reason courts require a plaintiff to state its trade secrets with particularity is so that the court can determine whether the information satisfies the elements necessary to qualify as a trade secret, such as that the information "derives economic value from not being generally known" and is "the subject of [reasonable] efforts . . . to maintain its secrecy." *See, e.g.*, *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 22 F. Supp. 3d 1305, 1314 (N.D. Ga. 2014), *vacated on other grounds,* (Feb. 2, 2015). In the instant case, iControl seeks clarification of Fintech's trade secrets but does not argue that they fail to satisfy these elements. iControl does not even identify what the elements are.

iControl also argues that it is not liable because it did not "use a 'substantial portion of [Fintech's trade] secret.'" [Doc. 68 at 15] (*citing Penalty Kick Mgmt., Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003). This argument attempts to mislead by mischaracterizing the scope of the trade secrets at issue. This case cannot be reduced to a single trade secret consisting of Fintech's entire software platform; rather, there are multiple trade secrets consisting of the discrete software design elements and proprietary functions in Fintech's software. [Doc. 44-1 / S-47, Zatkovich Report: 12-16, 19-25]. *Cf. Ajaxo Inc. v. E*Trade Grp., Inc.*, 135 Cal. App. 4th 21, 53, 54 (2005) (E*Trade misappropriated "trade secrets" inherent in Ajaxo's stock-trading software, including "how it dealt with the difficult problem of the 'cache,' "'buffering the cookie,'" "'how to sustain the session,'" "'support for session specific cookies with HTTPclient,'" and "'infrastructure for data cleansing support'").

Lopez's advice, regardless of whether it adopted it into its final project, necessarily reduced iControl's research and development costs, which constitutes "use" for purposes of whether there was a misappropriation of trade secrets. *See, e.g. Telex Corp. v. Int'l Bus. Machines Corp.*, 510 F.2d 894, 911 n.10, 932 (10th Cir. 1975) (where it took IBM Corp. six years and $30,000,000 to develop the "Merlin project," and Telex Corp., "through the use of IBM trade secrets," was able to get more than halfway through its development of an equivalent technology in just eighteen months, the jury reasonably awarded IBM $10,000,000 representing Telex's research and development savings, even though "Telex did not complete its Merlin project"), *abrogation on other grounds by Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318

F.3d 1284, 1292 (11th Cir. 2003) (reduction in R&D costs constitutes use) (quoting RESTATEMENT (3D) OF UNFAIR COMPETITION § 40, cmt. c.).

iControl argues that the confidential software development techniques that Lopez learned while at Fintech do not qualify trade secrets because they are merely "expertise." [Doc. 68 at 15]. Each of the two cases cited by iControl in support of this proposition are inapposite because they address expertise that the defendant employee gained *prior* to his employment with the plaintiff.

iControl also argues that it is entitled to summary judgment because Fintech relies only on circumstantial evidence of misappropriation, such as the similarity of the parties' software and the speed with which iControl developed its product. [Doc. 68 at 15, 16]. That is false. As discussed above, there is direct evidence of misappropriation in Lopez's e-mail correspondence with Keren and others. Moreover, courts have found misappropriation based solely on circumstantial evidence with facts similar to those at bar. *See, e.g.*, *Ajaxo Inc. v. E*Trade Grp., Inc.*, 135 Cal. App. 4th 21, 50-54 (2005) (rejecting defendant's argument that solely circumstantial evidence of misappropriation is insufficient when confronted with direct evidence to the contrary, finding jury reasonably inferred misappropriation based on defendant's comparatively rapid software development and similarities between the parties' discrete software components); *see also*, RESTATEMENT (3D) OF UNFAIR COMPETITION, § 40 cmt. c (1995). *Purchasing Power*, on which iControl relies for the contrary proposition, is inapposite because in that case the plaintiff "d[id] not specifically identify the 'circumstantial evidence' upon which it relie[d]." 22 F. Supp. 3d 1305, 1317 (N.D. Ga. 2014).

**F.     The FDUTPA Claim Is Not Preempted By FUTSA**

iControl argues that Fintech's FDUTPA claim is barred to the extent it is "based on the same underlying factual allegations as the claim for relief under the FUTSA." [Doc. 68 at 16, 17] (*citing Fla. Stat. § 688.008(1) (2017)).* However, there are additional facts here beyond mere misappropriation, such as the fact that iControl sought out (and concealed its efforts) to engage the plaintiff's former employees in order to obtain the trade secrets at issue. "Such assertions are sufficient to materially distinguish [plaintiff]'s FDUTPA claim from the FUTSA claim." *See, e.g. XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F. Supp. 3d 1245, 1263 (S.D. Fla. 2016) (FDUTPA claim was not preempted by FUTSA where plaintiff alleged defendant solicited one of plaintiff's former contractors "for the purpose of using [its] knowledge of [plaintiff's] proprietary trade secrets to create a competing product," and the contractor obtained the trade secrets deceptively, "under the guise of routine training"); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1146–47 (M.D. Fla. 2007) (defendant's "hir[ing] away [plaintiff's employees] *en masse* and use them to misappropriate [Plaintiff]'s trade secrets would constitute unlawful and unfair or deceptive acts or practices under the broad reading Florida courts traditionally apply to FDUTPA").

In addition, misappropriation-based FDUTPA claims are not preempted to the extent that iControl can establish that the misconduct at issue does not rise to the level of theft of trade secrets, because FDUTPA prohibits the unauthorized use or disclosure of non-trade secret confidential information. *See, e.g. Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1192, 1193, ¶¶ 340-343 (S.D. Fla. 2008) (disclosure of "non-trade secret

confidential information" qualified as "unfair methods of competition" under the statute); *see also Procaps S.A. v. Patheon Inc.*, 36 F. Supp. 3d 1306, 1331 (S.D. Fla. 2014) (same). For example, Lopez admitted that ███████████████████████████████████

███████████████████████████████████████████████████████████████

████. [Ex. D, Lopez 12/13/2016 Depo: 166:22-171:25].

### G. Fintech Timely Sued On iControl's False Statements And Can Show Damages

Fintech's claims regarding iControl's false statements are timely because all of the statements were published within two years of January 2017, when Fintech filed its Complaint. *See* [Ex. A, Jones 12/15/2016 Depo: Ex. 24 at PPLOP000017-18] (███████ e-mail); [*id.* at 168:16-18, Ex. 24 at PPLOP000015, 16 (pages 38, 39 of the .pdf)] (██████ ██████████████); [*id.* at 169:20-25, Ex. 22 at No. 5] (explaining why the ██████ statements were false); [*id.* at 171:7-172:16, Ex. 24, PPLOP000019, 20 (pages 42, 43 of the .pdf)] (█████████████████████████████████████); [Ex. H, Jones 01/30/2018 Depo: 33:16-39:2, 39:10-41:6, Ex. 5] (███████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████); [Ex. F, iControl Corp. Rep. Depo: 256:6-257:11, Ex. 1 at icontrol000345] (██████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████[5]).

---

[5] [Jones I: Ex. 18 at 8].

iControl argues that its false statements are not actionable due to lack of evidence of damages, but the argument should be rejected. [Doc. 68 at 22]. "[A]lthough damages usually must be established with a reasonable degree of certainty," "[m]ere difficulty in ascertaining the amount of damage is not fatal," and "[m]athematical precision in fixing the exact amount is not required." *Miller v. Allstate Ins. Co.*, 573 So. 2d 24, 28 n.4 (Fla. 3d DCA 1990) (*quoting* C. McCormick, *Damages*, § 31, at 101-102 (1935)). Also, "[i]f the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference." *Id.*

In the instant case, Jones testified that "[c]urrent and former customers of Fintech have advised Fintech that they engaged iControl because of false or misleading statements made by iControl." [Doc. 31-4 at 18, No. 11, Response No. 2]. For example, as of March 1, 2017, Fintech calculated the precise monthly revenue ███████████████████████ ██████████████████████████████████, [Ex. H, Jones 01/30/2018 Depo: Ex. 21 at PPLOP006033]. In addition, Fintech calculated the ███████████████ ████████████████████████████████████████████████████████████████████ ████████████████████. [Ex. Z at PPLOP005492-5498, 5505, 5534-5537, 5540, 5546, 5554, 5555-5557, 5559, 55561-5569, 5575, 5581, 5584-5586, 5588-5593]; [Doc. 31-4 at 3, No. 1.].

Moreover, ███████████████████████████████████████████████████ ████████████████████. [Ex. H, Jones 01/30/2018 Depo: Ex. 11]. Although it is not clear exactly how many customers were deceived, it is clear that the "no title to funds" feature is very expensive for Fintech to offer, whereas iControl enjoyed for free the benefits of falsely

advertising such capability. ██████████████████████████████████████

██████████████████████████████████████. [*Id.* at 62:1-64:2, 83:3-85:7, Ex. 13].

### H.   iControl's Tortious Interference Is Not Privileged

iControl argues that Fintech's claim for tortious interference with business relationships fails because "[c]ompetition for business by a competitor is not actionable . . . unless the competitor is attempting to induce a customer to breach a contract that is not terminable at will."  [Doc. 6 at 22] (*quoting Advantage Digital Sys., Inc. v. Digital Imaging Servs., Inc.*, 870 So.2d 111, 116 (Fla. 2d DCA 2003).  In fact, a competitor has "a privilege of interference" to acquire the business for itself only if the "competitor proves that the interference *was lawful competition . . . .*" *Id.* at 255 (emphasis added).  A defendant cannot "resort to methods" that are illegal or "tortious in themselves" in order to interfere with a business relationship.  *Seminole Tribe of Florida v. Times Pub. Co.*, 780 So. 2d 310, 316 (Fla. 4th DCA 2001) (*citing Restatement (Second) of Torts* § 767 (1979)).

### I.   Fintech's Alleged Delay Is Irrelevant To Its Prayer For Permanent Injunctive Relief

iControl argues that Fintech is not entitled to a permanent injunction because Fintech delayed in bringing suit and did not move for a preliminary injunction after the complaint had been filed.  [Doc. 68 at 25].  In support, iControl cites *Menudo Int'l, LLC v. In Miami Prod., LLC*, 2017 WL 4919222 (S.D. Fla. Oct. 31, 2017), but the case is inapposite because it addressed delay only in the context of moving for a *preliminary* injunction, not a permanent injunction.  "The two instruments are distinct forms of equitable relief that have different prerequisites and serve entirely different purposes."  *Lermer Germany GmbH v. Lermer*

*Corp.*, 94 F.3d 1575, 1577 (Fed. Cir. 1996). A plaintiff's delay in filing suit is irrelevant where the plaintiff seeks a permanent as opposed to preliminary injunction. *800 Adept, Inc. v. Murex Sec., Ltd.*, 505 F. Supp. 2d 1327, 1336–37 (M.D. Fla. 2007) (collecting cases) (internal citations omitted). Courts have also rejected iControl's argument that a plaintiff's decision not to move for a preliminary injunction mitigates against granting a motion for a permanent injunction. *ePlus, Inc. v. Lawson Software, Inc.*, 2011 WL 2119410, at *13 (E.D. Va. May 23, 2011); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 827 F. Supp. 2d 641, 650 (E.D. Va. 2011), *aff'd in part, rev'd in part on other grounds*, 694 F.3d 1312 (Fed. Cir. 2012). Moreover, Fintech did not delay in the instant case. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (delay of two years in filing counter claim did not bar preliminary injunctive relief where counter-plaintiff "did not 'sit' on its rights" but filed complaints, etc.); *Brand Ventures, Inc. v. TAC5, LLC*, 2018 WL 691774, at *3 (M.D. Fla. Feb. 2, 2018) (five-month delay due to investigation of facts not fatal to injunction).

## CONCLUSION

For the above reasons, iControl's Motion for Summary Judgment should be denied.

Respectfully submitted,

/s/Richard C. McCrea, Jr.
Richard C. McCrea, Jr.
Florida Bar No. 351539
Email: mccrear@gtlaw.com
Catherine H. Molloy
Florida Bar No. 33500
Email: molloyk@gtlaw.com
Tristan J. Reiniers
Florida Bar No. 0119358
reinierst@gtlaw.com

**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Boulevard
Suite 1900
Tampa, Florida 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900
*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on March 29, 2018, I electronically filed the foregoing

with the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Robert L. Rocke, Esq.
rrocke@rmslegal.com
Jonathan B. Sbar, Esq.
jsbar@rmslegal.com
Andrea K. Holder, Esq.
aholder@rmslegal.com
ROCKE, McLEAN & SBAR, P.A.
2309 S. MacDill Avenue
Tampa, Florida 33629

/s/ Richard C. McCrea, Jr.
Attorney