Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF FLORIDA
 3                    TAMPA DIVISION
 4
 5  FINANCIAL INFORMATION        )
    TECHNOLOGIES, INC.,          )
 6                               )
          Plaintiff,             )
 7                               )  No. 8:15-CV-02784-JSM
           vs.                   )          -AEP
 8                               )
    MARK LOPEZ,                  )
 9                               )
                                 )
10          Defendant.           )
11  _____)
12
13
14
15          VIDEOTAPED DEPOSITION OF SAM MALEK, taken on
16  behalf of the Plaintiff, at 18800 MacArthur Boulevard,
17  Irvine, California, commencing at 8:32 a.m., Sunday,
18  March 19, 2017, before ZINA TALLANT, Certified Shorthand
19  Reporter No. 13341.
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2      FOR THE PLAINTIFF:
 3          GREENBERG TAURIG
            BY:  RICHARD C. McCREA, ESQ.
 4          101 East Kennedy Boulevard
            Suite 1900
 5          Tampa, Florida 33602
            813-318-5700
 6          813-318-5900 (Fax)
            mccrear@gtlaw.com
 7
 8      FOR THE DEFENDANT:
 9          ROCKE, McLEAN & SBAR
            BY:  JONATHAN B. SBAR, ESQ.
10          2309 South MacDill Avenue
            Tampa, Florida 33629
11          813-769-5600
            jsbar@rmslegal.com
12
13      ALSO PRESENT:
14          BRAD BISSEGGER - Videographer
            JOE KWO
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2
 3  WITNESS              EXAMINATION             PAGE
 4  SAM MALEK            BY MR. McCREA              6
 5
 6
 7                  E X H I B I T S
 8  PLAINTIFF'S                                  PAGE
 9  1 - Expert Reports                            15
10  2 - October Monthly Retainer,                 94
        LOPEZ 000657
11
12  3 - E-mail 11/7/13, LOPEZ 000661              95
13  4 - E-mail Chain 11/3/14,                     96
        LOPEZ 000685-687
14  5 - Independent Contractor Agreement          98
        LOPEZ 000889-895
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1      IRVINE, CALIFORNIA, SUNDAY, MARCH 19, 2017
 2          8:32 A.M.
 3
 4      THE VIDEOGRAPHER:  Good morning.  My name is
 5  Brad Bissegger.  I'm a videographer associated with
 6  Barkley Court Reporters.
 7      Today's date is March 19, 2017, and the time
 8  is 8:32 a.m.  This deposition is taking place at 18800
 9  MacArthur Boulevard, Irvine, California 92612, in the
10  matter of Financial Information Technologies, Inc.,
11  versus Mark Lopez.  The Case Number is
12  8:15-CV-02784-JSM-AEP.
13      This is the videotaped deposition of Sam Malek
14  being taken on behalf of the plaintiff.
15      Will counsel for the parties please identify
16  themselves for the record.
17      MR. McCREA:  May it please the court, Richard
18  McCrea.  I'm here on behalf of the plaintiff, Fintech.
19      MR. SBAR:  My name is John Sbar.  I'm here for
20  the defendant, Mark Lopez.
21      THE VIDEOGRAPHER:  Thank you.  The court
22  reporter may now swear in the witness.
23      (The oath was administered to the deponent,
24  SAM MALEK, as follows:)
25      THE REPORTER:  Do you solemnly state that the
```

**Page 6**

1 testimony you are about to give in this matter shall be
2 the truth, the whole truth, and nothing but the truth,
3 so help you God?
4     THE WITNESS: I do.
5     THE REPORTER: Thank you.
6
7        EXAMINATION
8 BY MR. McCREA:
9     Q Please state your full name and home address.
10     A Sam Malek, 17 Cervantes Court, Irvine,
11 California 92617.
12     Q And, Mr. Malek, is Sam your full given name or
13 is that a nickname?
14     A That's my full given name.
15     Q What do you do for a living?
16     A I'm a professor.
17     Q And where are you a professor?
18     A University of California, Irvine.
19     Q And what is your position there?
20     A I'm an associate professor in the school of
21 information and computer sciences.
22     Q Is that a tenured position?
23     A That's right. I'm tenured.
24     Q And do you also derive part of your income
25 from serving as an expert witness?

**Page 7**

1     A I do.
2     Q And what part of your -- what percentage of
3 your annual income is derived from your activities as an
4 expert witness?
5     A It really depends from year to year. I would
6 say 50 to 60 percent -- 50 to 60 percent.
7     Q I apologize. I don't hear as well as I used
8 to, I think. And occasionally, if you don't keep your
9 voice up, I may need you to repeat what you said.
10     A Sure.
11     Q Have you ever testified in any cases involving
12 credit card processing?
13     A I testified in a lot of cases involving
14 software, and I can't remember, off the top of my head,
15 if some of those software systems had payment processing
16 components or not. If you put my CV in front of me, I
17 can try to look at the cases and see if I can remember.
18     Q Okay. We'll do that in a minute. But off the
19 top of your head, can you identify any cases where you
20 have served as an expert testifying about credit card
21 processing?
22     A So credit card processing systems are software
23 systems, and a lot of cases -- I mean, almost all cases
24 that I have worked on have been about software systems.
25 And, you know, I think some of those software systems

**Page 8**

1 have had credit card processing.
2     Q My question is, can you identify for me the
3 cases in which you've testified as an expert that
4 involve credit card processing?
5     A As I said, I would have to -- I would have
6 to -- I would have to do it off memory. If you put my
7 CV in front of me, I can look --
8     Q Without looking at it, can you tell me?
9     A As I said, credit card processing systems are
10 software systems. And I've testified on lots of
11 software systems involving millions of lines of code,
12 and I expect some of those software systems have had
13 credit card processing elements in them.
14     Q Without looking at your CV, can you identify
15 any of those cases?
16     A I would have to speculate right now.
17     Q Okay. Have you served as an expert witness in
18 any case involving billing applications?
19     A Again, I worked on lots of cases, lots of
20 large-scale software systems, and a lot of those
21 software systems, I would assume, have had billing
22 components, especially if they are e-commerce types of
23 software systems.
24     Q Okay. Are you able to identify any of those
25 cases for me?

**Page 9**

1     A If you put my CV in front of me, I will.
2     Q How about without it?
3     A As I said, I've worked on many cases over the
4 past few years. I don't remember.
5     Q Okay. Have you served as an expert witness in
6 any case involving secured payment transaction systems?
7     A So software security is one of my areas of
8 research and expertise. And I have developed lots of
9 software systems that have had e-commerce -- that were
10 e-commerce systems and have had payment processing
11 capabilities. And when you develop a payment processing
12 capability, you always want it to be secure. Because if
13 it's insecure, then, you know, hackers and attackers can
14 exploit it.
15     Q Can you identify for me the cases in which you
16 have testified as an expert that involve secure payment
17 transaction systems?
18     A I would have to look at my CV.
19     Q In terms of your teaching, have you taught any
20 classes on electronic commerce?
21     A Yes.
22     Q And where?
23     A UC Irvine.
24     Q And what were the classes?
25     A The class is called intern applications

Page 10

1    engineering.  And it's basically a web programming
2    class, as part of which I teach about 150 students how
3    to design and develop e-commerce software systems.
4        Q    All right.  Have you taught any classes on
5    Microsoft .NET?
6        A    Microsoft .NET?
7        Q    Yes.
8        A    I have taught -- yes.  That's basically a
9    programming platform, it's a software development
10   platform, and it's a platform that I know, and I've
11   taught concepts from it in my classes before.
12       Q    Which classes?
13       A    So I -- before at UC -- before at UC Irvine, I
14   taught at George Mason University.  So that's -- I moved
15   to UC Irvine two years ago.  And over there I taught a
16   distributed software engineering class.  And .NET is a
17   type of technology.  It's a technology that is used for
18   enabling software components in a distributed system to
19   talk to each other.  And so as part of that class, I
20   covered the concepts from .NET.
21       Q    Have you taught any classes on MySQL server?
22       A    Yes.
23       Q    And what classes did you teach?
24       A    I've taught MySQL in lots of courses.  In the
25   intern application classes, intern applications

Page 11

1    engineering class at UCI that I mentioned earlier.  I
2    also cover MySQL database.
3        Q    Have you ever had any involvement in
4    developing software that utilizes EFT processes?
5        A    So EFT processes are a type of an application,
6    right, a type of functionality or feature that you
7    develop, and they're developed -- they can be developed
8    in different program languages, different technologies.
9    I don't -- you know, in universities you don't really go
10   and teach how to build specific features.  You teach the
11   concepts and technologies that enable anyone that takes
12   those classes to build them.  So obviously I know how to
13   build them because I teach how to build --
14       Q    So the answer to my question is?
15       A    The answer to your question is I -- we don't
16   teach EFT systems in universities.
17       Q    No.  Have you had any involvement in
18   developing software that utilizes EFT processing?
19       A    As I said, when I worked in the industry, I
20   developed e-commerce applications, e-commerce systems,
21   and some of those systems used electronic forms of
22   payment.
23       Q    All right.  And when was that?
24       A    So this was after my undergraduate degree,
25   when I worked in the industry for -- as a software

Page 12

1    engineer.
2        Q    And when was that, temporally?
3        A    It was in, I would say, 2001 -- 2001/2002.
4        Q    And for whom were you working at the time?
5        A    So after my bachelor's, I worked as a software
6    engineer at PricewaterhouseCoopers consulting, the big
7    accounting firm, and I worked in their IT consulting
8    group.  And as an IT consult we built software for
9    various clients of PricewaterhouseCoopers.
10       Q    And while you were working for
11   Pricewaterhouse, you developed software that utilized
12   EFT processes; is that correct?
13       A    So software doesn't use the processes, the
14   processes are implemented using software, yes.
15       Q    Okay.  But you developed software --
16       A    I --
17       Q    -- for EFT purposes?
18       A    I developed software that had electronic forms
19   of payment.
20       Q    And do you recall which customers or clients
21   of Pricewaterhouse you did that for?
22       A    I don't remember.  This is a long time ago.
23       Q    And do you have any prior experience with EFT
24   processes or systems in the regulating commerce
25   industry?

Page 13

1        A    Are you asking me if I've developed software
2    for regulated processing -- regulated --
3        Q    Yes.
4        A    I haven't personally developed software in
5    that domain.
6        Q    Have you written any articles on EFT
7    processes?
8        A    So, I mean, the articles that we write are on
9    research -- on challenging research topics.  I don't
10   think EFT processes are challenging processes.  I mean,
11   they are well known.  They've been around for a long
12   time.  So, no, I haven't written articles on EFT
13   processes.
14       Q    And you haven't written any articles on
15   payment transfer processes in the regulating commerce
16   industry, correct?
17       A    There are no research challenges with those
18   types of systems.  They were conventional software
19   systems, you know, that any undergraduate graduating
20   from our programs can develop, so I haven't written
21   articles about it.
22       Q    Were you ever involved in developing any
23   software processes that were considered proprietary and
24   confidential?
25       A    Yes.

Page 14

1    Q    And where was that?

2    A    At companies that I worked at.

3    Q    Which companies?

4    A    I'm assuming all the companies that I worked

5    at.

6    Q    And have you ever been bound to a proprietary

7    and confidential agreement -- to a confidentiality

8    agreement?

9    A    I believe so.  Yes.

10   Q    And did you abide by them?

11   A    Yes.

12   Q    How about -- you're involved with a lab, SEAL,

13   is that the acronym?

14   A    I'm the director of the lab, yes.

15   Q    Do you have individuals working at the lab?

16   A    I have Ph.D. students and postdocs.  Yes.

17   Q    Are those individuals required to sign

18   confidentiality agreements?

19   A    No.

20   Q    Have you ever had any prior contact with

21   anyone associated with iControl?

22   A    Have I had any contacts with people associated

23   with iControl?  Is that the question?

24   Q    Yes.

25   A    So as I stated in my report, I've had phone

Page 15

1    conversations with them since I was retained on the

2    case.  I didn't know -- I didn't work with them.  I

3    didn't talk to them before the case.

4    Q    Okay.  That was my question.  You hadn't had

5    any prior --

6    A    No.

7    Q    -- contact with anyone associated with

8    iControl before you were retained in this matter?

9    A    That's correct.  I didn't talk to anybody.

10   MR. McCREA: This will be Exhibit 1.

11   (Plaintiff's Exhibit 1 was marked for

12   identification by the Reporter and is

13   attached hereto.)

14   BY MR. McCREA:

15   Q    You made reference to your CV earlier?

16   A    Yes.

17   Q    And before we go any further, do you recognize

18   that document?

19   A    This is Mr. Zatkovich's -- I'm not sure if I'm

20   pronouncing his last name correctly -- report.

21   Q    Okay.  Well, it shouldn't be.  It should be

22   your report, which is part of this.  I'll make sure

23   that --

24   MR. McCREA: Do you have a copy of his report

25   that you can give him?

Page 16

1    MR. SBAR: I have a copy.  It's got my notes

2    on it, if you're not going to make it --

3    MR. McCREA: I won't make it an exhibit.

4    MR. SBAR: -- an exhibit, it's fine.

5    MR. McCREA: I have one that has my notes on

6    it, and I'd rather that he not see it.

7    MR. SBAR: Okay.  He can't read my handwriting

8    anyway.

9    MR. McCREA: Wait a minute.  I think -- I

10   think we're okay.  I just didn't look far enough.  They

11   didn't page this right.

12   BY MR. McCREA:

13   Q    Is what I wanted to ask you about.  And I

14   believe that all of this was an attachment to your

15   report.

16   A    Yeah.  Probably.

17   Q    I think they just didn't bind it correctly.

18   Let's just flip that around.  And I'm not sure what

19   exhibit that was, but --

20   A    I think it was one of the earlier exhibits,

21   but that's fine.

22   Q    We can fix that.  I think the record will be

23   clear as to what it was that was attached to your

24   report.

25   All right.  I have handed you what has been

Page 17

1    marked for identification as Exhibit 1.

2    Can you identify that for me?

3    A    Yes.  This is my expert report.

4    Q    Okay.  And you made reference to your CV --

5    A    Uh-huh.

6    Q    -- earlier in your testimony, and I'll ask you

7    about that in a moment.  But you -- you signed this

8    report on page 19.

9    A    That's right.

10   Q    You signed it on February 14, 2017?

11   A    That's right.

12   Q    And before you signed it, did you take steps

13   to ensure that everything in it was accurate?

14   A    Yes.  I wrote it, so it's accurate.

15   Q    And did that include reading it carefully to

16   make sure that there were no mistakes in it?

17   A    I tried to avoid mistakes.

18   Q    Okay.  Including typographical errors?

19   A    I did my best.

20   Q    In other words, did you proofread it?

21   A    Yes.

22   Q    Could you tell me, by looking at your CV,

23   where it indicates that you developed commercially

24   available e-commerce software that supports processing

25   financial transactions?

Page 18

1     A   Are you asking for my professional experience
2  as a software engineer?
3     Q  I'm asking where in your CV it says that.
4     A  Well --
5     MR. SBAR: Object to form.
6     THE WITNESS: I think I should clarify
7  something for you.
8     So I developed lots of different types of
9  software systems. I consider the software development
10  skills to be relevant. I have developed -- developed
11  software that flies the drones when I was at Boeing. I
12  have developed techniques for analyzing security of
13  mobile devices. I have developed e-commerce
14  applications multiple times in the industry. I don't
15  write the specific features that have developed these
16  software systems. I've listed in my CV the fact that I
17  worked at these companies. And if you want, I can go
18  through some of the work that I've done at these
19  companies, but --
20  BY MR. McCREA:
21     Q  No. I would like you to answer my question.
22     A  Well --
23     Q  Can you direct me to where your CV states, as
24  you testified, that you developed commercially available
25  e-commerce software that supports processing financial

Page 19

1  transactions?
2     MR. SBAR: Object to form.
3     THE WITNESS: I think I answered your
4  question. As I said, I haven't listed all the types of
5  processes and features of software systems that I have
6  developed.
7  BY MR. McCREA:
8     Q  Are you telling me it doesn't state that?
9  That's all I need to know.
10     A  So what I'm saying is that, for example, when
11  I worked at Boeing, I developed software that flies
12  drones. I didn't state that in my CV, and I haven't
13  stated the fact that I've developed software.
14     Q  Okay. You're saying that it does not state
15  that, correct?
16     A  It doesn't state that.
17     Q  Okay. And this is not the same CV that's
18  attached to your web page at the University of
19  California Irvine, correct?
20     A  I have slightly different versions of my CVs.
21     Q  Right. And this CV is one that is geared more
22  towards issues in this case, is it not?
23     A  No. This is a CV that I use for my litigation
24  consulting that actually lists my litigation consulting
25  experience. I usually don't make that CV available on

Page 20

1  my website because my website is mainly for academic
2  purposes. And other professors and academics don't
3  necessarily care about my litigation experience.
4     Q  Okay. Take a look at page 5 of your report.
5     A  Okay.
6     Q  All right. And it says "Information
7  Considered."
8     A  Okay.
9     Q  Is that a complete listing of the information
10  that you considered in rendering your opinion in this
11  matter?
12     A  So I've also considered the citations that are
13  found in my report in terms of the footnotes that you
14  see, in addition to my general knowledge of computer
15  science software engineering and various companies I've
16  worked at.
17     Q  Okay. Well, specifically with respect to the
18  depositions that are listed on pages 5 and 6, did you
19  review any other depositions?
20     A  I believe these are the depositions that I
21  reviewed.
22     Q  Did you review any other depositions?
23     A  I don't recollect. No.
24     Q  Did you review the deposition of William
25  Harris?

Page 21

1     A  I don't believe so.
2     Q  Did you review the deposition of Robert Noe,
3  N-o-e?
4     A  I don't believe so.
5     Q  And do you know whether depositions have been
6  taken in this case other than the ones that are listed
7  by you in your report?
8     A  No. I don't know what other depositions have
9  been taken.
10     Q  Was it your decision to select the depositions
11  that you reviewed in connection with your report or was
12  it somebody else's decision?
13     A  I believe these were depositions that my
14  counsel found to be relevant to the -- to my -- my
15  tasks, which was look at the, you know, from more of a
16  software engineering standpoint.
17     Q  So these were the depositions that defendant's
18  counsel selected for you to review?
19     A  These were the ones that were provided to me.
20     Q  The ones that were selected by defendant's
21  counsel for you to review; is that correct?
22     MR. SBAR: Object to form.
23     THE WITNESS: I don't know what processes
24  they're going through to provide these to me. But these
25  are -- these are the documents that were provided to me.

Page 22

1    BY MR. McCREA:
2        Q   All right.  And who provided them to you?
3        A   I think it was either Mr. Sbar or one of his
4    associates.
5        Q   And the indication that I got from your report
6    was that you also interviewed some iControl employees?
7        A   That's right.  I had conversations with them.
8        Q   And which iControl employees did you have
9    conversations with?
10       A   I thought I listed that in my report.  Okay.
11   It's on the -- it's on the section 1.1.
12       Q   Okay.  It's on page 4?
13       A   Page 4 below the bullet points there.  So I
14   talked to Mark Lopez, Gilad Keren, and Andrew Sanderson.
15       Q   Okay.  You may want to spell Gilad Keren for
16   the court reporter.
17       A   Oh, Gilad, G-i-l-a-d, Keren is K-e-r-e-n.
18       Q   And did you speak to any iControl employees
19   other than Mr. Lopez, Mr. Keren, and Mr. Sanderson?
20       A   I don't believe so.
21       Q   And was it you who determined, or was it
22   someone else, which iControl employee you should speak
23   with?
24       A   I believe it was -- based on what I can
25   recollect, it was -- it was counsel that thought I

Page 23

1    should talk to these folks.  Mark Lopez, because, you
2    know, he's obviously involved in the case.  And I think
3    Gilad Keren -- I can't remember.  But Gilad Keren is the
4    technical guy there.  He's, I believe, the, you know,
5    technical officer there, and so it made sense to talk to
6    him.
7        Q   Okay.  But you did not make the determination
8    as to which employees you should interview, correct?
9        A   I can't precisely recollect.  I assume these
10   were identified by counsel, and I may have -- as I
11   talked to some of these, I may have identified other
12   people that I should talk to.  I can't recollect
13   exactly.
14       Q   And what did you learn from Mr. Lopez,
15   Mr. Sanderson, and Mr. Keren about the services that
16   Mr. Lopez performed for iControl as an independent
17   contractor between the fall of 2013 and March of 2015
18   when he became an employee of iControl?
19       A   What specific duties he performed as a
20   contractor?
21       Q   What duties?  What services?  What value?
22   What did he do?
23       A   I don't think -- I don't remember if he
24   actually talked about that.
25       Q   Well, do you remember or not?

Page 24

1        A   I remember reading something in his deposition
2    about that, and I remember he talked about it in his
3    deposition.  I can't recollect exactly what he said.
4        Q   Let's be clear here, sir.  Did you have any
5    conversation with Mr. Lopez, Mr. Keren, or Mr. Sanderson
6    about the services that Mr. Lopez performed for iControl
7    as an independent contractor between the fall of 2013
8    and March of 2015?
9        A   I don't remember.  I don't believe that was
10   the subject of something that we talked about.  I don't
11   remember.
12       Q   Did you have any conversation with Mr. Keren
13   about Mr. Lopez's involvement in any development of
14   iControl's software or database in order to facilitate
15   business in the regulated commerce industry?
16       A   So, I don't remember everything that we talked
17   about, but what I do remember vividly is the fact that
18   iControl has been providing software capabilities, you
19   know, the financial transaction capabilities in the
20   regulated industry before -- before Mr. Mark Lopez
21   was -- was even contacted.
22           So I understand that as of March 2013, several
23   months before the first contact with Mark Lopez was
24   made, Mr. Gilad [sic] pointed out that, you know,
25   they -- they have -- they were providing these financial

Page 25

1    transaction capabilities in the regulated domain.
2        Q   Would you answer my question, please.
3        A   I thought I did.
4        Q   You did not.
5            MR. SBAR:  Object to form.
6        BY MR. McCREA:
7        Q   Do you want me to repeat it?
8        A   Sure.
9        Q   What did Mr. Keren tell you about Mr. Lopez's
10   involvement in any development of iControl's software or
11   database in order to facilitate business in the
12   regulated commerce industry?
13       A   Well, I answered your question.  Because as I
14   said, they were providing the software services before
15   Mr. Mark Lopez was -- was -- was even in contact with
16   iControl.  So, you know, indirectly I take that to mean
17   that he was not involved in the development of the
18   software.
19       Q   I understand you're inferring that.  My
20   question is, did you have any discussion with Mr. Keren
21   about what services Mr. Lopez provided in that respect?
22           MR. SBAR:  Object to form.
23           THE WITNESS:  After he -- you know, after he
24   was actually in contact with iControl?
25   ///

Page 26

BY MR. McCREA:

1  BY MR. McCREA:
2  Q  Yes.
3  A  I don't remember specifics of what we talked
4  about.
5  Q  Do you recall whether you asked and were given
6  any information about that?
7  A  I don't recollect my conversations. It was a
8  few months ago.
9  Q  Were you provided any documents to review
10  regarding the period of time that Mr. Lopez was
11  providing consulting services to iControl?
12  A  Sorry. Can you repeat the question.
13  Q  Yes. Were you provided any documents,
14  e-mails, transactional documents, any documents
15  regarding the period of time when Mr. Lopez was
16  providing consulting services to iControl?
17  A  No. I don't believe so.
18  Q  Did you ask for them?
19  A  No, I didn't.
20  Q  And your report makes reference to the "Beer
21  Industry Electronic Commerce Coalition White Paper" in
22  2007. In fact, I think it's attached as an exhibit.
23  A  That's right.
24  Q  Where did you obtain that?
25  A  We obtained that from a website.

Page 27

1  Q  Well, you say "we." Did you download them or
2  did someone provide them who had downloaded them?
3  A  No. I think I downloaded them. Maybe me and
4  my associate, Dr. Hashmi, may have downloaded them
5  separately, but we found it online.
6  Q  Okay. Have you reviewed any e-mails to or
7  from Mr. Lopez regarding the services that he has
8  provided to iControl?
9  A  Nothing beyond what has been listed in my
10  report and was included in the -- you know, everything
11  that I essentially reviewed and relied on is in my
12  report, basically. So, no, I don't believe I have any
13  additional e-mails.
14  Q  Okay. And nor did you request them, correct?
15  A  I don't believe I requested them.
16  Q  And am I correct in understanding that you
17  have not spoken with anyone at Fintech?
18  A  That's correct.
19  Q  Take a look at page 7 of your report --
20  A  Okay.
21  Q  -- where it says, "No Title to Funds."
22  A  That's right.
23  Q  And you state that the no title to funds is
24  inherent in all ACH transactions?
25  A  Right.

Page 28

1  Q  What is no title to funds?
2  A  Well, my understanding is basically a
3  situation where an entity doesn't take title to funds.
4  Q  All right. Is there any difference between
5  ACH and no title to funds?
6  A  I believe, essentially, if you're using ACH
7  using the processes that are described there, between
8  two financial institutions, that's a no title to funds
9  type of a transaction.
10  Q  Okay. Is that a way of telling me that you
11  don't think there's any difference between the two?
12  A  I don't believe there are differences.
13  Q  All right. And are you aware of any other
14  industry that has a payment requirement of no title to
15  funds?
16  MR. SBAR: Object to form.
17  THE WITNESS: I can't -- I can't claim that I
18  know all the payment processing requirements of all
19  industries, so I don't know.
20  BY MR. McCREA:
21  Q  Okay. I'm not asking you to know them all.
22  I'm just asking whether you can identify any other
23  industry?
24  A  No.
25  Q  And do you know whether iControl's scan-based

Page 29

1  trading model takes title to funds?
2  A  I don't know that.
3  Q  Do you know whether no title to funds were
4  used by iControl in its early transactions with Spartan?
5  A  I'm assuming he did because -- because it
6  was -- it was -- it's dealing with alcohol and alcohol
7  is a regulated industry.
8  Q  Do you know?
9  A  Based on assumption that it's an alcohol --
10  it's an alcohol transaction, and assuming that it's, you
11  know -- I mean, yeah. It's based on that assumption. I
12  don't -- I haven't examined the software myself.
13  Q  Okay. Mr. Harris, who was the COO at the
14  time, testified at page 53 of his deposition, that no
15  title to funds were used with Spartan.
16  Do you have any reason to dispute that?
17  A  So you're saying that iControl's COO testified
18  that iControl used no title to funds in their
19  transactions with Spartan as of March 2015?
20  Q  Did not use no titles. Do you have any reason
21  to dispute that?
22  A  I haven't reviewed his deposition, and I don't
23  know what his basis is of the deposition.
24  Q  And do you have any basis on which you can
25  explain why that's inaccurate?

Page 30

1    A   I don't have an opinion on it.
2    Q   Was iControl's scan-based trading processes an
3  ACH process?
4    A   I don't know, as of the time when they were
5  providing these services, whether they were ACH
6  processes or not.
7    Q   When you say at these times, when are you
8  referring to?
9    A   Well, I mean, I don't know if it's an ACH
10 process.
11   Q   What evidence do you have that iControl was
12 using no title of fund transfers prior to Mr. Lopez's
13 association with iControl?
14   A   Can you repeat the question?
15   Q   Yes.  What evidence, what facts do you have
16 that iControl was using no title to fund transfers prior
17 to Mr. Lopez's association with iControl?
18       MR. SBAR: Object to form.
19       THE WITNESS: Is that with respect to an
20 opinion that I've provided?
21 BY MR. McCREA:
22   Q   I'm sorry?
23   A   Is that an opinion I provided in the case?
24   Q   It's a question for you that I want you to
25 answer.

Page 31

1        MR. SBAR: Same objection.
2        THE WITNESS: You're asking me a question that
3  is not in one of the opinions that I've provided.
4  BY MR. McCREA:
5    Q   That may be.  But if you're on the stand
6  during trial, I can ask you anything.  I'm not limited
7  to your expert opinion.
8    A   Sure.  And my answer is I don't have an
9  opinion on that.
10   Q   Do you know?
11   A   I don't know.
12   Q   And if I wanted to start a business competing
13 with Fintech that implements a no title to funds
14 application in the regulated commerce industry, where
15 would I go to learn that?
16   A   If you're trying to create an -- I'm sorry.
17 What is the question again?
18   Q   Yes.  If I wanted to start a competing
19 business with Fintech that implemented a no title to
20 funds application --
21   A   Uh-huh.
22   Q   -- in the regulated commerce industry, where
23 would I go to learn that?
24   A   You would go to UCI and take one of my
25 classes.

Page 32

1    Q   Okay.  And so you teach no title to funds?
2    A   I teach the technologies that they need to
3  build any kind of software, including that.
4    Q   But my question, sir, is do you teach students
5  how they can implement no title to funds applications,
6  specifically in the regulated commerce industry?
7    A   I teach them software development.  Once you
8  know software development, you can develop any kind of
9  software.
10   Q   Answer my question.
11   A   As I said, they would go take my class at
12 UCI.
13   Q   Do you teach students how to implement no
14 title to funds processes in the regulated commerce
15 industry?
16   A   I teach them software development.
17   Q   I understand that, but that's not my question.
18   A   Well --
19       MR. SBAR: Object to form.
20       THE WITNESS: -- it's kind of like this.  Let
21 me put it this way.  Let's say I'm teaching carpentry,
22 right, and then you're asking me can I build a door even
23 though you're teaching them how to build a table in the
24 class.  And my answer would be yes because once you
25 learn the basics of carpentry, then you can build any

Page 33

1  wood structure.
2  BY MR. McCREA:
3    Q   But you would under- -- you would understand
4  that taking a class in oil-based painting doesn't mean
5  that you know how to be an impressionist painter, does
6  it?
7    A   That's why we offer many classes in computer
8  science at UCI.  And so the specific class that I teach,
9  which teaches you how to build these types of
10 internet-based web-based applications is what we need.
11   Q   Okay.  Well, let's go back to my question.  I
12 understand the generalities that you're offering me.
13 I'm asking a very specific question.
14   A   Uh-huh.
15   Q   Whether or not you can direct me to how I
16 would learn setting up a competing business competing
17 with Fintech to implement a no title to funds
18 application in the regulated commerce industry?
19   A   I mean, as I said, you would take my class,
20 and then you would go to your office, and you would call
21 your state representatives, identify what are the
22 requirements for the specific types of processing that
23 you have to do, and you implement them in the software.
24   Q   Do you know when it was that iControl first
25 implemented no title to funds transfers?

Page 34

1      MR. SBAR: Object to form.
2      MR. McCREA: What's the objection?
3      MR. SBAR: I think it assumes a fact that's
4  not in evidence. I don't know that you've established
5  that iControl utilized no title to funds. In fact, I
6  think it's your client's position in the litigation that
7  it doesn't.
8      MR. McCREA: Okay.
9      THE WITNESS: Can you repeat the question?
10 BY MR. McCREA:
11     Q   What is your understanding of when it was that
12 iControl first implemented no title to funds transfers?
13     MR. SBAR: Same objection.
14     THE WITNESS: Your question is when did
15 iControl first implement the no title to funds
16 capability?
17 BY MR. McCREA:
18     Q   Yes.
19     A   I don't have the dates off the top of my head.
20 If it's in my report, you can point me to it and I can
21 review it.
22     Q   And if it's not in your report?
23     A   Then I just don't remember it right now.
24     Q   You indicate in your report that PayPal
25 provides no title to funds services to its patrons?

Page 35

1      A   So I'm saying PayPal offers ACH payment
2  services to various retailers.
3      Q   My question is, does PayPal take title to
4  funds or not?
5      A   Well, as I said, I think ACH payment services
6  are -- are, you know, are a type of no title to funds
7  type of transaction.
8      Q   All right. Does PayPal take title to funds?
9      A   I believe so.
10     Q   Okay. In fact, if you read its services
11 agreement, it makes it clear that it earns interest on
12 monies that it takes in, correct?
13     A   I haven't read the document before.
14     Q   You would agree with me without reading it
15 that if it says it earns interest, it has title to those
16 funds?
17     A   I don't know. I don't have an opinion.
18     Q   And do you consider PayPal's ACH system within
19 a public domain?
20     A   What do you mean whether it's in a public
21 domain? I don't understand.
22     Q   Well, you've used those terms with respect to
23 Fintech processes. You say they're within the public
24 domain. So I want to know whether or not you consider
25 PayPal's ACH system within the public domain?

Page 36

1      A   Oh, okay. In terms of the confidentiality
2  aspect, yes, I think it's public knowledge.
3      Q   Okay. So PayPal discloses to its competitors
4  processes and the designs by which it effectuates
5  payments; is that correct?
6      A   Well, I don't know the details of how -- you
7  know, what are the Pay -- what PayPal makes available to
8  the world. I mean, this is not -- you know, this was
9  not a critical part of the case I reviewed. But what I
10 do know is that Fintech makes it very clear on their
11 website that they don't take title to funds.
12     Q   Okay. But I'm asking a different question.
13 I'm asking about PayPal, which you invoked in your
14 report. I did not.
15     A   I invoked it as an example.
16     Q   Right. And that's why I'm asking about it.
17     A   You're asking me very detailed questions
18 about, you know, what information PayPal keeps
19 confidential and what they make publicly available, and
20 that's just not something that I focused on.
21     Q   Well, you testified under oath here today that
22 PayPal's ACH system is in the public domain.
23         And my question was, is it your testimony the
24 processes and designs by which it effectuates those
25 payment transfers are also in the public domain, or are

Page 37

1  they proprietary and confidential to PayPal?
2      A   Oh --
3      MR. SBAR: Object to form.
4      THE WITNESS: So my opinion here essentially
5  is just pointing to a website where it says, basically,
6  PayPal offers ACH payment services. I haven't reviewed
7  their design or their source code. And so it is
8  possible that their design and source code is
9  confidential. I just don't know.
10 BY MR. McCREA:
11     Q   You're not able to say?
12     A   I didn't review their design and source code.
13 Yes.
14     Q   Do you know whether the scan-based trading
15 model is lawful in the regulated commerce industry?
16     A   I don't know.
17     Q   And we talked earlier about the white paper
18 from 2007 that's attached to your report that you
19 located or downloaded.
20         Does that white paper indicate anywhere which
21 states authorize EFT as an acceptable form of payment?
22     A   I don't remember. I have to take a look at it
23 again.
24     Q   And Fintech is expressly mentioned in that
25 report, is it not?

Page 38

```
1        A  I don't remember.
2        Q  In any event, iControl is not mentioned in the
3    report.
4        A  I don't remember the details of that report.
5        Q  Do you have any explanation for why, if that
6    white paper published in 2007 was enlightening and
7    informative as to electronic funds transfers in the
8    regulated commerce industry, it took another eight years
9    for a competitor to get into the business?
10       A  I would have to speculate.  I mean, maybe it's
11   not -- maybe it's not a profitable domain to be in.
12   There could be many reasons for it.
13       Q  Well, speculation aside, do you know?
14       A  No.  I don't know.
15           MR. SBAR:  Object to form.
16   BY MR. McCREA:
17       Q  And does that white paper address the steps
18   that a third-party vendor like iControl must adhere to?
19       A  I would have to review the report on that.
20       Q  So you don't know whether it describes the
21   standards that a third-party vendor must adhere to?
22       A  If you want, I can review the report and
23   answer these specific questions.
24       Q  Go ahead.
25       A  I'll have to find it first.  Can you tell me
```

Page 39

```
1    where it is?
2            MR. SBAR:  You know, in mine it's in Exhibit
3    H.
4            MR. McCREA:  I was going to say Exhibit H.
5            MR. SBAR:  Yeah.  Mine is at the very end.
6            THE WITNESS:  But mine is not even marked
7    like --
8            MR. SBAR:  But yeah --
9            THE WITNESS:  -- maybe it is.  I don't know.
10           MR. McCREA:  The trouble I put --
11           MR. SBAR:  You changed it.
12           MR. McCREA:  I put Ivan's report at the end.
13           MR. SBAR:  Okay.
14           MR. McCREA:  That's not going to help him.
15           MR. SBAR:  Okay.
16           MR. McCREA:  Do you want to go off the record
17   and take a moment to locate it?
18           THE WITNESS:  Sure.
19           MR. McCREA:  Things happen faster --
20           THE VIDEOGRAPHER:  We're off -- we're off the
21   record at 9:16 a.m.
22           (Break in the proceedings.)
23           THE VIDEOGRAPHER:  We are back on the record
24   at 9:22 a.m.
25   ///
```

Page 40

```
1    BY MR. McCREA:
2        Q  Do you remember what I had asked you?
3        A  Can you remind me what is the question?
4        Q  Yes.  Certainly.
5            Does that white paper describe the standards
6    that a third-party vendor like iControl must adhere to?
7            MR. SBAR:  Object to form.
8            THE WITNESS:  So I think so.  I think to some
9    extent it does.
10   BY MR. McCREA:
11       Q  Okay.  Could you direct me to that?
12       A  So, I mean, the entire white paper talks about
13   various requirements, you know, what distributors have
14   to do with -- retailers have to do.  But on page 7,
15   section 3, there's a section called "Services from
16   Third-Party Providers."
17       Q  Okay.  Anything else?
18       A  Well, that section goes on for about a couple
19   pages.  And, you know, I would have to review it more
20   carefully, but it seems to me it is providing, you know,
21   discussions of how the system works in credit
22   prohibition states and credit states and so on.
23       Q  Would a no title to funds system require a
24   different code from an application that allows customers
25   to deposit funds in an account with a third-party
```

Page 41

```
1    vendor?
2        A  I'm not sure if I understand the question.
3    What do you mean by "code"?
4        Q  Software code.
5        A  I'm not sure.  That's not a term of art.
6        Q  Okay.  Well, would it require some sort of
7    different -- you're saying software code, source code,
8    would that help you?
9        A  Oh, source code?
10       Q  Yes.
11       A  I thought you meant, like, a code, like a
12   number, for example.
13       Q  No.
14       A  So your question is does -- does performing
15   these functions require source code?
16       Q  No.  Would a no title to funds transfer system
17   require a different source code from an application that
18   allows customers to deposit funds directly into an
19   account with a third-party vendor?
20       A  So you're asking me if the source code that
21   would perform the EFT for a third party would be
22   different from the source code that doesn't do to a
23   third-party, for example, distributor retailer?
24       Q  Right.
25       A  I think the crux of it is going to be the
```

Page 42

1   same.  The core of it, there might be some differences.
2   I would have to think about it more carefully.
3       Q   So you're not able to say?
4       A   I mean, what I'm able to say is that the core
5   of the capability is going to be the same.
6       Q   That may be.  But my question is would it
7   require some further development of a source code or new
8   source code in order to move from one system to the
9   other?
10      A   It might be.  I mean, it might -- it's
11  plausible that it will require some changes to the
12  source code.
13      Q   Do you know whether iControl engaged in any
14  EFT transactions with a distributor that was involved
15  with retailers in multiple states prior to 2015?
16      A   You're asking whether iControl was engaged
17  with multiple clients?
18      Q   No.  Whether it engaged in any EFT
19  transactions with a distributor that had retailers in
20  multiple states prior to 2015?
21      A   I don't know that.
22      Q   And do you see on page 10 it says, "Fairness
23  Guidelines for Establishing EFT"?
24      A   Okay.
25      Q   Does it indicate that each trading partner

Page 43

1   should bear its own cost for the transaction, unless
2   otherwise provided for by state statute or regulation?
3       A   Where are you?
4       Q   It's hard for me to do it upside down, but --
5       A   Okay.  That's right.
6       Q   All right.  And prior to 2015, are you aware
7   of any application that removed the costs from the
8   retailer side from electronic transactions as it relates
9   to the purchase of alcohol beverages?
10      A   I don't know.
11      Q   And is it your testimony that the specific
12  processes that Fintech uses to process transactions with
13  no title to funds is in the public domain?
14      A   Can you repeat the question?
15      Q   Yes.  Is it your testimony that the specific
16  processes that Fintech uses to process transactions with
17  no title to funds is in the public domain?
18      A   The specific processes that Fintech uses?
19      Q   Yes.
20      A   Like, the fact, like, you know -- you know,
21  the fact that they're saying that they take no title to
22  funds, for example?
23      Q   No.  That's a concept.  I'm talking about how
24  it works.  The difference between seeing the face of the
25  clock and understanding what's going on behind the face

Page 44

1   of the clock.
2       A   You mean like source code?
3       Q   Source code or any other information about how
4   it works, its processes, the design, that sort of thing.
5       A   I mean, you use the word processes, and I
6   usually think about -- not software.  I usually think
7   about business processes when you say processes.  So if
8   you mean source code, you know, I -- I -- you know, I
9   don't -- I don't think their source code is publicly
10  available, if that's what you're asking me.
11      Q   And aside from source code, is it your
12  testimony that anything other than the fact that Fintech
13  has a process of processing transactions using no title
14  to funds is in the public domain with respect to that
15  way of processing funds?
16      MR. SBAR:  Object to form.
17      THE WITNESS:  Again, I think we're getting a
18  little -- I'm getting -- at least I'm getting confused
19  with what you mean by "processes."
20  BY MR. McCREA:
21      Q   System.  Design.
22      A   So source code?
23      Q   Any other way.  That's what I'm asking.  We've
24  already covered the source code.
25      A   Based on my understanding, their source code

Page 45

1   is not publicly available.  That's -- based on my
2   limited understanding, their source code is not
3   available.  At least they are claiming it's
4   confidential.  I wouldn't know.  You know, that was not
5   something -- I didn't have access to their source code.
6   I didn't do an analysis of that.  Beyond that -- beyond
7   the kinds of business transactions that they do, my
8   understanding is that it's public.  So they are
9   advertising no title to funds and things like that on
10  the website.
11      Q   The fact that it engages in that type of
12  transactions in the public domain, correct?
13      A   Right.
14      Q   How it does it internally is not in the public
15  domain?
16      A   The implementation in the software is -- my
17  understanding -- is not in the public domain, but I
18  haven't -- again, I -- it's not something that I
19  investigated or opined on.
20      Q   Okay.  We'll get to that.  Do you know what
21  Fintech's distributor EFT is?
22      A   Yes.  Based on what I have reviewed in the
23  documents.
24      Q   All right.  What is your understanding of what
25  it is and how it works?

Page 46

1    A   So distributor EFT basically, in sort of
2  common terms, is a situation where the distributor pays
3  the fees, pays the fees of the retailer, basically.
4    Q   And do you know how that works internally at
5  Fintech?
6    A   In terms of, you mean, software?  In terms of
7  the source code?
8    Q   Or in any other way.  I mean, I'm not sure I'm
9  willing to agree with you that source code is the extent
10  of internal information.  But since you state that out,
11  I'll go with you on that.
12    A   I mean, I'm not really sure what you're
13  asking.  There's probably some source code that
14  facilitates that.  I agree with that.
15    Q   And you indicate in your report that the DEFT
16  model is common across the industry?
17    A   I mean, this idea of, you know, one party
18  providing or paying for the -- for the fees of the other
19  party, I think, is just -- it's common knowledge, common
20  concept of the transaction.
21    Q   Okay.  The concept of the transaction as
22  opposed to how to effectuate the transaction, correct?
23    A   I mean, how -- the how part of it is also
24  really simple if you ask me.  I mean, it's basically
25  just, you know, let's say -- let's say a fee is -- for a

Page 47

1  transaction is supposed to be 5 bucks.  And you're
2  saying that, well, either we can have the distributor
3  and retailer pay half of this 5 bucks or we can have the
4  distributor pay the entire thing.  And so I don't really
5  see how even how part of this is not obvious.
6    Q   Okay.  Just to be clear, is it your testimony
7  that the manner in which Fintech internally effectuates
8  distributor EFT is in the public domain?
9    A   I don't think the source code -- I don't
10  believe the source code is in the public domain, if
11  that's what you're asking me.  I don't think they're
12  making their source code available on the website.  But,
13  you know, in terms of what it is as a concept and in
14  terms of what it takes to implement it, like I think those
15  are common knowledge.  But I don't think their specific
16  source code is in the public domain.
17    Q   Do you have an understanding of what the fair
18  share rule is?
19    A   I don't remember.  No.
20    Q   Do you know whether or not in the beverage
21  alcohol industry a distributor can pay for a retailer?
22    A   Well, let me ask you, in this paragraph that
23  you were pointing to on page 10 of this white paper, it
24  says it's allowed provided by the state statute and
25  local regulation.

Page 48

1    Q   And other than reading that, do you have any
2  independent knowledge of that issue?
3    A   No.  Not that I can think of right now.
4    Q   Did you review iControl's service disclosure?
5    A   What do you mean by "service disclosure"?
6    Q   The terms of use.  I've seen it referred to on
7  different websites.
8        Do you understand what I'm talking about?
9    A   The terms of use of their software?
10    Q   Of the website.
11    A   Oh, terms of use of the website?
12    Q   Yeah.
13    A   I don't -- I don't believe I reviewed that.
14  No.
15    Q   Okay.  Are you familiar with the term
16  service -- service disclosure?
17    A   Right.  I mean, but it could be for different
18  things.  I wasn't really sure if you were talking about
19  the software or if you were talking about the website.
20    Q   Okay.  And in your report you state that
21  Fintech's DEFT system is not a true DEFT system because
22  Fintech may charge retailers a monthly service fee; is
23  that correct?
24    A   Can you point me to the specific place in my
25  report?

Page 49

1    Q   No.  Do you recall saying that in your report?
2    A   I don't remember exactly where I say it, so
3  I'm missing the context.
4        Are we done with the white paper?
5    Q   Yes.
6        It's under the section where you discuss the
7  distributor EFT, no cost, which I think is at page 8.
8    A   Okay.
9    Q   You say, "Finally, Mr. Zatkovich,"
10  Z-a-t-k-o-v-i-c-h, "has failed to establish that Fintech
11  offers a DEFT no cost base model.  On the contrary,
12  various online resources suggest that Fintech also
13  charged monthly fees to their retailers."
14    A   Right.
15    Q   Do you see where I'm reading?
16    A   Right.
17    Q   So my question was, you state in your report
18  that Fintech DEFT system is not a true DEFT system
19  because Fintech may charge retailers a monthly service
20  fee.
21    A   Well, I'm just -- they're pointing out
22  these -- if you go to the previous page, there are these
23  references of various websites and demo -- demo videos
24  that seem to contradict what Mr. Zatkovich --
25    Q   Okay.

Page 50

1    A  -- said.

2    Q  Can you answer my question?

3    A  I think I did answer your question.

4    Q  No, sir. I would like a direct answer.

5    MR. SBAR: Object to form.

6    THE WITNESS: Well, I think my opinion, as

7  stated there, is pretty clear, so I'm not even sure what

8  you're asking.

9  BY MR. McCREA:

10    Q  Okay. Do you take the position in your report

11  that Fintech's DEF system -- DEFT system is not a true

12  DEFT system because Fintech may charge retailers a

13  monthly service fee?

14    A  So as I've stated there, based on the evidence

15  that I've shown there and based on the way Mr. Zatkovich

16  had described DEFT no cost approach, it -- there seems

17  to be a contradiction.

18    Q  Okay. Does iControl charge a monthly service

19  fee to its retailers?

20    A  I don't know.

21    Q  Does Fintech charge a monthly service fee to

22  all of its retail clients?

23    A  I don't know.

24    Q  And do you understand there to be any

25  difference between DEFT retailers and Fintech retailers

Page 51

1  generally?

2    A  I don't have an opinion of that. I don't

3  know.

4    Q  Well, do you know?

5    A  I don't know.

6    Q  Are you aware of any third party EFT vendors

7  within the alcoholic beverage industry that removed

8  transactional fees from retailers prior to 2015?

9    A  I don't know.

10    Q  Would a price discrepancy analytics report be

11  proprietary in any industry?

12    MR. SBAR: Object to form.

13    THE WITNESS: I don't think a feature like

14  that would be proprietary because lots of -- lots of

15  industries, lots of companies have that feature. And

16  especially if you put it on your website or if you

17  advertise it, then it's not proprietary.

18  BY MR. McCREA:

19    Q  Again, are you speaking of the concept of

20  price discrepancy analytics and reporting those or are

21  you talking about how it's done?

22    A  I'm speaking consistent with the way

23  Mr. Zatkovich has asserted his arguments. He's

24  asserting that these concepts, these features are

25  proprietary and confidential. And I disagree that these

Page 52

1  concepts and features are not proprietary and

2  confidential.

3    I adopted the position that, you know, the

4  design, the implementation of the source code could

5  potentially be confidential. But I have not seen any

6  evidence in his report that talks about anything really

7  that detailed. And so that's essentially the crux of my

8  opinions.

9    Q  Okay. And just again, and I don't want to

10  belabor this. But it seems to me that you're making a

11  distinction between whether a report is proprietary and

12  confidential and -- I know you don't like this word --

13  the processes or systems that are used to create those

14  reports are proprietary and confidential; is that

15  correct?

16    A  I think -- I think it's pretty -- let me give

17  you an example, just to clarify it for you. So the

18  ability to search the web, the concept of searching the

19  web, which is what Google, for example, provides.

20  Google is well known for their search capability. That

21  concept is not confidential and proprietary. Because if

22  it was, then Google would be out of business. I mean,

23  many people have provided capabilities for searching the

24  web. The first one was probably AltaVista. And there

25  are lots of companies even right now that provide you

Page 53

1  the ability to search. Microsoft has its own search

2  engine called Bing, right? So that capability is not

3  confidential. The algorithms, the internal

4  implementation within Google that, you know, scans the

5  web, that does the indexing and the processing and

6  provides the business advantage for them, because

7  Google, we know, is probably the -- well, it is the most

8  precise and scalable search engine. So that part could

9  potentially be confidential and proprietary.

10    And so that -- essentially it's the same

11  opinion that I'm providing here, which is that, you

12  know, a feature, such as analytics or reporting or

13  editing invoices, those -- those features, those

14  concepts are not proprietary because they're the same as

15  the ability to search the web. They're the same as, you

16  know, let's say, booking a hotel reservation on an

17  online website. Those concepts are well known. They

18  are not confidential. But the details, algorithms, you

19  know, the implementations could be confidential,

20  assuming that they provide some kind of business

21  advantage and assuming that that entity -- that the

22  company has gone through the right processes of ensuring

23  its privacy and secrecy.

24    Q  So taking your explanation, if Google had

25  taken some application that AltaVista was using to

Page 54

1 create a search engine for the internet and customized
2 it and maintained its confidentiality, you would agree
3 that that would be proprietary and confidential
4 information, correct?
5     MR. SBAR: Object to form.
6     THE WITNESS: I'm not sure if I follow
7 exactly. You're saying that if Google had stolen --
8 BY MR. McCREA:
9     Q No. I'm not suggesting that they did
10 anything -- that they did anything improper.
11     A Okay.
12     Q I'm just talking about the everyday reality
13 that competitors will see what somebody else in the
14 industry is doing and somehow engage, on their own, in
15 some customization that gives them an advantage in the
16 market. And I'm asking whether or not you agree with
17 that? Does it happen, to your knowledge?
18     A So I'm not -- again, I'm not 100 percent sure
19 if you're talking the same language. So if Google --
20 let's say a new company comes and sees Google does
21 searching in this particular way. Let's say Facebook
22 comes along and says, "Well, I'm going to provide search
23 capabilities, but I'm going to provide them in a
24 different way. I'm going to provide them in a way
25 that's going to be more useful for the users."

Page 55

1     They are entitled to come up with a new
2 algorithm, new ways of implementing the same -- same --
3 providing the same feature, same capability but in a
4 different way.
5     Q And if they take the proper steps to maintain
6 the confidentiality of its customization, that
7 information would be proprietary and confidential to
8 that business, correct?
9     MR. SBAR: Object to form.
10     THE WITNESS: If they develop an algorithm,
11 you know, a piece of software that, you know, that
12 perhaps forms the same functionality, but in a different
13 way, a way that is more effective, that gives them a
14 business advantage, and they go through the processes of
15 ensuring its privacy and secrecy, then that would be a
16 trade secret. That would be something that is
17 confidential.
18 BY MR. McCREA:
19     Q Do you know how many years of back-and-forth
20 with its clients Fintech required to develop and refine
21 and update its processes, reports, file transfers,
22 invoice payments, and analytics?
23     A I have information based on -- I mean, I've
24 reviewed Mr. Zatkovich's report. He has -- he has
25 described some numbers and then figures I have -- you

Page 56

1 know, that's the extent of my opinion.
2     Q Do you have any basis on which to dispute that
3 information?
4     A It's a little suspicious to me that, you know,
5 it would take a company that many years to become
6 profitable and it would take that much money to develop
7 a software.
8     Q Okay.
9     A Beyond sort of my background as a software
10 engineer, I don't really have any --
11     Q We all have suspicions. I'm asking whether
12 you have any facts?
13     A I don't -- no, I don't. I haven't -- as I
14 said, I haven't talked to Fintech employees. I don't
15 know what difficulties they faced and so on.
16     Q Okay. Do you know whether a case quantity
17 normalization would be a proprietary feature in this
18 industry or any industry?
19     A What is the feature you're asking?
20     Q Case quantity normalization?
21     A So that basically just says normal data to a
22 common unit. So basically if you're trying to -- I
23 mean, I have given an example. You know, you could be
24 measuring something in yards and feet. And if you're
25 trying to compare them together, you want to change them

Page 57

1 to a unit, to a common unit, maybe to inches so you can
2 compare them.
3     The notion of normalization is public
4 knowledge because it's done everywhere.
5     Q Okay. So case quantity normalization would
6 not be a proprietary feature in this industry or any
7 industry.
8     Is that your testimony?
9     A I don't -- I don't think that concept, that
10 capability is confidential because, you know, it's about
11 changing liters and gallons to other units.
12     Q Okay. And you and I have gone back and forth
13 about functions as opposed to how they work, using
14 simple terms?
15     A Functionality.
16     Q That's what I mean. Is there anything on the
17 website -- on the web or publicly available that
18 describes how any of Fintech's functionalities work or
19 how they were designed?
20     A There are potentially some, but I wouldn't say
21 there's a lot.
22     Q No. Okay. Well, that's what I -- I wanted to
23 ask you.
24     A Uh-huh.
25     Q What are they and where are they?

Page 58

```
 1        A   So if you go to an application, a web
 2   application, sometimes from the -- from the URL you can
 3   tell what type of -- what type of technology is used for
 4   the development of that application.  So, for example,
 5   if the URL, you know, is pointing to a servlet or to a
 6   JSP page, then you know the back end is a JAVA -- JAVA
 7   system.
 8        I don't remember exactly, sitting here, if I
 9   saw that.  That's why I can't really give you a concrete
10   answer.  But some information about how might be
11   available, but I wouldn't expect there to be a lot.
12   Most companies don't make a lot of information about how
13   they do things.
14        Q   All right.  I'm trying to get a specific
15   answer as opposed to a generality.
16        Can you identify for me, by subject, and where
17   I would look for it, where in the public domain or on
18   the web there's information that describes how any of
19   Fintech's functionalities are designed?
20        A   There's not a lot of information.  No.  I
21   mean, I can't think of anything right now.  You know, if
22   there was anything, I would have assumed -- if there was
23   anything about how Fintech does things and whether there
24   was any opinions about the how that is proprietary and
25   confidential, it would have been in Mr. Zatkovich's
```

Page 59

```
 1   report.  His report was also void of any details about
 2   how the software does things.
 3        Q   Do you know whether Fintech has a service
 4   disclosure, like we discussed earlier?
 5        A   I don't know.
 6        Q   Did you look?
 7        A   Are you talking about for the website?
 8        Q   Yes, sir.
 9        A   I didn't look.  But I remember -- I think I
10   recollect in one of the depositions reading discussions
11   about this, that at some point they didn't have it and
12   then at a later point they had it.  But I didn't check
13   myself.
14        Q   Okay.  I'm asking about a service disclosure
15   on the website.  I think the deposition testimony that
16   you're referring to is whether there was a separate
17   standalone confidentiality agreement as part of the
18   agreement with distributors or retailers?  I'm asking
19   specifically about a service disclosure --
20        A   For the website?
21        Q   -- for the website.
22        A   No, I think I'm talking about that.  I'm
23   talking about the service disclosure for the website.
24   There was some deposition that I remember.  I can't
25   remember.
```

Page 60

```
 1        Q   So it your testimony that at some point
 2   Fintech didn't have a service disclosure on its website?
 3        A   I'm vaguely remembering something like that in
 4   the depositions.  But I didn't check myself, if that's
 5   what you're asking.
 6        Q   And -- so then you would have no way,
 7   assuming there was a point in which there wasn't any,
 8   when that changed?
 9        A   I don't really have an opinion.  I didn't
10   check.  So, you know, I don't know if in the past it has
11   changed or not.
12        Q   You agree, though, that specific algorithms
13   and code developed by Fintech to enable data conversion
14   could qualify as confidential and proprietary?
15        A   Sorry.  What was that again?
16        Q   Yes.  Specific algorithms and code developed
17   my Fintech to enable data conversion could qualify as
18   confidential and proprietary?
19        A   So the data conversion itself is not
20   proprietary concept.  It's a capability that exists
21   everywhere.  If -- yes, I mean, algorithms behind the
22   scene that perform data conversion in a way that gives
23   you a business advantage in a way that is knowable and
24   kept secret could be -- the trade secret could be --
25   could be confidential.
```

Page 61

```
 1        Q   Okay.  And I'm looking at page 11, where you
 2   say in your report, "While the specific algorithms and
 3   code developed by Fintech to enable data conversion
 4   could potentially quality as Fintech proprietary
 5   information" --
 6        A   Uh-huh.
 7        Q   -- you still stand behind that statement,
 8   correct?
 9        A   Right.  And I'm saying could.  I mean, so I
10   don't really know.  I'm just saying it's potentially
11   possible.
12        Q   And is Fintech's specific data converter
13   proprietary and confidential?
14        A   It's not possible to tell because there's no
15   information available in Mr. Zatkovich's report to be
16   able to make that determination, and I haven't seen any
17   source code or any algorithms that suggest that.
18        Q   All right.  And you reviewed Mr. Keren's
19   deposition?
20        A   Yes.
21        Q   Where he testified at page 43 that he felt
22   that iControl's data converts were proprietary
23   applications?
24        A   Is it in my report?  I take it that he said
25   that.  I don't remember everything that he said in his
```

Page 62

1  deposition.
2  Q   And did that surprise you?
3  A   No.  Because as I said, it's possible for data
4  conversion algorithms and software to be proprietary.
5  Q   The report -- I'm looking at footnotes 25 and
6  26.
7  A   Okay.
8  Q   -- you reference a location on Fintech's
9  website where you located distributor and retailer
10  demonstration videos.
11  A   Correct.
12  Q   How did you go about finding them on the
13  website?
14  A   I think it's -- once you get on the website, I
15  think there are links that take you there.  So I just
16  went to their website.
17  Q   You said you think.  Is that your testimony?
18  A   No.  I'm actually pretty sure because I
19  checked -- I checked the website last night.
20  Q   And so it's your testimony that there are
21  links that take you to the distributor demonstration
22  video and retailer demonstration video that are on
23  Fintech's website; is that correct?
24  A   That's correct.
25  Q   Do you know whether invoice editing was a

Page 63

1  feature that was offered by any third-party EFT provider
2  in the alcoholic beverage industry prior to 2015?
3  A   I don't know.
4  Q   Do you know when iControl first developed its
5  invoice edit feature?
6  A   I don't know exactly.  No.
7  Q   And your report makes reference to exception
8  reporting?
9  A   Uh-huh.
10  Q   Is it your testimony that Fintech discloses
11  the format of its exception reports on its website?
12  A   I have to refer to my report.  Right.  That's
13  one of the things that I provided.  Yeah.
14  Q   Okay.  So it's your opinion that Fintech's
15  exception reporting is -- format that appears on
16  Fintech's website?
17  A   Well, with respect to exception reporting, I
18  have a couple of opinions here.  One is that the
19  concept, as a whole, is known across all industries.  I
20  have citations to other websites and other places that
21  talk about exception reporting as just a general
22  business concept.  And then I'm pointing to the website,
23  the demo, where the exception reporting is disclosed and
24  is shown in that demo.
25  Q   Okay.  I appreciate that.  But my question is,

Page 64

1  is it your testimony that Fintech discloses the form of
2  its exception reports on its website?
3  A   If by form you mean, what it looks like --
4  Q   Yes.  In format.
5  A   -- then I believe so, yeah, because they are
6  showing the reporting --
7  Q   And with respect to footnote 29 --
8  A   Uh-huh.
9  Q   -- is it your testimony that internal
10  applications are shown in the FTX retailer demonstration
11  that are referenced in that footnote?
12  A   I'm sorry.  I lost you.  What was the
13  question?
14  Q   Yeah.  Is it your testimony that the internal
15  applications shown in the FTX retailer demonstration --
16  I'm sorry.  Let me repeat this.
17  Is it your testimony that internal
18  applications are shown in the FTX retailer demonstration
19  referenced in footnote number 29?
20  A   I don't know what you mean by internal
21  applications.
22  Q   Any applications that Fintech uses solely
23  internally and doesn't share with anyone externally?
24  A   Are you using the word "application"
25  interchangeably with source code?

Page 65

1  Q   No.
2  A   So applications, I consider the entire Fintech
3  software to be one application.
4  Q   Okay.  If you would answer my question,
5  please.
6  A   Well, I don't understand what is internal
7  application.  What are you asking me?
8  Q   You say, "Further, Fintech has publicly
9  disclosed the format of its exception reports on its
10  website."
11  A   Uh-huh.
12  Q   And there's been testimony in this case that
13  Fintech's exception reports are purely an internal
14  application that were designed by Mr. Lopez while he
15  worked for Fintech.
16  My question is, is it your testimony that with
17  respect to footnote 21 -- 29, that discloses an internal
18  application, specifically the format of Fintech's
19  exception reports?
20  MR. SBAR:  Objection to form.
21  THE WITNESS:  I don't know anything about the
22  internal.  What I'm saying is that demo on the
23  website basically describes various kind of reports that
24  exist, and one of them is exception reports.
25  ///

Page 66

BY MR. McCREA:

Q   Okay.  And as you sit here, you believe it
discloses the format of the exception reports, correct?

A   Well, when you show a report to me -- it's
like if you show me my bank statement, then I know what
the bank statement looks like.  So if you refer to a
bank statement as a report, which I think is a type of
report, and I can see my account number, my
transactions, I can see the balance and so on.  So I
consider that to be the format.

     And, you know, to the best of my knowledge,
when I looked at the website and looked at the demo, you
know, there was an exception report that is shown and it
has the format of that report in it.

Q   Okay.  Do you know why it was that iControl
waited from April 2013 until after Mr. Lopez was hired
in March of 2015 to build such a feature into its user
portal?

     MR. SBAR: Object to form.

     THE WITNESS: I don't know if I agree with the
question.  I don't know if it was actually until then
that they actually implemented this feature.

BY MR. McCREA:

Q   Okay.  Well, it's an assumption built into my
question.  But assuming that my question is based upon a

Page 67

fact that I can prove at trial, do you know why it took
that long?

     MR. SBAR: Same objection.

     THE WITNESS: Okay.  So you're telling me they
implemented this feature in what, November?  I forget
the dates that you gave me.

BY MR. McCREA:

Q   I'm trying to find out whether or not you know
of any reason why iControl would have waited from
April of 2013 until after Mr. Lopez was hired in March
of 2015 to implement this feature.

A   What makes you -- I mean, there's lots of
assumptions to that question.  What makes you think they
were even waiting?

Q   I'm sorry?

A   What makes you think they were waiting?

Q   I'll expand on the question.  Do you know why
it took so long?

     MR. SBAR: Object to form.

     THE WITNESS: It's -- I don't understand the
basis of the question.  I mean, you're asking me why
they waited.  I don't even know if they waited.  I mean,
it's like saying why --

BY MR. McCREA:

Q   Why did it take so long, sir, since it's

Page 68

publicly available information?  It's on the website.
They could have found it like you did.

     MR. SBAR: Object to form.

     THE WITNESS: I would have to speculate of
what goes on in their heads.  It's like saying why
iPhone from the get-go didn't make their phones
waterproof.

BY MR. McCREA:

Q   In other words you don't know?

A   I don't know.

Q   And you reviewed Mr. Lopez's deposition
testimony?

A   I did.  Yes.

Q   And you were aware that he facilitated
scraping information from Fintech's website?

A   He mentioned scraping the website.  Yes.

Q   He testified under oath about it.  He didn't
just mention it.

A   Well, if you mention something while you're
testifying, you're testifying.

Q   I place a much different spin on somebody
saying something under oath than mentioning something.

     MR. SBAR: Object to form.

     THE WITNESS: I consider whatever I mention
today to be part of my testimony.

Page 69

BY MR. McCREA:

Q   Because you're under oath, you're under the
penalty of perjury?

A   That's right.

Q   Is that a business activity that you consider
to be appropriate or inappropriate?

A   I think it's appropriate.

Q   So you disagree with Mr. Lopez's testimony?

A   Yes.

Q   And do you know whether it would have been
possible to scrape that information unless someone had
used a feature called view source on Fintech's website?

A   No.  So anything you make available on the
website is public information.  And companies that
compete with each other, they would be fools to not look
at each other's website to determine what the other
companies are doing and compete.  So I don't see
anything wrong with it.

Q   That may be, but if you would answer my
question, we would move along a little faster.

A   As I said, I don't see anything wrong with it.

Q   That's not my question.  Do you want me to
repeat my question?

A   Yes.

Q   Is it correct that it would not have been

Page 70

1  possible to scrape that information off Fintech's
2  website unless somebody had used the feature on
3  Fintech's website called view source?
4      A  I don't have an opinion on that. I don't know
5  what you're talking about about view source. Are you
6  talking about view source in the browser?
7      Q  Yes.
8      A  Okay. Because you said Fintech's feature
9  called view source. View source is a feature in the
10  browser.
11     Q  Right. On Fintech's website.
12     A  No. It's a feature on any website. It's a
13  feature in the web browser.
14     Q  All right.
15     A  So like Chrome or Internet Explorer, they all
16  have that feature.
17     Q  Right.
18     A  And I don't think it matters really. It's not
19  relevant. And it's possible to implement the same
20  capability without using view source.
21     Q  And do you know whether or not somebody used
22  view source, that feature on the browser in Fintech's
23  website, in order to create the application that was
24  used to scrape the information on Fintech's website?
25     A  Do I know if somebody used view source?

Page 71

1      Q  Yes.
2      A  I don't know how they did the scraping.
3      Q  Have you asked?
4      A  No. Because I don't think it's relevant. I
5  mean, either way it's appropriate.
6      Q  Do you know where iControl obtained its
7  service disclosure?
8      A  I don't know.
9      Q  And in your report you make reference to
10  Starbucks e-mail communication regarding the use of
11  Fintech's proprietary format.
12     A  Yes.
13     Q  And it was your opinion that it was not
14  Fintech's proprietary standard file format; is that
15  correct?
16     A  Well, I was basically pointing out to -- I was
17  pointing out the fact that Mr. Zatkovich had
18  cherry-picked the evidence in forming his opinion. He
19  had relied on the e-mail from the Fintech employee to
20  show that something was proprietary, ignoring the e-mail
21  that came from the Starbucks employee, basically.
22     Q  All right. If you would answer my question,
23  please.
24     A  I thought I did answer the question.
25     Q  No. You did not.

Page 72

1      MR. SBAR: Object to form.
2      MR. McCREA: Can you read my question back,
3  please.
4      (Question read back.)
5      THE WITNESS: I haven't seen any evidence that
6  it is Fintech's proprietary file format other than an
7  e-mail from a Fintech employee.
8  BY MR. McCREA:
9      Q  Do you know whether or not it's Fintech's
10  proprietary format?
11     A  I think if you're sending a file to your
12  client, then you're publically disclosing that file
13  format to those clients, then it's not proprietary.
14     Q  Is it your testimony that if you disclose
15  information to a client that is subject to a service
16  disclosure you lose the ability to maintain
17  confidentiality of that information?
18     A  So there are two points there. So if the
19  client is not on the confidentiality agreement, then you
20  lose the confidentiality of that file format. I don't
21  know if Starbucks was or wasn't at that time.
22     Q  Right.
23     A  But, also, if that client then goes --
24  regardless of whether they are under confidentiality or
25  not, if that client goes and sends that file to, for

Page 73

1  example, iControl, then it's not really iControl's fault
2  at that point.
3      Q  All right. That was not my question. Do you
4  know that? You know that's not what I'm asking you?
5      A  I'm pretty sure I answered the question.
6      Q  No, you didn't.
7      MR. SBAR: Object to form.
8  BY MR. McCREA:
9      Q  Is your testimony that if you send proprietary
10  information to a customer that is subject to a service
11  disclosure, it's no longer confidential information?
12     A  So again, I'm not an attorney, right? But my
13  understanding is that if the client is -- is not under
14  confidentiality, then that information would not be
15  confidential. And if they are under confidentiality,
16  based on my understanding, it would remain confidential.
17     Q  If they were subject to a service disclosure
18  that requires them to maintain confidentiality, does a
19  company lose its right to confidentiality by sharing
20  information electronically with a customer?
21     MR. SBAR: Object to form.
22     THE WITNESS: I think I just answered that
23  question.
24  BY MR. McCREA:
25     Q  No. You said "if."

Page 74

1    A   Well --

2    Q   I'm giving you a closed question, not an

3   either-or.

4    A   Well, I mean, I choose how to answer my

5   questions.

6        So, basically, if the customer is not under

7   the confidentiality agreement -- which I understand has

8   been the case with some of the Fintech clients -- then

9   that information is disclosed at that point.  If the

10   client is under confidentiality, depending on the clause

11   of that confidentiality and what the contract was and

12   entailed, then, yes, in certain circumstances they would

13   maintain the confidentiality of that file.

14    Q   Okay.  Let's be very specific.  Is it your

15   testimony that if a company discloses information

16   electronically to a customer that is subject to a

17   service disclosure, the company that discloses that

18   information loses its right to maintain the

19   confidentiality of that information?

20        MR. SBAR:  Object to form.

21        THE WITNESS:  So I have answered, you know,

22   for the past few minutes.  If a client or customer is

23   not under a confidentiality --

24   BY MR. McCREA:

25    Q   That's not my question.

Page 75

1    A   I know, but I'm trying to qualify my answer.

2   If the client or customer is not under a confidentiality

3   agreement, then -- then that information at that point

4   is disclosed.

5    Q   My question is, what if it is under a service

6   disclosure agreement that requires confidentiality?

7   That's the question I'm trying to get you to answer.

8    A   That's the second part of my answer.  So if

9   the customer or client is not under confidentiality,

10   then it's considered disclosed.

11        If the customer or client is under a

12   confidentiality agreement, depending on the nature of

13   the contract and the clauses in the confidentiality

14   agreement, then at that point it's not disclosed.

15        So it kind of depends on various factors.  It

16   depends on whether the customer is under a

17   confidentiality agreement, and if so, what are the

18   clauses in that confidentiality agreement.

19    Q   And you have testified under oath, not

20   casually mentioning, you testified under oath that you

21   have not looked at Fintech's service disclosure,

22   correct?

23    A   I have not looked at -- I don't know, for

24   example, if Fintech had a confidentiality agreement with

25   Starbucks, if that's --

Page 76

1    Q   My question, sir, is you have not looked at

2   Fintech's service disclosure?

3    A   Service disclosure is for the website, right?

4    Q   Yes.

5    A   So how is that related to the Starbucks --

6    Q   If you would answer my question, please.  You

7   have not looked at the service disclosure?

8    A   I have not looked at the service disclosure of

9   Fintech on their website.

10    Q   And you don't know whether or not Fintech had

11   a confidentiality agreement separate and apart from the

12   service disclosure with Starbucks, correct?

13    A   That's right.  What I have opined here is that

14   Mr. Zatkovich does not indicate one way or another

15   whether there was a confidentiality agreement with

16   Starbucks.  He chose to cherry-pick, you know, the

17   second half of the e-mail conversation with Starbucks to

18   form his opinion, and I disagree with his opinion.

19    Q   And what significance, if any, did you place

20   upon the e-mail at the end of the chain in which

21   Mr. Farrell from Starbucks said that they would stop

22   using that proprietary Fintech format?

23    A   I don't --

24        MR. SBAR:  Object to form.

25        THE WITNESS:  I don't know what part you might

Page 77

1   be referring to.

2   BY MR. McCREA:

3    Q   Okay.  Were you aware that Mr. Fintech --

4   Mr. Farrell indicated in his e-mail, last e-mail to

5   Fintech that he would stop using that file format?

6        MR. SBAR:  Object to form.

7        THE WITNESS:  I don't recollect.  But I assume

8   they wanted to -- they wanted to be nice clients.  And

9   they -- you know, they saw that Fintech doesn't want

10   them to use it, they decided not to use it.

11        I mean, I would be speculating as to what went

12   on.

13   BY MR. McCREA:

14    Q   Well, you don't know, correct?

15    A   I don't know the details.  No.

16    Q   Did you understand that the file format at

17   issue was not created by Starbucks?

18    A   You're asking me if I know what Starbucks was

19   doing?  I don't -- I can't testify as to what Starbucks

20   was doing, if that's your question.

21    Q   Well, that's my question.  Do you know whether

22   or not that document that was at issue, the format that

23   was at issue in those e-mails had been created by

24   Starbucks?

25    A   I don't know one way or another.  What I've

**Page 78**

1  opined here in my report is that Mr. Zatkovich has not
2  presented evidence, one way or another, whether it was
3  proprietary. And, you know, he's based his opinion off
4  of Fintech's employee, and he's not providing any
5  evidence that you're asking me, such as confidentiality
6  agreement that maybe Starbucks was under.
7      So basically my opinions here are rebutting
8  Mr. Zatkovich's claims that the data interface formats
9  were proprietary.
10     Q  If he --
11     A  From the evidence that he's presented, he's
12  not been able to convince me.
13     Q  Did you do any analysis to determine whether
14  or not the document at issue in those Starbucks e-mails
15  contained the same actual database field names from
16  Fintech's system?
17     A  You're asking me if I knew that the document
18  has the same database fields as Fintech's --
19     Q  Whether you did any analysis to determine
20  whether that was the case.
21     A  I don't think Fintech's database information
22  was presented to me, was made available to me.
23     Q  So the answer is you did not?
24     A  I didn't because I didn't have the
25  information.

**Page 79**

1      Q  Okay. So you did not conduct any analysis?
2      A  No.
3      Q  When was Cyberonix founded?
4      A  Oh, I'm going to say 2013.
5      Q  Is it known by any other name?
6      A  No.
7      Q  You note in the report that iControl has a
8  patent pending on certain technology that it developed.
9      A  My understanding is that they have a patent
10  pending. Correct.
11     Q  Pending. Are you separating from my question
12  technology that it developed?
13     A  Well, usually you can get a patent on
14  something you develop, so, yeah. I mean, it goes --
15     Q  When you steal something --
16     A  -- that goes without saying.
17     Q  When you steal something nobody else has
18  patented, you can get a patent on that. So that wasn't
19  why it was part of my question.
20     MR. SBAR: Object to form.
21     THE WITNESS: Well, my understanding is that
22  they have -- you know, they have been developing some
23  capabilities with reconciliation of -- of invoices and
24  so on, and so they filed for a patent on that.
25     ///

**Page 80**

1  BY MR. McCREA:
2      Q  So it's your understanding that iControl is --
3  has a patent pending on certain technology that it has
4  developed?
5      A  That's right.
6      Q  And is it your understanding that iControl
7  considers that information confidential and proprietary?
8      A  So generally speaking, when a patent is
9  published, you've made a disclosure to the world, so
10 then it's not confidential. And I'm not a patent
11 attorney, so I can't tell you what is the status of a --
12 disclosures on a patent and when you file a patent. I
13 just don't know that.
14     Q  Before iControl applied for a patent, do you
15 know whether it considered the information that was the
16 subject of the patent to be confidential and
17 proprietary?
18     A  I don't know that.
19     Q  And can you have confidential proprietary
20 information related to software programming if it's not
21 patent approved?
22     A  I'm sorry. I didn't quite catch --
23     Q  Do you recognize that information related to
24 software programming can be confidential and proprietary
25 whether or not a patent has been applied for?

**Page 81**

1      A  Right. I mean, you can have -- you can have
2  elements of your software or design implementation
3  algorithms that would be trade secrets.
4      Q  In page 13 of your report, you indicate that
5  iControl was providing ACH services to a single
6  distributor in Michigan in 2013 before Mr. Lopez came on
7  board?
8      A  That's right.
9      Q  And what steps did you take to determine
10 whether, at the time of these transactions, iControl's
11 EFT software was fully developed?
12     A  I'm not really sure what you mean by "fully
13 developed." They -- what I'm stating there is that they
14 were providing financial transaction services to
15 Spartan, and that's the extent of the opinion that I'm
16 providing there.
17     Q  Okay. And I'm asking a different question,
18 though. I understand you've said that.
19     My question is, do you know whether or not at
20 that time iControl's EFT software was fully developed?
21     A  I don't know what you mean by "fully
22 developed."
23     Q  Was it in the same state that it is today?
24 Has it been using the same software that it used in
25 those transactions ever since April 2013?

Page 82

1    A   I suspect not.  I mean, most companies, they
2   evolve their software, they fix bugs, they add features.
3   I'm assuming -- they seem to be a sophisticated software
4   shop, so I assume they modified things on the software
5   end.
6    Q   And are you aware of whether or not additional
7   software code and database architecture needed to be
8   created after April 2013?
9    A   They may have had to write new software.  It's
10  possible.
11   Q   All right.  And database architecture?
12   A   I'm not sure what you mean by "database
13  architecture."
14   Q   Well, Mr. Harris testified at page 55 of his
15  deposition that after this first pilot, they needed
16  additional code and database architecture created in
17  order to go into the business.
18       MR. SBAR: Object to form.
19       THE WITNESS: I don't really think that
20  term really -- that doesn't really parse properly
21  because I don't think either one of these companies are
22  in the business of building databases.  So the company
23  that typically makes the most widely used database is
24  Oracle.  If you're asking whether they wrote some
25  software that's required to talk to database, that seems

Page 83

1   plausible.
2   BY MR. McCREA:
3    Q   So you don't know whether or not additional
4   database architecture needed to be created after
5   April 2013?
6    A   I'm not really sure what you're asking me.  It
7   seems like you're asking do I think they have had to
8   develop new software.  And as I have said, I think any
9   software shop fixes bugs.  They add features to their
10  software on a regular basis.  So it's completely
11  plausible to me that they have modified the software
12  system.
13   Q   And Mr. Harris, who was COO and later CIO,
14  testified that additional software code and database
15  architecture needed to be created.
16       And it's your testimony you don't really
17  understand what he meant by database architecture, so
18  you can't comment on that; is that right.
19       MR. SBAR: Object to form.
20       THE WITNESS: My answer is that these
21  companies don't make databases.
22  BY MR. McCREA:
23   Q   Okay.  And there would be no need for any
24  data- -- database architecture modifications after
25  April of 2013, therefore, correct?

Page 84

1    A   Database architecture does not make sense to
2   me in the context of this case.  He might have meant to
3   refer to database e-mails or database, you know, set up.
4   Probably scheme is what he really meant, the structure
5   of the database he was installing.  It's possible that
6   they changed that.
7    Q   Well, he was making the distinction between
8   what needed to be done from rolling out was essentially
9   a beta version of the application for functionality.
10       MR. SBAR: Object to --
11  BY MR. McCREA:
12   Q   Does that help you?
13       MR. SBAR: Object to form.
14       THE WITNESS: I think you're asking me more or
15  less the same question.  You're asking me if I think the
16  software has had to change.  And, you know, I don't know
17  if the software had to change.  But I know that most
18  software shops, they fix bugs, they add features, they
19  make improvements.  And whether they have done that
20  since April 2013, it seems plausible to me.
21  BY MR. McCREA:
22   Q   Okay.  But you're not able to testify about
23  any changes or modifications that iControl made to its
24  software from April 17, 2013, correct?
25   A   I don't have the specifics.  No.

Page 85

1    Q   Okay.  And you did not conduct any examination
2   or analysis of the software that iControl used in
3   April of 2013 to determine whether or not it would be
4   sufficient in order for it to conduct the business that
5   it's conducting today in the regulating commerce
6   industry; is that correct?
7    A   I haven't compared their source code from
8   April 2013 against what they are using right now.
9    Q   And other than the one Michigan distributor,
10  Spartan, what retailers and distributors in the
11  regulated alcohol industry was iControl serving before
12  it had any association with Mr. Lopez?
13   A   I don't have -- I don't know.
14   Q   Do you know any?
15   A   No.  I mean, what the -- you know, what I have
16  provided is the information you see in my report.
17   Q   Okay.  But I understand that.  I would like an
18  answer, not a direction to your report.
19       Can you identify for me any other distributors
20  or retailers that iControl was serving before Mr. Lopez
21  became associated with that firm?
22   A   Not that I can think of today.
23   Q   And your statement -- and this is at page 13
24  of your report.
25   A   Uh-huh.  Yes.

Page 86

1  Q  And I'm looking at the last sentence of the
2  first section.
3  A  Okay.
4  Q  Right here.
5  A  Okay.
6  Q  You say, "To cater to the requirements of the
7  alcohol industry, iControl simply adapted their existing
8  infrastructure to be compatible with various per state
9  regulations specific to the alcohol industry."
10  And the basis for that part of your expert
11  opinion is Mr. Keren's deposition testimony?
12  A  That's right.
13  Q  So that rests upon Mr. Keren's credibility?
14  MR. SBAR: Object to form.
15  THE WITNESS: It's based on my -- yeah.  It's
16  based on his deposition.  And I think I have also talked
17  to him, and he's expressed the same thing when I talk to
18  him.
19  BY MR. McCREA:
20  Q  Okay.  Well, whether he testified under oath
21  or said it to you --
22  A  Right.
23  Q  -- you know, mentioned, that statement is
24  based upon Mr. Keren's credibility, correct?
25  MR. SBAR: Object to form.

Page 87

1  THE WITNESS: That's the basis of my opinion
2  there.
3  BY MR. McCREA:
4  Q  And did Mr. Keren tell you what adaptations
5  were made to the existing infrastructure in order to be
6  compatible with the various alcohol industry?
7  A  I mean, basically, you know, Mr. Keren's
8  arguments and positions here are consistent with my own
9  analysis of their software.  I've used their -- I've
10  used their software.  I got login access to Harmony, and
11  I looked at the scan-based part of the business and the
12  regulated part of the business.  And it seemed to me,
13  you know, that the core of the two software are the
14  same.  The UIs are more or less the same.  And so it
15  seemed reasonable to me that, you know, you can adapt
16  one to the other.  And so that's the extent of the
17  opinion that I'm providing here.
18  Q  Okay.  But that wasn't my question.
19  A  I thought I answered your question.
20  Q  Okay.
21  A  Maybe you're not getting the answers you want,
22  but I'm answering the question.
23  Q  No.  I'm looking for answers.
24  A  Okay.
25  Q  Not what you want to say.

Page 88

1  A  Well, I'm going to answer my -- answer the
2  questions the way I want to answer them.
3  Q  At trial, the judge is going to make you
4  answer my questions.
5  MR. SBAR: Object to form.
6  BY MR. McCREA:
7  Q  My question was, is there any basis for this
8  statement that iControl simply adapted their existing
9  infrastructure to be compatible with the various per
10  state regulations specific to the alcohol industry,
11  other than Mr. Keren?
12  MR. SBAR: Object to form.  Asked and
13  answered.
14  THE WITNESS: Well, I mean, it is based on my
15  conversations with Mr. Keren and his deposition, of
16  course, and also based on my analysis of the software.
17  BY MR. McCREA:
18  Q  All right.  After April of 2013, do you know
19  whether iControl made any changes to its in-bound data
20  converter?
21  A  I don't know the specifics.  No.  I know
22  they -- I know the -- I know iControl, based on what
23  I've talked to them, said they get requests from clients
24  and retailers and distributors to customize their
25  interfaces.  So it seems plausible that they've done

Page 89

1  those types of customizations, but --
2  Q  Well, do you know whether or not, since
3  April 2013, iControl has made changes to its out-bound
4  data converters?
5  A  I don't have the specifics, but they've told
6  me that they get requests from customers and clients to
7  customize their interfaces.
8  Q  Do you know whether since April of 2013
9  iControl has made any changes to the code that governs
10  how iControl processes ACH files?
11  A  I don't have the details of all the changes
12  they made to the software.
13  Q  Does that mean you don't know?
14  A  I don't know the details.  No.  I don't know
15  the specifics.
16  Q  Do you know whether or not after April of 2013
17  any additional logic was introduced to the iControl
18  system to allow it to function in a regulated industry?
19  A  Since, what, April of 2013?  Is that --
20  Q  Yes, sir.
21  A  -- what you're asking me?  You know, I think
22  my answer is going to be the same to most of these
23  questions.  I don't know the -- all the detailed changes
24  that they made to the software.
25  Q  I just want to know specifically with respect

Page 90

1  to this question whether you know whether or not changes
2  were made?
3      A  To their ACH processing?
4      Q  No.  Whether any additional logic was
5  introduced to their system to allow it to function in a
6  regulated industry?
7      A  I don't know.
8      Q  All right.  Do you know whether in April of
9  2013 any changes were made to iControl's system to
10  detect invoices with anomalies or issues?
11      A  I don't know.
12      Q  Do you know whether after April of 2013
13  iControl developed the ability for iControl employees to
14  onboard suppliers without developer intervention?
15      A  I don't know.
16      Q  Do you know whether since April of 2013 any
17  changes have been made to iControl web-based distributor
18  file upload tool to facilitate the regulated commerce
19  business?
20      A  I don't know.
21      Q  Do you know whether any changes have been made
22  since April of 2013 to iControl's exceptions report?
23      A  No.  I don't know.
24      Q  So if changes were made, you would not be able
25  to tell me when they were made, correct?

Page 91

1      A  Presented with the right information, I can
2  tell you.
3      Q  But today.
4      A  Sitting here today, I can't tell you all the
5  changes that they made over the past two years.
6      Q  And today you would not be able to tell me
7  whether or not any changes that we talked about were in
8  development prior to Mr. Lopez's arrival at iControl,
9  correct?
10      A  I don't know exactly when they started making
11  those developments.  No.
12      Q  Did you -- and I may have asked you this.  And
13  if I did, I apologize.  I don't want to fly back here.
14  No offense.
15          Do you know, based on some analysis you did,
16  how much of the scan-based retail software was used in
17  order to -- for iControl to do business in the regulated
18  commerce industry?
19      A  How much of that software was used?
20      Q  Yes.
21      A  What do you mean how much -- how much of that
22  was -- I mean, I don't know how to ask that.  How many
23  times was it used?
24      Q  No.
25      A  How much -- like what percentage of the code

Page 92

1  was used?
2      Q  Yes.  Yes.
3      A  I don't know what percentage of the code was
4  used or whether they had that code or not.
5      Q  Okay.  Have you conducted any analysis of
6  that?
7      A  I haven't reviewed source code.  No.
8      Q  Did you have access to iControl's software
9  development project plans or timelines?
10      A  I haven't had -- I haven't seen anything.  No.
11      Q  Did you request them?
12      A  No.
13      Q  Do you know whether there's any information
14  regarding this regulated commerce industry business that
15  iControl considers to be confidential?
16      A  Your question is do I know if there are things
17  iControl considers proprietary and confidential.  I
18  don't know.
19      Q  Did you ask?
20      A  No.
21      Q  Were you aware that iControl has designated
22  thousands of pages of documents in this case as
23  attorneys' eyes only.  Confidential.
24      MR. SBAR: Object to form.
25      THE WITNESS: No.

Page 93

1  BY MR. McCREA:
2      Q  So you wouldn't know why that was done?
3      MR. SBAR: Object to form.
4      THE WITNESS: I mean, companies consider
5  various things to be confidential.  I don't think about
6  that on a daily basis.
7  BY MR. McCREA:
8      Q  Were you aware that iControl required
9  Mr. Lopez and Mr. Sanderson and others to sign
10  agreements containing trade secret and confidentiality
11  provisions?
12      A  Sorry.  Can you repeat the question?
13      Q  Yes, sir.  Were you aware that iControl
14  required Mr. Lopez and Mr. Sanderson and other iControl
15  employees to sign agreements pertaining to trade secret
16  and confidentiality provisions?
17      A  I -- I think I recollect something along those
18  lines being said in one of the depositions.  But, yeah,
19  I mean, that's the extent of the recollection that I
20  have.
21      Q  All right.  Did you have any discussion with
22  anyone at iControl about the purpose for which iControl
23  employees are required to sign such agreements?
24      A  No.  But, I mean, I think I can kind of assume
25  what they would be for.  At least for the same reasons

Page 94

1  any company makes their employees sign confidentiality
2  agreements.
3      Q   Okay.  Well, did anyone at iControl inform you
4  of the information that iControl considers to be
5  protected by those agreements?
6      A   No.
7      Q   And you did not ask?
8      A   No.
9          MR. McCREA:  Why don't we take five.
10         THE VIDEOGRAPHER:  We're off the record at
11  10:28 a.m.
12         (Break in the proceedings.)
13         THE VIDEOGRAPHER:  We are back on the record
14  at 10:35 a.m.
15         MR. McCREA:  This one is marked as Exhibit
16  Number 2.
17         (Plaintiff's Exhibit 2 was marked for
18          identification by the Reporter and is
19          attached hereto.)
20         MR. McCREA:  And I apologize because it's a
21  little water soaked.  It wasn't that way when I brought
22  it.
23         MR. KWO:  It needed --
24         MR. SBAR:  Understood.
25         MR. KWO:  It needed a shower.

Page 95

1  BY MR. McCREA:
2      Q   All right.  Mr. Malek, have you seen this
3  document before?
4      A   I don't think I have.
5      Q   And this was produced by either Mr. Lopez or
6  iControl.  But I'll represent to you that it relates to
7  the period that Mr. Lopez was performing consulting
8  services.
9      A   Okay.
10     Q   And it indicates "Review distributor
11  onboarding application with Gilad and Ygor."
12         Do you know what that is in reference to?
13     A   I don't.
14     Q   Obviously, you have not seen this before.  But
15  you haven't had any discussion with anyone at iControl
16  about work that was done on a rounding issue for
17  distributor onboard application?
18     A   I haven't.
19         MR. McCREA:  Let's have this marked as Exhibit
20  Number 3.
21         (Plaintiff's Exhibit 3 was marked for
22          identification by the Reporter and is
23          attached hereto.)
24  BY MR. McCREA:
25     Q   Have you seen this document before?

Page 96

1      A   I don't think I have.
2      Q   So you did not have any opportunity to speak
3  to Mr. Lopez or Mr. Keren about the purpose for which
4  there was a conference call between them in November of
5  2013 about reviewing regulated matters?
6      A   No.  I don't recall talking about this.
7          MR. McCREA:  Let's have this marked as Exhibit
8  Number 4.
9          (Plaintiff's Exhibit 4 was marked for
10          identification by the Reporter and is
11          attached hereto.)
12  BY MR. McCREA:
13     Q   Okay.  Have you seen this document before?
14     A   I haven't.
15     Q   So you're not able to tell me what -- for what
16  purpose, if any, Mr. Lopez was involved in
17  communications about a rounding issue of regulated
18  billing?
19     A   I mean, it's basically based on what I've read
20  here, which seems to have to do with some kind of a
21  rounding problem.  But I don't know the details of what
22  they're taking about.
23     Q   Have you reviewed Mr. Lopez's independent
24  contractor agreement?
25     A   Is this with Fintech?

Page 97

1      Q   No.
2      A   With iControl, you mean?
3      Q   Yes, sir.
4      A   No.  I don't think I have.
5      Q   So you're not familiar with the scope of
6  services that are attached to that agreement?
7      A   I don't recollect right now.  I don't think I
8  have seen that.
9      Q   And did you have any communication with
10  Mr. Lopez or anyone about [sic] iControl about the
11  purpose for which Mr. Lopez was brought in as an
12  independent contractor?  I think I may have asked you
13  this earlier, but I want to be sure.
14     A   I don't think I know the details.  No.
15     Q   And you did not have any communication with
16  anybody at iControl about the meaning or purpose of the
17  scope of services that was attached to Mr. Lopez's
18  independent contractor agreement?
19     A   Again, I don't think I reviewed that document.
20     Q   Okay.  And that's why I asked you a different
21  way.  You may not have seen it, but you may have had
22  communications about it.
23     A   About the extent of his consulting services,
24  basically?
25     Q   No.  The meaning or purpose of the scope of

Page 98

1 services section of that independent contract agreement.
2    A    I don't think -- no. I don't think I had
3 conversations about that.
4         MR. McCREA: And this, let's have this marked
5 then as Exhibit Number --
6         THE REPORTER: 5.
7         MR. McCREA: -- 5.
8         (Plaintiff's Exhibit 5 was marked for
9         identification by the Reporter and is
10         attached hereto.)
11 BY MR. McCREA:
12    Q    Okay. Just so the record is clear, that's the
13 independent contractor agreement that I have been asking
14 you about. And you had not reviewed it, nor have you
15 reviewed or discussed with anyone the scope of services
16 that appear as an attachment to that agreement; is that
17 correct? Page 6.
18    A    Right. I don't believe I have reviewed this
19 document.
20    Q    And did you take any steps to confirm whether
21 or not Mr. Lopez had any involvement in the development
22 of iControl's software or database in order to
23 facilitate business in the regulated commerce industry?
24    A    Do I have any -- what was the first part of
25 the question? That --

Page 99

1    Q    Did you take any steps?
2    A    To analyze --
3    Q    To confirm whether or not --
4    A    Uh-huh.
5    Q    -- he had any involvement whatsoever in the
6 development of iControl's software or database in order
7 to facilitate business in the regulated commerce
8 industry?
9    A    Based on my conversations with him, he has --
10 he's basically told me more or less what he basically
11 said in his deposition, which is that he's not been
12 involved in development of features that are -- that
13 Fintech accuses iControl -- or Fintech considers to be
14 confidential.
15    Q    Just so we're not talking past one another.
16 Are you telling me that Mr. Lopez has stated to you that
17 he had no involvement in the development of iControl's
18 software or database in order to facilitate business in
19 a regulated commerce industry?
20    A    I don't recollect having that conversation
21 specifically like that with him.
22    Q    Okay.
23    A    It was more along the line of the -- you know,
24 Fintech confidential elements or what Fintech considers
25 to be confidential elements of their software. That was

Page 100

1 the scope of my conversations with him.
2    Q    Obviously I was asking you a more sweeping --
3    A    Right. I don't know all -- I don't know if
4 he's had any -- I didn't specifically talk to him about
5 the regulated side of business and whether he's had any
6 type of development on that or not.
7    Q    Okay. Did you have any communication with
8 Mr. Lopez or Mr. Keren about Mr. Harris' testimony, that
9 during his consulting period Mr. Lopez advised on a
10 technical basis about what the code would need to look
11 like in order to process transactions?
12    A    I don't think we had that conversation. No.
13    Q    And you weren't provided with the Harris
14 deposition transcript, correct?
15    A    I don't -- yeah. I don't think I've reviewed
16 that deposition.
17    Q    Okay. You state multiple times in your report
18 that iControl has never utilized or accessed Fintech's
19 source code, correct?
20    A    That's right.
21    Q    All right. And you did not have the
22 opportunity to analyze Fintech's source code against
23 iControl's source code, correct?
24    A    I haven't reviewed the two companies' source
25 code. Correct.

Page 101

1    Q    And so the basis for your statement is
2 information that you obtained from other people?
3    A    It's multiple. It's not just information I
4 obtained from people. So obviously, you know, one
5 criteria that I've relied on -- one source of
6 information is my conversations with Mr. Gilad Keren.
7 But also, I have looked at the underlying technologies
8 that are used in the two software systems, and the two
9 underlying technologies are different. They're
10 different programming languages. And so I don't expect
11 that I will find copied source code at least because the
12 technologies are so different.
13         Also, I've used -- I looked at the demo of the
14 Fintech software, and I've use the Harmony software from
15 iControl, and the two softwares have a very different
16 look and feel, and you know, the way the features are
17 provided, it gives me the impression the software
18 systems are not going to operate the same way.
19         But, yeah, I mean, I would like to be able to
20 look at the source code of the two products to make a
21 more concrete statement about that.
22    Q    Okay. And going back to the beginning of your
23 answer where you said "conversations," have you had a
24 conversation with anyone other than Mr. Keren about
25 whether iControl has ever utilized or accessed Fintech's

Page 102

1 source code?
2    A  I think that's a conversation that I've had
3 with all the -- all the iControl employees that I have
4 talked to.
5    Q  You talked to three employees.
6    A  All those three.
7    Q  Is there any reason why you don't reference
8 anywhere in your report that Mr. Lopez or Mr. Sanderson
9 told you that iControl has never utilized or accessed
10 Fintech's source code? Each and every time you've
11 attributed that to Mr. Keren.
12    A  Right. Because Mr. Keren is the -- if I
13 remember correctly, he's the CTO. So he's sort of the
14 man that is in charge of the software, and he's been
15 there from the beginning. And so, you know, it seems,
16 based on the evidence, that they were providing services
17 in the regulated domain before -- at least before
18 Mr. Lopez was employed there. And so I have cited his
19 deposition, my conversations with him, because he just
20 seems to be a much more authoritative figure at the
21 company to be able to -- to, you know, to be able to
22 provide that kind of a guidance.
23    Q  Well, in other places in your report you
24 reference statements made by Mr. Lopez.
25    A  Uh-huh.

Page 103

1    Q  Particularly in his -- in his deposition.
2    A  Uh-huh.
3    Q  I don't see any reference in your report to
4 any statements made to you by Mr. Sanderson.
5    A  Right.
6    Q  I could be mistaken about that. The report
7 will speak for itself.
8    A  Uh-huh.
9    Q  My question is, is there -- other than
10 Mr. Keren being more authoritative, is there any reason
11 why you didn't include in your report the fact that
12 Mr. Lopez or Mr. Sanderson said to you that iControl
13 never utilized or accessed Fintech's source code?
14    A  I mean, my understanding is that -- so my
15 understanding is that Mr. Sanderson, he is -- he's in
16 the marketing side of things. I'm not really sure, you
17 know, he has much to say about source code and, you
18 know, how it's implemented. And so that's why I really
19 didn't cite him. Because I don't think it's really
20 within his duty, essentially. You know, the source code
21 is kind of outside of his duties.
22    Q  Well, did Mr. Sanderson make that statement?
23    A  I don't recollect exact statements that were
24 exchanged. I mean, I was essentially on a
25 teleconference with these guys and discussed this. And

Page 104

1 so, again, when it came down to source code and
2 software, Mr. Keren was sort of the person in charge,
3 and he's the one that answered my questions, and so he's
4 the one that I have cited.
5    Q  Same question with respect to Mr. Lopez. Do
6 you have a specific recollection that Mr. Lopez made a
7 statement to you that iControl has never utilized or
8 accessed Fintech's source code?
9    A  I mean, these are conversations that I had on
10 the phone, you know, two months ago. So I -- I remember
11 we discussed this, and, you know, I believe, you know,
12 to the best of my recollection, he said that they
13 haven't used any of Fintech's source code.
14    Q  Okay. When you couch it in believe and best
15 of my recollection, I'm trying to get a statement as to
16 whether you have that recollection.
17    A  I have the recollection that he said that they
18 didn't use source code.
19    Q  And what did you say?
20    A  I can't remember the exact sentences, if
21 that's what you're asking.
22    Q  And how many telephone conversations have you
23 had with Mr. Lopez?
24    A  I think two. I could be wrong, but I remember
25 at least two.

Page 105

1    Q  And when was the first one and when was the
2 last one?
3    A  So the report is dated February 14th. And so
4 I'm thinking about maybe -- you know, maybe the first
5 one was a couple of weeks before the report or two or
6 three weeks before the report, and the second one was
7 maybe a week before the report.
8    Q  Okay. And when were you first retained in
9 connection with this matter?
10    A  You know, sometime in January.
11    Q  All right. Were you first approached by
12 Mr. Sbar or somebody at iControl?
13    A  I think it was Mr. Sbar, but I don't remember
14 exactly. I think it was him.
15    Q  Bear with me just a second. Sorry.
16      All right. You have in front of you as part
17 of your report Mr. Zatkovich's report, correct?
18    A  Yes.
19    Q  Could you take a look at page 25 of that
20 report.
21    A  Okay.
22    Q  All right. And do you see the chart at the
23 bottom with the different features?
24    A  Correct.
25    Q  All right. In your opinion, what are the

Page 106

1  probabilities that a vendor, new to this industry, would
2  produce the same 12 features that are only present in
3  one competitor's product in the industry in this amount
4  of time?
5      MR. SBAR: Object to form.
6      THE WITNESS: Well, I think companies within
7  the same industry, more or less, provide the same
8  features. I would give it a very high probability.
9  BY MR. McCREA:
10     Q   When you say a pretty high probability, what
11 probability?
12     A   I mean, I think given that these features are
13 somewhat fundamental to the way these companies provide
14 these services, I think it's given that they would have
15 these features. To me it's like -- it's like, imagine
16 airline companies that provide services to book airline
17 tickets. I mean, to book an airline ticket, you have to
18 provide certain kinds of capabilities. You know, you
19 ask for, you know, itinerary information, the airports,
20 the dates, the return flights, the -- you know, the
21 number of passengers, you know, checked bags in or not.
22 So those -- you know, so within the airline industry,
23 different airlines provide the same features and
24 capabilities. And so within this industry, they
25 provided these features and capabilities. It's kind of

Page 107

1  a -- to me it's a given that they would provide similar
2  features.
3      Q   Well, do you have any explanation for why
4  iControl did not begin offering these 12 features until
5  after Mr. Lopez arrived?
6      MR. SBAR: Object to form.
7      THE WITNESS: My understanding is that they
8  started to go into the regulated domain, you know,
9  within the past few years. And so, you know, it would
10 seem natural to me it took them some time to develop
11 these things. I don't know if it had anything to do
12 with Mr. Lopez going there.
13 BY MR. McCREA:
14     Q   Okay. But I think we've gone through most of
15 these, and you've indicated you don't know whether or
16 not iControl was offering these features before
17 Mr. Lopez arrived; is that correct?
18     A   I don't know the timelines of exactly when
19 they started offering the various features.
20     Q   And as part of your expert report, you have
21 not conducted a timeline like that, correct?
22     A   That's right. So I think that the core
23 features of the system are actually really not listed
24 here. The core features are, you know, the ability to
25 actually perform an electronic fund transfer, the UI,

Page 108

1  the application user interface, and things like that.
2  So those were already in place for the scan-based side
3  of the business. And so these features you have listed
4  here, I kind of consider these to be adjustments that
5  they've had to make to the core capabilities that they
6  were already providing.
7      Q   Okay. But that was not what I asked you. I
8  asked you whether or not you conducted any time- -- you
9  prepared or examined a timeline that would enable you to
10 analyze when each of those features was added or
11 offered by iControl.
12     A   Well, as I've already answered, I don't know
13 the specific dates of when each of these modifications
14 were added.
15     Q   Nor did you attempt to conduct or prepare such
16 a timeline, correct?
17     A   I didn't see such a timeline in Mr.
18 Zatkovich's report, and so I -- and I also didn't
19 perform an additional analysis on that.
20     Q   Okay. You didn't prepare a timeline?
21     A   No. I didn't. I didn't -- I don't know when
22 these feature were added to their system.
23     Q   Do you know whether iControl considers its
24 case equivalent normalization proprietary?
25     A   Can you repeat the question?

Page 109

1      Q   Yes. Do you know whether iControl considers
2  its case equivalent normalization proprietary?
3      A   You know, I would -- you know, I think they
4  may consider some algorithms and software behind it to
5  be proprietary. As I've opined, I don't think -- I
6  don't think a company can really consider a feature or a
7  capability like that to be proprietary. But the
8  algorithms and the software and the -- so, I mean, the
9  way -- maybe the way to phrase it to kind of even
10 clarify it, is that in software engineering there's a
11 difference between "what" and "how."
12     Q   Uh-huh.
13     A   So the what part of software is requirements
14 engineering, where you try to figure out what the
15 software should do, right, and then the how is how you
16 actually go about implementing it.
17     So the "what" a lot of times ends up being not
18 proprietary because -- especially if you're going to put
19 it in marketing brochures, if you're going to create
20 demos and put it on your website, this is what my
21 software does. The "what" part is not really
22 proprietary. It's the "how" that may be proprietary.
23 Which is, like, well, we do this -- we provide this
24 capability in this particular way. And that, I think,
25 is usually -- not all the time. But that's usually

Page 110

```
 1   where confidential trade secret information is in
 2   software products, not the "what."
 3        And so that's kind of, like, related to this
 4   discussion we're having here.  You're pointing to these
 5   features, and these are features that are made available
 6   on their website, on Fintech's website.  They're all
 7   dealing with "what."  What does the software do?  So the
 8   software provides normalization.  The software provides
 9   analytic features.  The software provides invoice
10   editing.  And it's different from "how."  You know, how
11   does it do it?  And my -- the crux of my report is that
12   Mr. Zatkovich's report is really lacking in terms of
13   how.  He's just describing the what.
14     Q   You've read a number of depositions that I've
15   conducted in this.  At least two that I can think of,
16   correct?
17     A   Right.
18     Q   And did you observe that at different points
19   in time, iControl's counsel, Mr. Sbar, asked that the
20   Fintech representative leave the room because the
21   information that was being asked about was attorneys'
22   eyes only, confidentiality?
23     A   Yes.
24     Q   Okay.  And did you observe that I wasn't
25   asking you about source code?  I was asking you about
```

Page 111

```
 1   what iControl does?
 2        MR. SBAR:  Object to form.
 3   BY MR. McCREA:
 4     Q   Do you have any explanation for that --
 5        MR. SBAR:  Object.
 6   BY MR. McCREA:
 7     Q   -- if it's not confidential?
 8     A   I mean, I'm not a lawyer, so I can't speak for
 9   Mr. Sbar on why he did what he did.  But my
10   understanding is that when a deposition takes a
11   direction where you think it might lead into question or
12   answers that may jeopardize the confidential
13   information, then you would ask the -- you would ask
14   potentially some witnesses or attendees to leave the
15   room.
16        So maybe while he was asking about the what,
17   he thought that maybe the answer would somehow get into
18   how.  And so I don't know.  I'm just speculating.
19     Q   That's complete speculation by you, correct?
20   You don't know why?
21     A   I'm not an attorney.
22     Q   Right.  But you do recognize that none of the
23   questions were about source code.  They were asked about
24   what iControl does.
25        MR. SBAR:  Object to form.
```

Page 112

```
 1   BY MR. McCREA:
 2     Q   Is that correct?
 3        MR. SBAR:  Same objection.
 4        THE WITNESS:  Well, as I said, I'm not an
 5   attorney, and I can't speak on behalf of Mr. Sbar as to
 6   why he asked the -- asked the people that you mentioned
 7   to leave the room.  But what I do know is that you,
 8   know, you ask a question, and the answer you might get
 9   may be confidential.  So maybe that's why he asked.
10   BY MR. McCREA:
11     Q   And does that speculation apply to a document
12   produced by iControl, which has been marked attorneys'
13   eyes only but only talks about what iControl does as
14   opposed to its source code?
15        MR. SBAR:  Object to form.
16        THE WITNESS:  You're asking question that I
17   think you should be asking Mr. Sbar.
18   BY MR. McCREA:
19     Q   I'm going to be asking you these questions at
20   trial.
21     A   You're asking me --
22     Q   Do you have an answer for that question?
23     A   You're asking me why Mr. Sbar asked somebody
24   to leave --
25     Q   No.  I'm asking if you have an explanation for
```

Page 113

```
 1   if, in your opinion, what is never confidential, why
 2   documents have been produced in this case that have been
 3   protected by iControl, which merely state what iControl
 4   does, in terms of its functionalities and not how it
 5   does it or its source code?  Do you have an explanation
 6   for that?
 7        MR. SBAR:  Object to form.
 8        THE WITNESS:  I think with all due respect,
 9   you just misstated my testimony.
10   BY MR. McCREA:
11     Q   No.  I'm asking you a question.
12     A   You want an answer, right?
13     Q   Yes.  Do you have an explanation for that?
14     A   Yes.  If you give me a chance to answer.
15        MR. SBAR:  Same objection.
16   BY MR. McCREA:
17     Q   I'm going to.
18     A   So I never said that what can never be
19   confidential, which is what you actually said right now
20   in your question.
21        I said that usually in software systems,
22   usually, oftentimes the what is not confidential.  Not
23   all the time.  So in the particular situation in that
24   particular deposition, I don't know what document was
25   being put on the table.  I don't know what were the
```

Page 114

1 circumstances of the case, the discussions. You're
2 asking me to speculate about something that I have no
3 context.
4    Q   So by expansion, what Fintech does could also
5 conceivably be confidential, correct?
6    A   If they don't make it available on the
7 website, if it's not obviously public knowledge, yes.
8       MR. McCREA: Let's take five.
9       THE VIDEOGRAPHER: We're off the record at
10 11:01 a.m.
11       (Break in the proceedings.)
12       THE VIDEOGRAPHER: We are back on the record
13 at 11:09 a.m.
14 BY MR. McCREA:
15    Q   Mr. Malek, what is your understanding of how
16 scan-based trading works?
17    A   My understanding is that, you know,
18 basically -- so if you think about newspapers, for
19 example, as an example of a scan-based trading sort of
20 commodity, you know, you would have the distributors
21 that bring the newspaper, and then your retailers charge
22 distributors based on how many newspapers they sell, and
23 they determine that based on the scans that they do.
24    Q   All right. And -- and how does that differ
25 from payment in the regulated commerce industry?

Page 115

1    A   So the difference has to do mostly, I think,
2 with the regulations that are associated with it. So
3 when we were looking at the white paper, we talked about
4 the credit states and then the cash states, and so on.
5 So different states have different regulations in terms
6 of how you can pay for liquor.
7    Q   All right. And I may have asked you this
8 before. And if I did, I apologize.
9       But do you know whether the scan-based trading
10 is lawful in the alcohol beverage industry?
11    A   I don't know. I don't know for certain or not
12 --
13    Q   All right.
14    A   -- at this --
15    Q   And what is your understanding of how the
16 regulated commerce industry works payment transfers,
17 et cetera?
18    A   I mean, I think I just described that already.
19 I mean, so I've also described it in my report. You
20 know, I described the whole ACH-based approach of, you
21 know, crediting and debiting the accounts.
22    Q   Well, what are the differences between
23 scan-based trading and the regulated commerce industry?
24    A   Beyond what I've already described?
25    Q   Well, I'm not sure whether -- I'm not sure

Page 116

1 whether I know or listened to or understood what you
2 were telling me were the differences.
3    A   So basically with the scan-based approach, you
4 go and you buy a newspaper, you scan it, and then, you
5 know, the retailer essentially pays for that scan or
6 sold newspaper to the distributor, the news agency or
7 whoever produces the newspaper.
8       In the case of alcohol, it's not the same. So
9 you don't go and buy a beer and then have the retailer
10 pay for the beer that you bought to the -- to the
11 distributor. That's the -- sort of the crux of the
12 difference there.
13    Q   Okay. Is there any difference, other than the
14 time at which payment is due?
15    A   Right. I mean, as I said, there are state
16 regulations in terms of how you pay for it, whether it's
17 through credit or whether it's through cash, and also
18 how long you have to resolve the -- you know, resolve
19 the payment, basically.
20    Q   Okay. But I'm asking about electronic funds
21 transferred in the regulated commerce industry. So we
22 can set aside whether you pay cash or credit or check.
23 And I think I understand that one of the differences
24 that you've identified is the timing of payment. I
25 think you indicated the scan-based trading payment is

Page 117

1 due and owing at some period after it's scanned through
2 the register.
3    A   Uh-huh.
4    Q   And you have indicated a different timing may
5 be required depending on the state when it comes to the
6 regulated commerce industry, correct?
7    A   That's right.
8    Q   What other differences exist between those two
9 methods of payment?
10    A   So -- I mean, so that's obviously one
11 difference, is, you know, the time that, you know,
12 payments have to be made. I think that the other aspect
13 is, you know, when the distributor provides you the
14 alcohol, they get paid for that -- for that -- for
15 essentially the alcohol that they deliver. And in that
16 sense it's different from sort of the scan-based model.
17    Q   I'm sorry. Try that again because I didn't
18 follow.
19    A   So if a distributor brings you two cases of
20 beer, they get paid for those two cases of beer, whereas
21 in a -- whereas if a newspaper distributor brings you
22 two copies of newspaper, you only pay for whatever you
23 sell.
24    Q   Okay. And maybe it was me, but I thought that
25 was assumed within what we already talked about, which

Page 118

1   is the timing of when payment is owed or made.
2       A   I mean, these are different models of --
3       Q   Any other -- are there any other differences
4   that you're aware of?
5       A   That's what I can recollect right now.
6       Q   Are there any differences in the way that
7   disputes are dealt with?  Let's say there's a dispute
8   over the quantity of either newspapers or cases of beer
9   that are delivered.
10      A   I mean, I'm assuming on the business side of
11  things there are norms and standards that are followed
12  in different industries.  I don't claim that I know all
13  the norms and standards of the way disputes are handled
14  in the newspaper industry versus alcohol industry.
15      Q   Well, do you know how disputes are handled in
16  the regulated commerce industry?
17      A   I don't know the details of it.  No.
18      Q   We've talked a lot about source code.  And I
19  just want to be clear.  Is it your belief that -- that
20  companies are only able to protect the actual source
21  code from walking out the door or being transferred or
22  are they able to protect the logic and processes that
23  are within the source code?
24      A   So the source code -- basically to answer the
25  question, confidential information with respect to

Page 119

1   software could be source code.  It could be the
2   algorithms.  It could be the design of the software.  It
3   could be the flow of the logic.  Those could be
4   confidential.
5       Q   So in other words, if one of your students --
6   one of your grad students got a job doing software
7   development that -- and they were -- he or she was bound
8   by confidentiality, it would not simply be limited to
9   them picking the source code and physically giving it to
10  someone else.  It may be transferring information about
11  the logic and processes within the source code.
12      MR. SBAR:  Object to form.
13  BY MR. McCREA:
14      Q   Is that accurate?
15      MR. SBAR:  Object to form.
16      THE WITNESS:  When I say how, the how of
17  software being usually confidential, assuming that the
18  company has not put -- has put in processes to protect
19  it.  I'm talking about source code.  I'm talking about
20  design.  I'm talking about the information about the
21  details of how a software system operates.
22  BY MR. McCREA:
23      Q   Okay.
24      A   And that's all within how.
25      Q   Just like, you know, it's unfair for me to ask

Page 120

1   you about legal terms, I want to make sure in my
2   language I understand what you're saying.  And I think
3   what you're saying is that you think it would be
4   inappropriate for your student to share, in the face of
5   a confidentiality restriction, the logic and processes
6   within the source code that he or she developed --
7       MR. SBAR:  Object to form.
8   BY MR. McCREA:
9       Q   -- beyond taking it on a flash drive and
10  giving it to someone?
11      MR. SBAR:  Object to form.
12      THE WITNESS:  Well, assuming the information
13  that we're dealing about the software is confidential,
14  assuming it is information -- yeah.  Information doesn't
15  have to be necessarily source code.  It could be details
16  of an algorithm.  Details of an architecture of how the
17  systems works.  Those -- those could all be
18  confidential.
19  BY MR. McCREA:
20      Q   The logic flows?
21      A   Right.  I mean, the logic flows is what I
22  call -- I like architecture essentially.  So the
23  software system has an architecture just like your
24  building has an architecture.  So that architecture,
25  assuming it is confidential, it could be -- it could be

Page 121

1   confidential.  You know, I'm not -- it doesn't have to
2   be, but it could be confidential.
3       Q   No.  No.  No.  That's why I prefaced my
4   question by saying that your student was subject to
5   confidentiality as to the software he or she developed.
6       A   And assuming the architecture of the software
7   that he or she developed was confidential --
8       Q   Right.
9       A   -- which is the how.  And the source
10  code/architecture, they're kind of like closely related
11  to each other.  Then, yeah, I would consider that to be
12  confidential information.
13      Q   Okay.  I think for once I understand what
14  you're telling me.
15      A   Okay.  Good.
16      Q   I'm not criticizing you as a professor, by the
17  way.  I was not a great student.  All right.  Let's take
18  a minute or two.  I may be done.
19      MR. SBAR:  Okay.
20      THE VIDEOGRAPHER:  We're off the record at
21  11:18 a.m.
22      (Break in the proceedings.)
23      THE VIDEOGRAPHER:  We are back on the record
24  at 11:24 a.m.
25      ///

Page 122

BY MR. McCREA:

1  Q   Mr. Malek, what is your understanding of how
2  many companies are doing the same services that Fintech
3  and iControl offer in the regulated commerce industry?
4     A   My understanding is that there are some
5  distributors that provide similar services for their
6  retailers. But other than Fintech and iControl, I don't
7  know of any other third-party entity that does the same
8  thing.
9     Q   Third party meaning that they handle
10 transactions between distributors and retailers --
11    A   That's right.
12    Q   -- as opposed to being a distributor and just
13 handling payments by retailing?
14    A   That's right.
15    Q   Can a system that was created for scan-based
16 trading handle EFT transactions for the regulated
17 commerce industry without any modification?
18    A   Well, as I've stated in my report, with some
19 adjustments you would be able to do it.
20    Q   Okay. And did you identify, specifically in
21 your report, what those adjustments would be?
22    A   It would be adjustments to satisfy the
23 regulations essentially, the state -- you know,
24 state-forced regulations of how long you have before
25

Page 123

1  payments are posted and, you know, things of that
2  nature.
3     Q   And for somebody uninformed like myself, what
4  does that mean? What would need to be done to the
5  scan-based training model in order to achieve those
6  adjustments?
7     A   I mean, so -- it's -- it's basically source
8  code and, you know, the source code provides the
9  capabilities that it provides, and you have to go on it,
10 you adjust it, you modify it to satisfy the new
11 requirements for the regulated domain.
12    Q   Is there anything more specific that you can
13 tell me about that?
14    A   No. I think there are parts of the software
15 that could be reused. You know, so probably some -- a
16 good portion of the database structure, the database
17 could be used. The technology that talks to the
18 database could be reused. The user interfaces could be
19 reused, but then they would have to be modified to
20 satisfy whatever new requirements --
21    Q   That's what I was asking.
22    A   Right.
23    Q   Could you explain to me any more specifically
24 the modifications or adjustments that would be required?
25    A   It's difficult to describe it, you know, not

Page 124

1  having the software in front of us. So, you know, all
2  I can tell you is that it would be changes related to
3  the -- to the way payments have to -- have to be made to
4  satisfy the state regulations.
5     Q   In fairness, I think you testified earlier,
6  that you didn't conduct any analysis of the scan-based
7  trading software that existed prior to 2013.
8     A   I didn't look at the version of Harmony that
9  existed before 2013. I looked at the version of Harmony
10 software -- iControl software as it exists right now.
11 And I've looked at both the scan-based side of it. I've
12 used the scan-based side of it and the regulated side of
13 it.
14    MR. McCREA: Okay. Anything further?
15    MR. KWO: No.
16    MR. McCREA: That's all I have.
17    MR. SBAR: I have no questions. We'll read.
18    MR. McCREA: I'm ordering.
19    MR. SBAR: And I will take a copy.
20    THE VIDEOGRAPHER: This concludes today's
21 deposition of Sam Malek. The time is 11:27 a.m. The
22 date is March 19, 2017, and we're off the record.
23    (Deposition concluded at 11:27 a.m.)
24
25

Page 125

1        I have read the foregoing deposition
2  transcript and by signing hereafter, approve same.
3
4  Dated_____.
5
6
7                        _____
                         (Signature of Deponent)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 126

```
1              DEPOSITION OFFICER'S CERTIFICATE

2

3   STATE OF CALIFORNIA        )
                               )  ss.
4   COUNTY OF ORANGE           )

5

6          I, Zina Tallant, hereby certify:

7          I am a duly qualified Certified Shorthand

8   Reporter in the State of California, holder of

9   Certificate Number CSR 13341 issued by the Court

10  Reporters Board of California and which is in full force

11  and effect.  (Fed. R. Civ. P. 28(a)).

12         I am authorized to administer oaths or

13  affirmations pursuant to California Code of Civil

14  Procedure, Section 2093(b), and prior to being examined,

15  the witness was first duly sworn by me.  (Fed. R. Civ.

16  P. 28(a), 30(f)(1)).

17         I am not a relative or employee or attorney or

18  counsel of any of the parties, nor am I a relative or

19  employee of such attorney or counsel, nor am I

20  financially interested in this action.  (Fed. R. Civ. P.

21  28).

22         I am the deposition officer that

23  stenographically recorded the testimony in the foregoing

24  deposition and the foregoing transcript is a true record

25                          ///
```

Page 127

```
1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3          Before completion of the deposition, review of

4   the transcript [XX] was [ ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8   Dated: MARCH 31, 2017

9

10

11

12

13                    _____

14

15

16

17

18

19

20

21

22

23

24

25
```

**/**

**/// (5)**
25:25;39:25;65:25;
79:25;121:25

**[**

**[sic] (2)**
24:24;97:10

**A**

**abide (1)**
14:10
**ability (6)**
52:18;53:1,15;72:16;
90:13;107:24
**able (27)**
8:24;37:11;42:3,4;
61:16;78:12;84:22;
90:24;91:6;96:15;
101:19;102:21,21;
118:20,22;122:20
**academic (1)**
20:1
**academics (1)**
20:2
**acceptable (1)**
37:21
**access (3)**
45:5;87:10;92:8
**accessed (5)**
100:18;101:25;
102:9;103:13;104:8
**account (3)**
40:25;41:19;66:8
**accounting (1)**
12:7
**accounts (1)**
115:21
**accurate (3)**
17:13,14;119:14
**accuses (1)**
99:13
**ACH (15)**
27:24;28:5,6;30:3,5,
9;35:1,5,18,25;36:22;
37:6;81:5;89:10;90:3
**ACH-based (1)**
115:20
**achieve (1)**
123:5
**acronym (1)**
14:13
**across (2)**
46:16;63:19
**activities (1)**
7:3
**activity (1)**
69:5
**actual (2)**

78:15;118:20
**actually (10)**
19:24;23:24;25:24;
62:18;66:21,22;
107:23,25;109:16;
113:19
**adapt (1)**
87:15
**adaptations (1)**
87:4
**adapted (2)**
86:7;88:8
**add (3)**
82:2;83:9;84:18
**added (3)**
108:10,14,22
**addition (1)**
20:14
**additional (8)**
27:13;82:6,16;83:3,
14;89:17;90:4;108:19
**address (2)**
6:9;38:17
**adhere (3)**
38:18,21;40:6
**adjust (1)**
123:10
**adjustments (6)**
108:4;122:20,22,23;
123:6,24
**administered (1)**
5:23
**adopted (1)**
52:3
**advantage (5)**
53:6,21;54:15;55:14;
60:23
**advertise (1)**
51:17
**advertising (1)**
45:9
**advised (1)**
100:9
**Again (13)**
8:19;31:17;37:23;
44:17;45:18;51:19;
52:9;54:18;60:15;
73:12;97:19;104:1;
117:17
**against (2)**
85:8;100:22
**agency (1)**
116:6
**ago (4)**
10:15;12:22;26:8;
104:10
**agree (7)**
35:14;46:9,14;54:2,
16;60:12;66:20
**agreement (23)**
14:7,8;35:11;59:17,
18;72:19;74:7;75:3,6,
12,14,17,18,24;76:11,

15;78:6;96:24;97:6,18;
98:1,13,16
**agreements (6)**
14:18;93:10,15,23;
94:2,5
**ahead (1)**
38:24
**airline (4)**
106:16,16,17,22
**airlines (1)**
106:23
**airports (1)**
106:19
**alcohol (16)**
29:6,6,9,10;43:9;
47:21;85:11;86:7,9;
87:6;88:10;115:10;
116:8;117:14,15;
118:14
**alcoholic (2)**
51:7;63:2
**algorithm (3)**
55:2,10;120:16
**algorithms (12)**
53:3,18;60:12,16,21;
61:2,17;62:4;81:3;
109:4,8;119:2
**allow (2)**
89:18;90:5
**allowed (1)**
47:24
**allows (2)**
40:24;41:18
**almost (1)**
7:23
**along (4)**
54:22;69:20;93:17;
99:23
**AltaVista (2)**
52:24;53:25
**always (1)**
9:12
**amount (1)**
106:3
**analysis (11)**
45:6;78:13,19;79:1;
85:2;87:9;88:16;91:15;
92:5;108:19;124:6
**analytic (1)**
110:9
**analytics (4)**
51:10,20;53:12;
55:22
**analyze (3)**
99:2;100:22;108:10
**analyzing (1)**
18:12
**Andrew (1)**
22:14
**annual (1)**
7:3
**anomalies (1)**
90:10

**answered (9)**
19:3;25:13;73:5,22;
74:21;87:19;88:13;
104:3;108:12
**apart (1)**
76:11
**apologize (4)**
7:7;91:13;94:20;
115:8
**appear (1)**
98:16
**appears (1)**
63:15
**application (22)**
10:25;11:5;31:14,20;
33:18;40:24;41:17;
43:7;53:25;58:1,2,4;
64:24;65:3,7,14,18;
70:23;84:9;95:11,17;
108:1
**applications (14)**
8:18;9:25;10:25;
11:20;18:14;32:5;
33:10;61:23;64:10,15,
18,21,22;65:2
**applied (2)**
80:14,25
**apply (1)**
112:11
**appreciate (1)**
63:25
**approach (3)**
50:16;115:20;116:3
**approached (1)**
105:11
**appropriate (3)**
69:6,7;71:5
**approved (1)**
80:21
**April (19)**
66:16;67:10;81:25;
82:8;83:5,25;84:20,24;
85:3,8;88:18;89:3,8,16,
19;90:8,12,16,22
**architecture (15)**
82:7,11,13,16;83:4,
15,17,24;84:1;120:16,
22,23,24,24;121:6
**areas (1)**
9:7
**arguments (2)**
51:23;87:8
**around (2)**
13:11;16:18
**arrival (1)**
91:8
**arrived (2)**
107:5,17
**art (1)**
41:5
**articles (5)**
13:6,8,12,14,21
**aside (3)**

38:13;44:11;116:22
**aspect (2)**
36:2;117:12
**asserted (1)**
51:23
**asserting (1)**
51:24
**associate (2)**
6:20;27:4
**associated (6)**
5:5;14:21,22;15:7;
85:21;115:2
**associates (1)**
22:4
**association (3)**
30:13,17;85:12
**assume (5)**
8:21;23:9;77:7;82:4;
93:24
**assumed (2)**
58:22;117:25
**assumes (1)**
34:3
**assuming (14)**
14:4;29:5,10;53:20,
21;60:7;66:25;82:3;
118:10;119:17;120:12,
14,25;121:6
**assumption (3)**
29:9,11;66:24
**assumptions (1)**
67:13
**attached (11)**
15:13;16:23;19:18;
26:22;37:18;94:19;
95:23;96:11;97:6,17;
98:10
**attachment (2)**
16:14;98:16
**attackers (1)**
9:13
**attempt (1)**
108:15
**attendees (1)**
111:14
**attorney (4)**
73:12;80:11;111:21;
112:5
**attorneys' (3)**
92:23;110:21;112:12
**attributed (1)**
102:11
**authoritative (2)**
102:20;103:10
**authorize (1)**
37:21
**available (17)**
17:24;18:24;19:25;
36:7,19;44:10;45:1,3;
47:12;57:17;58:11;
61:15;68:1;69:13;
78:22;110:5;114:6
**avoid (1)**

17:17
**aware (10)**
28:13;43:6;51:6;
68:14;77:3;82:6;92:21;
93:8,13;118:4

### B

**bachelor's (1)**
12:5
**back (11)**
33:11;39:23;57:12;
58:6;72:2,4;91:13;
94:13;101:22;114:12;
121:23
**back-and-forth (1)**
55:19
**background (1)**
56:9
**bags (1)**
106:21
**balance (1)**
66:9
**bank (3)**
66:5,6,7
**Barkley (1)**
5:6
**base (1)**
49:11
**based (24)**
22:24;29:9,11;44:25;
45:1,22;50:14,15;
55:23;66:25;73:16;
78:3;86:15,16,24;
88:14,16,22;91:15;
96:19;99:9;102:16;
114:22,23
**basically (25)**
10:1,8;27:12;28:2;
37:5;46:1,3,24;56:21,
22;65:23;71:16,21;
74:6;78:7;87:7;96:19;
97:24;99:10,10;
114:18;116:3,19;
118:24;123:7
**basics (1)**
32:25
**basis (11)**
29:23,24;56:2;67:21;
83:10;86:10;87:1;88:7;
93:6;100:10;101:1
**bear (2)**
43:1;105:15
**became (2)**
23:18;85:21
**become (1)**
56:5
**Beer (6)**
26:20;116:9,10;
117:20,20;118:8
**begin (1)**
107:4
**beginning (2)**

101:22;102:15
**behalf (3)**
5:14,18;112:5
**behind (4)**
43:25;60:21;61:7;
109:4
**belabor (1)**
52:10
**belief (1)**
118:19
**below (1)**
22:13
**best (4)**
17:19;66:11;104:12,
14
**beta (1)**
84:9
**beverage (4)**
47:20;51:7;63:2;
115:10
**beverages (1)**
43:9
**beyond (6)**
27:9;45:6,6;56:9;
115:24;120:9
**big (1)**
12:6
**billing (3)**
8:18,21;96:18
**bind (1)**
16:17
**Bing (1)**
53:2
**Bissegger (1)**
5:5
**board (1)**
81:7
**Boeing (2)**
18:11;19:11
**book (2)**
106:16,17
**booking (1)**
53:16
**both (1)**
124:11
**bottom (1)**
105:23
**bought (1)**
116:10
**Boulevard (1)**
5:9
**bound (2)**
14:6;119:7
**Brad (1)**
5:5
**Break (4)**
39:22;94:12;114:11;
121:22
**bring (1)**
114:21
**brings (2)**
117:19,21
**brochures (1)**

109:19
**brought (2)**
94:21;97:11
**browser (4)**
70:6,10,13,22
**bucks (2)**
47:1,3
**bugs (3)**
82:2;83:9;84:18
**build (10)**
11:10,12,13,13;32:3,
22,23,25;33:9;66:17
**building (2)**
82:22;120:24
**built (2)**
12:8;66:24
**bullet (1)**
22:13
**business (30)**
24:15;25:11;31:12,
19;33:16;38:9;44:7;
45:7;52:22;53:6,20;
55:8,14;60:23;63:22;
69:5;82:17,22;85:4;
87:11,12;90:19;91:17;
92:14;98:23;99:7,18;
100:5;108:3;118:10
**buy (2)**
116:4,9

### C

**CALIFORNIA (5)**
5:1,9;6:11,18;19:19
**call (3)**
33:20;96:4;120:22
**called (6)**
9:25;40:15;53:2;
69:12;70:3,9
**came (3)**
71:21;81:6;104:1
**can (69)**
7:17,17,19;8:2,7,8,
14;9:13,15;11:7;13:20;
15:25;16:22;17:2;
18:17,23;22:24;26:12;
28:22;29:24;30:14;
31:6;32:5,8,22,25;
33:15;34:9,20,20;
38:22,25;40:3;43:14;
47:2,3,21;48:3,24;
50:2;57:1;58:2,16;
66:8,9;67:1;72:2;
79:13,18;80:19,24;
81:1,1;85:19,22;87:15;
91:1;93:12,24;108:25;
109:6;110:15;113:18;
115:6;116:22;118:5;
122:16;123:12;124:2
**capabilities (12)**
9:11;24:18,19;25:1;
52:23;54:23;79:23;
106:18,24,25;108:5;

123:9
**capability (11)**
9:12;34:16;42:5;
52:20;53:2;55:3;57:10;
60:20;70:20;109:7,24
**card (7)**
7:12,20,22;8:1,4,9,13
**care (1)**
20:3
**carefully (3)**
17:15;40:20;42:2
**carpentry (2)**
32:21,25
**Case (23)**
5:11;8:18;9:6;15:2,
3;19:22;21:6;23:2;
30:23;36:9;56:16,20;
57:5;65:12;74:8;78:20;
84:2;92:22;108:24;
109:2;113:2;114:1;
116:8
**cases (15)**
7:11,13,17,19,23,23;
8:3,15,19,25;9:3,15;
117:19,20;118:8
**cash (3)**
115:4;116:17,22
**casually (1)**
75:20
**catch (1)**
80:22
**cater (1)**
86:6
**certain (5)**
74:12;79:8;80:3;
106:18;115:11
**Certainly (1)**
40:4
**Cervantes (1)**
6:10
**cetera (1)**
115:17
**chain (1)**
76:20
**challenges (1)**
13:17
**challenging (2)**
13:9,10
**chance (1)**
113:14
**change (3)**
56:25;84:16,17
**changed (4)**
39:11;60:8,11;84:6
**changes (15)**
42:11;84:23;88:19;
89:3,9,11,23;90:1,9,17,
21,24;91:5,7;124:2
**changing (1)**
57:11
**charge (8)**
48:22;49:19;50:12,
18,21;102:14;104:2;

114:21
**charged (1)**
49:13
**chart (1)**
105:22
**check (4)**
59:12;60:4,10;
116:22
**checked (3)**
62:19,19;106:21
**cherry-pick (1)**
76:16
**cherry-picked (1)**
71:18
**choose (1)**
74:4
**chose (1)**
76:16
**Chrome (1)**
70:15
**CIO (1)**
83:13
**circumstances (2)**
74:12;114:1
**citations (2)**
20:12;63:20
**cite (1)**
103:19
**cited (2)**
102:18;104:4
**claim (2)**
28:17;118:12
**claiming (1)**
45:3
**claims (1)**
78:8
**clarify (3)**
18:6;52:17;109:10
**class (10)**
9:25;10:2,16,19;
11:1;32:11,24;33:4,8,
19
**classes (11)**
9:20,24;10:4,11,12,
21,23,25;11:12;31:25;
33:7
**clause (1)**
74:10
**clauses (2)**
75:13,18
**clear (8)**
16:23;24:4;35:11;
36:10;47:6;50:7;98:12;
118:19
**client (1)**
72:12,15,19,23,25;
73:13;74:10,22;75:2,9,
11
**clients (10)**
12:9,20;42:17;50:22;
55:20;72:13;74:8;77:8;
88:23;89:6
**client's (1)**

34:6
**clock (2)**
43:25;44:1
**closed (1)**
74:2
**closely (1)**
121:10
**Coalition (1)**
26:21
**code (82)**
8:11;37:7,8,12;
40:24;41:3,4,7,7,9,11,
15,17,20,22;42:7,8,12;
44:2,3,8,9,11,22,24,25;
45:2,5;46:7,9,13;47:9,
10,12,16;52:4;60:13,
16;61:3,17;64:25;82:7,
16;83:14;85:7;89:9;
91:25;92:3,4,7;100:10,
19,22,23,25;101:11,20;
102:1,10;103:13,17,20;
104:1,8,13,18;110:25;
111:23;112:14;113:5;
118:18,21,23,24;119:1,
9,11,19;120:6,15;
123:8,8
**code/architecture (1)**
121:10
**comment (1)**
83:18
**commerce (28)**
9:20;12:24;13:15;
24:15;25:12;26:21;
31:14,22;32:6,14;
33:18;37:15;38:8;85:5;
90:18;91:18;92:14;
98:23;99:7,19;114:25;
115:16,23;116:21;
117:6;118:16;122:4,18
**commercially (2)**
17:23;18:24
**commodity (1)**
114:20
**common (7)**
46:2,16,19,19;47:15;
56:22;57:1
**communication (4)**
71:10;97:9,15;100:7
**communications (2)**
96:17;97:22
**companies (20)**
14:2,3,4;18:17,19;
20:15;51:15;52:25;
58:12;69:14,17;82:1,
21;83:21;93:4;106:6,
13,16;118:20;122:3
**companies' (1)**
100:24
**company (11)**
53:22;54:20;56:5;
73:19;74:15,17;82:22;
94:1;102:21;109:6;
119:18

**compare (2)**
56:25;57:2
**compared (1)**
85:7
**compatible (3)**
86:8;87:6;88:9
**compete (2)**
69:15,17
**competing (4)**
31:12,18;33:16,16
**competitor (1)**
38:9
**competitors (2)**
36:3;54:13
**competitor's (1)**
106:3
**complete (2)**
20:9;111:19
**completely (1)**
83:10
**components (3)**
7:16;8:22;10:18
**computer (3)**
6:21;20:14;33:7
**conceivably (1)**
114:5
**concept (11)**
43:23;46:20,21;
47:13;51:19;52:18,21;
57:9;60:20;63:19,22
**concepts (7)**
10:11,20;11:11;
51:24;52:1;53:14,17
**concluded (1)**
124:23
**concludes (1)**
124:20
**concrete (2)**
58:9;101:21
**conduct (5)**
79:1;85:1,4;108:15;
124:6
**conducted (4)**
92:5;107:21;108:8;
110:15
**conducting (1)**
85:5
**conference (1)**
96:4
**confidential (58)**
13:24;14:7;36:19;
37:1,9;45:4;51:25;
52:2,5,12,14,21;53:3,9,
18,19;54:3;55:7,17;
57:10;58:25;60:14,18,
25;61:13;73:11,15,16;
80:7,10,16,19,24;
92:15,17,23;93:5;
99:14,24,25;110:1;
111:7,12;112:9;113:1,
19,22;114:5;118:25;
119:4,17;120:13,18,25;
121:1,2,7,12

**confidentiality (38)**
14:7,18;36:1;54:2;
55:6;59:17;72:17,19,
20,24;73:14,15,18,19;
74:7,10,11,13,19,23;
75:2,6,9,12,13,17,18,
24;76:11,15;78:5;
93:10,16;94:1;110:22;
119:8;120:5;121:5
**confirm (2)**
98:20;99:3
**confused (1)**
44:18
**connection (2)**
21:11;105:9
**consider (12)**
18:9;35:18,24;65:2;
66:10;68:24;69:5;93:4;
108:4;109:4,6;121:11
**considered (6)**
13:23;20:7,10,12;
75:10;80:15
**considers (8)**
80:7;92:15,17;94:4;
99:13,24;108:23;109:1
**consistent (2)**
51:22;87:8
**consult (1)**
12:8
**consulting (9)**
12:6,7;19:24,24;
26:11,16;95:7;97:23;
100:9
**contact (5)**
14:20;15:7;24:23;
25:15,24
**contacted (1)**
24:21
**contacts (1)**
14:22
**contained (1)**
78:15
**containing (1)**
93:10
**context (3)**
49:3;84:2;114:3
**contract (3)**
74:11;75:13;98:1
**contractor (7)**
23:17,20;24:7;96:24;
97:12,18;98:13
**contradict (1)**
49:24
**contradiction (1)**
50:17
**contrary (1)**
49:11
**conventional (1)**
13:18
**conversation (7)**
24:5,12;76:17;99:20;
100:12;101:24;102:2
**conversations (13)**

15:1;22:7,9;26:7;
88:15;98:3;99:9;100:1;
101:6,23;102:19;
104:9,22
**conversion (6)**
60:13,17,19,22;61:3;
62:4
**converter (2)**
61:12;88:20
**converters (1)**
89:4
**converts (1)**
61:22
**convince (1)**
48:24
**COO (3)**
29:13,17;83:13
**copied (1)**
101:11
**copies (1)**
117:22
**copy (3)**
15:24;16:1;124:19
**core (6)**
42:1,4;87:13;107:22,
24;108:5
**correctly (3)**
15:20;16:17;102:13
**cost (4)**
43:1;49:7,11;50:16
**costs (1)**
43:7
**couch (1)**
104:14
**counsel (7)**
5:15;21:14,18,21;
22:25;23:10;110:19
**couple (3)**
40:18;63:18;105:5
**course (1)**
88:16
**courses (1)**
10:24
**Court (5)**
5:6,17,21;6:10;22:16
**cover (1)**
11:2
**covered (2)**
10:20;44:24
**create (5)**
31:16;52:13;54:1;
70:23;109:19
**created (7)**
77:17,23;82:8,16;
83:4,15;122:16
**credibility (2)**
86:13,24
**credit (12)**
7:12,20,22;8:1,4,9,
13;40:21,22;115:4;
116:17,22
**crediting (1)**
115:21

**criteria (1)**
101:5
**critical (1)**
36:9
**criticizing (1)**
121:16
**crux (4)**
41:25;52:7;110:11;
116:11
**CTO (1)**
102:13
**customer (4)**
73:10,20;74:6,16,22;
75:2,9,11,16
**customers (4)**
12:20;40:24;41:18;
89:6
**customization (2)**
54:15;55:6
**customizations (1)**
89:1
**customize (2)**
88:24;89:7
**customized (1)**
54:1
**CV (16)**
7:16;8:7,14;9:1,18;
15:15;17:4,22;18:3,16,
23;19:12,17,21,23,25
**CVs (1)**
19:20
**Cyberonix (1)**
79:3

## D

**daily (1)**
93:6
**data (12)**
56:21;60:13,17,19,
22;61:3,12,22;62:3;
78:8;88:19;89:4
**data- (1)**
83:24
**database (26)**
11:2;24:14;25:11;
78:15,18,21;82:7,11,
12,16,23,25;83:4,14,
17,24;84:1,3,3,5;98:22;
99:6,18;123:16,16,18
**databases (2)**
82:22;83:21
**date (2)**
5:7;124:22
**dated (1)**
105:3
**dates (4)**
34:19;67:6;106:20;
108:13
**dealing (3)**
29:6;110:7;120:13
**dealt (1)**
118:7

debiting (1)
115:21
decided (1)
77:10
decision (2)
21:10,12
DEF (1)
50:11
defendant (1)
5:20
defendant's (2)
21:17,20
DEFT (10)
46:15;48:21,21;
49:11,18,18;50:11,12,
16,25
degree (1)
11:24
deliver (1)
117:15
delivered (1)
118:9
demo (7)
49:23,23;63:23,24;
65:22;66:12;101:13
demonstration (6)
62:10,21,22;64:10,
15,18
demos (1)
109:20
depending (3)
74:10;75:12;117:5
depends (3)
7:5;75:15,16
deponent (1)
5:23
deposit (2)
40:25;41:18
deposition (27)
5:8,13;20:24;21:2;
24:1,3;29:14,22,23;
59:15,24;61:19;62:1;
68:11;82:15;86:11,16;
88:15;99:11;100:14,
16;102:19;103:1;
111:10;113:24;124:21,
23
depositions (13)
20:18,19,20,22;21:5,
8,10,13,17;59:10;60:4;
93:18;110:14
derive (1)
6:24
derived (1)
7:3
describe (2)
40:5;123:25
described (7)
28:7;50:16;55:25;
115:18,19,20,24
describes (4)
38:20;57:18;58:18;
65:23

describing (1)
110:13
design (10)
10:3;37:7,8,12;44:4,
21;52:4;81:2;119:2,20
designated (1)
92:21
designed (3)
57:19;58:19;65:14
designs (2)
36:4,24
detailed (3)
36:17;52:7;89:23
details (13)
36:6;38:4;53:18;
59:1;77:15;89:11,14;
96:21;97:14;118:17;
119:21;120:15,16
detect (1)
90:10
determination (2)
23:7;61:16
determine (6)
69:16;78:13,19;81:9;
85:3;114:23
determined (1)
22:21
develop (11)
9:11;10:3;11:7;
13:20;32:8;55:10,20;
56:6;79:14;83:8;
107:10
developed (35)
9:8;11:7,7,20;12:11,
15,18;13:1,4;17:23;
18:8,10,10,12,13,15,
24;19:6,11,13;60:13,
16;61:3;63:4;79:8,12;
80:4;81:11,13,20,22;
90:13;120:6;121:5,7
developer (1)
90:14
developing (4)
11:4,18;13:22;79:22
development (18)
10:9;18:9;24:13;
25:10,17;32:7,8,16;
42:7;58:4;91:8;92:9;
98:21;99:6,12,17;
100:6;119:7
developments (1)
91:11
devices (1)
18:13
differ (1)
114:24
difference (9)
28:4,11;43:24;50:25;
109:11;115:1;116:12,
13;117:11
differences (8)
28:12;42:1;115:22;
116:2,23;117:8;118:3,

6
different (31)
11:8,8;18:8;19:20;
36:12;40:24;41:7,17,
22;48:7,17;54:24;55:4,
12;68:21;81:17;97:20;
101:9,10,12,15;105:23;
106:23;110:10,18;
115:5,5;117:4,16;
118:2,12
difficult (1)
123:25
difficulties (1)
56:15
direct (4)
18:23;33:15;40:11;
50:4
direction (2)
85:18;111:11
directly (1)
41:18
director (1)
14:14
disagree (3)
51:25;69:8;76:18
disclose (1)
72:14
disclosed (6)
63:23;65:9;74:9;
75:4,10,14
discloses (7)
36:3;63:10;64:1;
65:17;66:3;74:15,17
disclosing (1)
72:12
disclosure (21)
48:4,5,16;59:4,14,19,
23;60:2;71:7;72:16;
73:11,17;74:17;75:6,
21;76:2,3,7,8,12;80:9
disclosures (1)
80:12
discrepancy (2)
51:10,20
discuss (1)
49:6
discussed (4)
59:4;98:15;103:25;
104:11
discussion (4)
25:20;93:21;95:15;
110:4
discussions (3)
40:21;59:10;114:1
dispute (4)
29:16,21;56:2;118:7
disputes (3)
118:7,13,15
distinction (2)
52:11;84:7
distributed (2)
10:16,18
distributor (24)

41:23;42:14,19;
45:21;46:1,2;47:2,4,8,
21;49:7;62:9,21;81:6;
85:9;90:17;95:10,17;
116:6,11;117:13,19,21;
122:13
distributors (9)
40:13;59:18;85:10,
19;88:24;114:20,22;
122:6,11
document (12)
15:18;35:13;77:22;
78:14,17;95:3,25;
96:13;97:19;98:19;
112:11;113:24
documents (8)
21:25;26:9,13,14,14;
45:23;92:22;113:2
domain (22)
13:5;25:1;35:19,21,
24,25;36:22,25;38:11;
43:13,17;44:14;45:12,
15,17;47:8,10,16;
58:17;102:17;107:8;
123:11
done (8)
18:18;49:4;51:21;
57:4;84:8,19;88:25;
93:2;95:16;121:18;
123:4
door (2)
32:22;118:21
down (2)
43:4;104:1
download (1)
27:1
downloaded (4)
27:2,3,4;37:19
Dr (1)
27:4
drive (1)
120:9
drones (2)
18:11;19:12
due (2)
113:8;116:14;117:1
during (2)
31:6;100:9
duties (3)
23:19,21;103:21
duty (1)
103:20

**E**

earlier (8)
11:1;15:15;16:20;
17:6;37:17;59:4;97:13;
124:5
early (1)
29:4
earns (2)
35:11,15

e-commerce (9)
8:22;9:9,10;10:3;
11:20,20;17:24;18:13,
25
edit (1)
63:5
editing (3)
53:13;62:25;110:10
effective (1)
55:13
effectuate (1)
46:22
effectuates (3)
36:4,24;47:7
EFT (24)
11:4,5,16,18;12:12,
17,23;13:6,10,12;
37:21;41:21;42:14,18,
23;45:21;46:1;47:8;
49:7;51:6;63:1;81:11,
20;122:17
eight (1)
38:8
either (6)
22:3;47:2;71:5;
82:21;95:5;118:8
either-or (1)
74:3
electronic (8)
9:20;11:21;12:18;
26:21;38:7;43:8;
107:25;116:20
electronically (2)
73:20;74:16
elements (4)
8:13;81:2;99:24,25
else (5)
22:22;40:17;54:13;
79:17;119:10
else's (1)
21:12
e-mail (8)
71:10,19,20;72:7;
76:17,20;77:4,4
e-mails (6)
26:14;27:6,13;77:23;
78:14;84:3
employed (1)
102:18
employee (6)
22:22;23:18;71:19,
21;72:7;78:4
employees (11)
22:6,8,18;23:8;
56:14;90:13;93:15,23;
94:1;102:3,5
enable (5)
11:11;60:13,17;61:3;
108:9
enabling (1)
10:18
end (5)
39:5,12;58:6;76:20;

82:5
ends (1)
  109:17
engage (1)
  54:14
engaged (3)
  42:13,16,18
engages (1)
  45:11
engine (3)
  53:2,8;54:1
engineer (4)
  12:1,6;18:2;56:10
engineering (7)
  10:1,16;11:1;20:15;
  21:16;109:10,14
enlightening (1)
  38:6
enough (1)
  16:10
ensure (1)
  17:13
ensuring (2)
  53:22;55:15
entailed (1)
  74:12
entire (3)
  40:12;47:4;65:2
entitled (1)
  55:1
entity (3)
  28:3;53:21;122:8
equivalent (2)
  108:24;109:2
errors (1)
  17:18
especially (3)
  8:22;51:16;109:18
essentially (12)
  27:11;28:6;37:4;
  52:7;53:10;84:8;
  103:20,24;116:5;
  117:15;120:22;122:24
establish (1)
  49:10
established (1)
  34:4
Establishing (1)
  42:23
et (1)
  115:17
even (10)
  24:21;25:15;32:22;
  39:6;47:5;50:7;52:25;
  67:14,22;109:9
event (1)
  38:2
everyday (1)
  54:12
everywhere (2)
  57:4;60:21
evidence (11)
  30:11,15;34:4;50:14;

52:6;71:18;72:5;78:2,
5,11;102:16
evolve (1)
  82:2
exact (2)
  103:23;104:20
exactly (9)
  23:13;24:3;49:2;
  54:7;58:8;63:6;91:10;
  105:14;107:18
EXAMINATION (2)
  6:7;85:1
examined (2)
  29:12;108:9
example (13)
  19:10;36:15;41:12,
  23;43:22;52:17,19;
  56:23;58:4;73:1;75:24;
  114:19,19
exception (13)
  63:7,11,15,17,21,23;
  64:2;65:9,13,19,24;
  66:3,13
exceptions (1)
  90:22
exchanged (1)
  103:24
Exhibit (17)
  15:10,11;16:3,4,19;
  17:1;26:22;39:2,4;
  94:15,17;95:19,21;
  96:7,9;98:5,8
exhibits (1)
  16:20
exist (2)
  65:24;117:8
existed (2)
  124:7,9
existing (3)
  86:7;87:5;88:8
exists (2)
  60:20;124:10
expand (1)
  67:17
expansion (1)
  114:4
expect (3)
  8:12;58:11;101:10
experience (4)
  12:23;18:1;19:25;
  20:3
expert (11)
  6:25;7:4,20;8:3,17;
  9:5,16;17:3;31:7;
  86:10;107:20
expertise (1)
  9:8
explain (2)
  29:25;123:23
explanation (7)
  38:5;53:24;107:3;
  111:4;112:25;113:5,13
exploit (1)

9:14
Explorer (1)
  70:15
expressed (1)
  86:17
expressly (1)
  37:24
extent (7)
  40:9;46:9;56:1;
  81:15;87:16;93:19;
  97:23
externally (1)
  64:23
eyes (3)
  92:23;110:22;112:13

## F

face (3)
  43:24,25;120:4
Facebook (1)
  54:21
faced (1)
  56:15
facilitate (6)
  24:14;25:11;90:18;
  98:23;99:7,18
facilitated (1)
  68:14
facilitates (1)
  46:14
fact (14)
  18:16;19:13;24:17;
  26:22;34:3,5;35:10;
  43:20,21;44:12;45:11;
  67:1;71:17;103:11
factors (1)
  75:15
facts (2)
  30:15;56:12
failed (1)
  49:10
fair (1)
  47:17
Fairness (2)
  42:22;124:5
fall (2)
  23:17;24:7
familiar (2)
  48:15;97:5
far (1)
  16:10
Farrell (2)
  76:21;77:4
faster (2)
  39:19;69:20
fault (1)
  73:1
feature (24)
  11:6;51:13,15;53:12;
  55:3;56:17,19;57:6;
  63:1,5;66:17,22;67:5,
  11;69:12;70:2,8,9,12,

13,16,22;108:22;109:6
features (29)
  11:10;18:15;19:5;
  51:24;52:1;53:13;82:2;
  83:9;84:18;99:12;
  101:16;105:23;106:2,
  8,12,15,23,25;107:2,4,
  16,19,23,24;108:3,10;
  110:5,5,9
February (2)
  17:10;105:3
fee (6)
  46:25;48:22;49:20;
  50:13,19,21
feel (1)
  101:16
fees (5)
  46:3,3,18;49:13;51:8
feet (1)
  56:24
felt (1)
  61:21
few (4)
  9:4;26:8;74:22;
  107:9
field (1)
  78:15
fields (1)
  78:18
figure (2)
  102:20;109:14
figures (1)
  55:25
file (12)
  55:21;71:14;72:6,11,
  12,20,25;74:13;77:5,
  16;80:12;90:18
filed (1)
  79:24
files (1)
  89:10
Finally (1)
  49:9
Financial (7)
  5:10;17:25;18:25;
  24:19,25;28:8;81:14
find (3)
  38:25;67:8;101:11
finding (1)
  62:12
fine (2)
  16:4,21
Fintech (57)
  5:18;27:17;31:13,19;
  33:17;35:23;36:10;
  37:24;43:12,16,18;
  44:12;46:5;47:7;48:22;
  49:10,12,18,19;50:12,
  21,25;55:20;56:14;
  58:23;59:3;60:2,13,17;
  61:3,4;63:10;64:1,22;
  65:2,8,15;71:19;72:7;
  74:8;75:24;76:9,10,22;

77:3,5,9;96:25;99:13,
13,24,24;101:14;
110:20;114:4;122:3,7
Fintech's (38)
  45:21;48:21;50:11;
  57:18;58:19;61:12;
  62:8,23;63:14,16;
  65:13,18;68:15;69:12;
  70:1,3,8,11,22,24;
  71:11,14;72:6,9;75:21;
  76:2;78:4,16,18,21;
  100:18,22;101:25;
  102:10;103:13;104:8,
  13;110:6
firm (2)
  12:7;85:21
first (14)
  24:23;33:24;34:12,
  15;38:25;52:24;63:4;
  82:15;86:2;98:24;
  105:1,4,8,11
five (2)
  94:9;114:8
fix (3)
  16:22;82:2;84:18
fixes (1)
  83:9
flash (1)
  120:9
flies (2)
  18:11;19:11
flights (1)
  106:20
flip (1)
  16:18
flow (1)
  119:3
flows (2)
  120:20,21
fly (1)
  91:13
focused (1)
  36:20
folks (1)
  23:1
follow (2)
  54:6;117:18
followed (1)
  118:11
follows (1)
  5:24
fools (1)
  69:15
footnote (4)
  64:7,11,19;65:17
footnotes (2)
  20:13;62:5
forget (1)
  67:5
form (52)
  18:5;19:2;21:22;
  25:5,22;28:16;30:18;
  32:19;34:1;37:3,21;

38:15;40:7;44:16;50:5;
51:12;54:5;55:9;64:1,
3;65:20;66:19;67:19;
68:3,23;72:1;73:7,21;
74:20;76:18,24;77:6;
79:20;82:18;83:19;
84:13;86:14,25;88:5,
12;92:24;93:3;106:5;
107:6;111:2,25;
112:15;113:7;119:12,
15;120:7,11
**format (18)**
63:11,15;64:4;65:9,
18;66:3,10,14;71:11,
14;72:6,10,13,20;
76:22;77:5,16,22
**formats (1)**
78:8
**forming (1)**
71:18
**forms (3)**
11:21;12:18;55:12
**forth (1)**
57:12
**found (4)**
20:13;21:14;27:5;
68:2
**founded (1)**
79:3
**front (5)**
7:16;8:7;9:1;105:16;
124:1
**FTX (3)**
64:10,15,18
**full (3)**
6:9,12,14
**fully (4)**
81:11,12,20,21
**function (2)**
89:18;90:5
**functionalities (3)**
57:18;58:19;113:4
**functionality (5)**
11:6;55:12;57:15;
84:9
**functions (2)**
41:15;57:13
**fund (3)**
30:12,16;107:25
**fundamental (1)**
106:13
**Funds (39)**
27:21,23;28:1,3,5,8,
15;29:1,3,15,18;31:13,
20;32:1,5,14;33:17,25;
34:5,12,15,25;35:4,6,8,
16;36:11;38:7;40:23,
25;41:16,18;43:13,17,
22;44:14,15;45:9;
116:20
**further (4)**
15:17;42:7;65:8;
124:14

### G

**gallons (1)**
57:11
**gave (1)**
67:6
**geared (1)**
19:21
**general (2)**
20:14;63:21
**generalities (1)**
33:12
**generality (1)**
58:15
**generally (2)**
51:1;80:8
**George (1)**
10:14
**get-go (1)**
68:6
**Gilad (8)**
22:14,15,17;23:3,3;
24:24;95:11;101:6
**G-i-l-a-d (1)**
22:17
**given (7)**
6:12,14;26:5;56:23;
106:12,14;107:1
**gives (4)**
54:15;55:13;60:22;
101:17
**giving (3)**
74:2;119:9;120:10
**God (1)**
6:3
**goes (6)**
40:18;68:5;72:23,25;
79:14,16
**Good (3)**
5:4;121:15;123:16
**Google (9)**
52:19,20,22;53:4,7,
24;54:7,19,20
**governs (1)**
89:9
**grad (1)**
119:6
**graduating (1)**
13:19
**great (1)**
121:17
**group (1)**
12:8
**guidance (1)**
102:22
**Guidelines (1)**
42:23
**guy (1)**
23:4
**guys (1)**
103:25

### H

**hackers (1)**
9:13
**half (2)**
47:3;76:17
**handed (1)**
16:25
**handle (2)**
122:10,17
**handled (2)**
118:13,15
**handling (1)**
122:14
**handwriting (1)**
16:7
**happen (2)**
39:19;54:17
**hard (1)**
43:4
**Harmony (4)**
87:10;101:14;124:8,
9
**Harris (5)**
20:25;29:13;82:14;
83:13;100:13
**Harris' (1)**
100:8
**Hashmi (1)**
27:4
**head (3)**
7:14,19;34:19
**heads (1)**
68:5
**hear (1)**
7:7
**help (4)**
6:3;39:14;41:8;
84:12
**hereto (5)**
15:13;94:19;95:23;
96:11;98:10
**high (2)**
106:8,10
**hired (1)**
66:16;67:10
**home (1)**
6:9
**hotel (1)**
53:16

### I

**iControl (97)**
14:21,23;15:8;22:6,
8,18,22;23:16,18;24:6,
18;25:16,24;26:11,16;
27:8;29:4,18;30:11,13,
16,17;33:24;34:5,12,
15;38:2,18;40:6;42:13,
16;50:18;63:4;66:15;
67:9;71:6;73:1;79:7;
80:2,6,14;81:5;84:23;
85:2,11,20;86:7;88:8,
19,22;89:3,9,10,17;
90:13,13,17;91:8,17;
92:15,17,21;93:8,13,
14,22,22;94:3,4;95:6,
15;97:2,10,16;99:13;
100:18;101:15,25;
102:3,9;103:12;104:7;
105:12;107:4,16;
108:11,23;109:1;
111:1,24;112:12,13;
113:3,3;122:4,7;
124:10
**iControl's (18)**
24:14;25:10;28:25;
29:17;30:2;48:4;61:22;
73:1;81:10,20;90:9,22;
92:8;98:22;99:6,17;
100:23;110:19
**idea (1)**
46:17
**identification (6)**
15:12;17:1;94:18;
95:22;96:10;98:9
**identified (3)**
23:10,11;116:24
**identify (12)**
5:15;7:19;8:2,14,24;
9:15;17:2;28:22;33:21;
58:16;85:19;122:21
**ignoring (1)**
71:20
**imagine (1)**
106:15
**implement (8)**
32:5,13;33:17,23;
34:15;47:14;67:11;
70:19
**implementation (4)**
45:16;52:4;53:4;
81:2
**implementations (1)**
53:19
**implemented (7)**
12:14;31:19;33:25;
34:12;66:22;67:5;
103:18
**implementing (2)**
55:2;109:16
**implements (1)**
31:13
**impression (1)**
101:17
**impressionist (1)**
33:5
**improper (1)**
54:10
**improvements (1)**
84:19
**inaccurate (1)**
29:25
**inappropriate (2)**
69:6;120:4
**in-bound (1)**
88:19
**Inc (1)**
5:10
**inches (1)**
57:1
**include (2)**
17:15;103:11
**included (1)**
27:10
**Including (2)**
17:18;32:3
**income (2)**
6:24;7:3
**independent (8)**
23:16;24:7;48:2;
96:23;97:12,18;98:1,
13
**indexing (1)**
53:5
**indicate (6)**
34:24;37:20;42:25;
46:15;76:14;81:4
**indicated (4)**
77:4;107:15;116:25;
117:4
**indicates (2)**
17:23;95:10
**indication (1)**
22:5
**indirectly (1)**
25:16
**individuals (2)**
14:15,17
**industries (4)**
28:19;51:15;63:19;
118:12
**industry (58)**
11:19,25;12:25;
13:16;18:14;24:15,20;
25:12;26:21;28:14,23;
29:7;31:14,22;32:6,15;
33:18;37:15;38:8;
46:16;47:21;51:7,11;
54:14;56:18,18;57:6,7;
63:2;85:6,11;86:7,9;
87:6;88:10;89:18;90:6;
91:18;92:14;98:23;
99:8,19;106:1,3,7,22,
24;114:25;115:10,16,
23;116:21;117:6;
118:14,14,16;122:4,18
**inferring (1)**
25:19
**inform (1)**
94:3
**Information (59)**
5:10;6:21;20:6,9;
26:6;36:18;44:3;46:10;
54:4;55:7,23;56:3;
58:10,12,18,20;61:5,
15;68:1,15;69:11,14;

70:1,24;72:15,17;
73:10,11,14,20;74:9,
15,18,19;75:3;78:21,
25;80:7,15,20,23;
85:16;91:1;92:13;94:4;
101:2,3,6;106:19;
110:1,21;111:13;
118:25;119:10,20;
120:12,14,14;121:12
**informative (1)**
38:7
**infrastructure (3)**
86:8;87:5;88:9
**inherent (1)**
27:24
**insecure (1)**
9:13
**installing (1)**
84:5
**institutions (1)**
28:8
**interchangeably (1)**
64:25
**interest (2)**
35:11,15
**interface (2)**
78:8;108:1
**interfaces (3)**
88:25;89:7;123:18
**intern (3)**
9:25;10:25,25
**internal (10)**
46:10;53:3;64:9,14,
17,20;65:6,13,17,22
**internally (4)**
45:14;46:4;47:7;
64:23
**internet (2)**
54:1;70:15
**internet-based (1)**
33:10
**intervention (1)**
90:14
**interview (1)**
23:8
**interviewed (1)**
22:6
**into (8)**
38:9;41:18;66:17,24;
82:17;107:8;111:11,17
**introduced (2)**
89:17;90:5
**investigated (1)**
45:19
**invoice (4)**
55:22;62:25;63:5;
110:9
**invoices (3)**
53:13;79:23;90:10
**invoked (2)**
36:13,15
**involve (2)**
8:4;9:16

**involved (7)**
13:22;14:12;23:2;
25:17;42:14;96:16;
99:12
**involvement (7)**
11:3,17;24:13;25:10;
98:21;99:5,17
**involving (5)**
7:11,13;8:11,18;9:6
**iPhone (1)**
68:6
**IRVINE (8)**
5:1,9;6:10,18;9:23;
10:13,15;19:19
**issue (7)**
48:2;77:17,22,23;
78:14;95:16;96:17
**issues (2)**
19:22;90:10
**itinerary (1)**
106:19
**Ivan's (1)**
39:12

**J**

**January (1)**
105:10
**JAVA (2)**
58:6,6
**jeopardize (1)**
111:12
**job (1)**
119:6
**John (1)**
5:19
**JSP (1)**
58:6
**judge (1)**
88:3

**K**

**keep (1)**
7:8
**keeps (1)**
36:18
**kept (1)**
60:24
**Keren (22)**
22:14,15,17,19;23:3,
3,15;24:5,12;25:9,20;
87:4;88:11,15;96:3;
100:8;101:6,24;
102:11,12;103:10;
104:2
**K-e-r-e-n (1)**
22:17
**Keren's (5)**
61:18;86:11,13,24;
87:7
**kind (15)**
32:3,8,20;53:20;

65:23;75:15;93:24;
96:20;102:22;103:21;
106:25;108:4;109:9;
110:3;121:10
**kinds (2)**
45:7;106:18
**knew (1)**
78:17
**knowable (1)**
60:23
**knowledge (9)**
20:14;36:2;46:19;
47:15;48:2;54:17;57:4;
66:11;114:7
**known (5)**
13:11;52:20;53:17;
63:19;79:5
**KWO (3)**
94:23,25;124:15

**L**

**lab (3)**
14:12,14,15
**lacking (1)**
110:12
**language (2)**
54:19;120:2
**languages (2)**
11:8;101:10
**large-scale (1)**
8:20
**last (5)**
15:20;62:19;77:4;
86:1;105:2
**later (2)**
59:12;83:13
**lawful (2)**
37:15;115:10
**lawyer (1)**
111:8
**lead (1)**
111:11
**learn (5)**
23:14;31:15,23;
32:25;33:16
**least (7)**
44:18;45:3;93:25;
101:11;102:17;104:25;
110:15
**leave (4)**
110:20;111:14;
112:7,24
**legal (1)**
120:1
**less (4)**
84:15;87:14;99:10;
106:7
**limited (3)**
31:6;45:2;119:8
**line (1)**
99:23
**lines (2)**

8:11;93:18
**links (2)**
62:15,21
**liquor (1)**
115:6
**listed (8)**
18:16;19:4;20:18;
21:6;22:10;27:9;
107:23;108:3
**listened (1)**
116:1
**listing (1)**
20:9
**lists (1)**
19:24
**liters (1)**
57:11
**litigation (4)**
19:23,24;20:3;34:6
**little (4)**
44:18;56:4;69:20;
94:21
**living (1)**
6:15
**local (1)**
47:25
**locate (1)**
39:17
**located (2)**
37:19;62:9
**location (1)**
62:8
**logic (8)**
89:17;90:4;118:22;
119:3,11;120:5,20,21
**login (1)**
87:10
**long (7)**
12:22;13:11;67:2,18,
25;116:18;122:25
**longer (1)**
73:11
**look (17)**
7:17;8:7;9:18;16:10;
20:4;21:15;27:19;
37:22;58:17;59:6,9;
69:15;100:10;101:16,
20;105:19;124:8
**looked (12)**
66:12,12;75:21,23;
76:1,7,8;87:11;101:7,
13;124:9,11
**looking (8)**
8:8,14;17:22;61:1;
62:5;86:1;87:23;115:3
**looks (2)**
64:3;66:6
**Lopez (44)**
5:11,20;22:14,19;
23:1,14,16;24:5,6,20,
23;25:15,21;26:10,15;
27:7;65:14;66:16;
67:10;81:6;85:12,20;

93:9,14;95:5,7;96:3,
16;97:10,11;98:21;
99:16;100:8,9;102:8,
18,24;103:12;104:5,6,
23;107:5,12,17
**Lopez's (9)**
24:13;25:9;30:12,17;
68:11;69:8;91:8;96:23;
97:17
**lose (3)**
72:16,20;73:19
**loses (1)**
74:18
**lost (1)**
64:12
**lot (9)**
7:13,23;8:20;57:21;
58:11,12,20;109:17;
118:18
**lots (11)**
8:10,19,19;9:8;
10:24;18:8;51:14,14,
15;52:25;67:12

**M**

**MacArthur (1)**
5:9
**mainly (1)**
20:1
**maintain (5)**
55:5;72:16;73:18;
74:13,18
**maintained (1)**
54:2
**makes (10)**
26:20;35:11;36:7,10;
63:7;67:12,13,16;
82:23;94:1
**making (4)**
47:12;52:10;84:7;
91:10
**Malek (8)**
5:13,24;6:10,12;
95:2;114:15;122:2;
124:21
**man (1)**
102:14
**manner (1)**
47:7
**many (10)**
9:3;33:7;38:12;
52:23;55:19;56:5;
91:22;104:22;114:22;
122:3
**MARCH (9)**
5:1,7;23:17;24:8,22;
29:19;66:17;67:10;
124:22
**Mark (7)**
5:11,20;22:14;23:1;
24:20,23;25:15
**marked (12)**

15:11;17:1;39:6;
94:15,17;95:19,21;
96:7;9,9;98:4,8;112:12
**market (1)**
54:16
**marketing (2)**
103:16;109:19
**Mason (1)**
10:14
**matter (5)**
5:10;6:1;15:8;20:11;
105:9
**matters (2)**
70:18;96:5
**May (26)**
5:17,22;7:9;22:15;
23:10,11;27:4;31:5;
42:6;48:22;49:19;
50:12;69:19;82:9;
91:12;97:12,21,21;
109:4,22;111:12;
112:9;115:7;117:24;
119:10;121:18
**Maybe (15)**
27:3;38:10,11;39:9;
57:1;78:6;87:21;105:4,
4,7;109:9;111:16,17;
112:9;117:24
**McCREA (92)**
5:17,18;6:8;15:10,
14,24;16:3,5,9,12;
18:20;19:7;22:1;25:6;
26:1;28:20;30:21;31:4;
33:2;34:2,8,10,17;
37:10;38:16;39:4,10,
12,14,16,19;40:1,10;
44:20;50:9;51:18;54:8;
55:18;66:1,23;67:7,24;
68:8;69:1;72:2,8;73:8,
24;74:24;77:2,13;80:1;
83:2,22;84:11,21;
86:19;87:3;88:6,17;
93:1,7;94:9,15,20;95:1,
19,24;96:7,12;98:4,7,
11;106:9;107:13;
111:3,6;112:1,10,18;
113:10,16;114:8,14;
119:13,22;120:8,19;
122:1;124:14,16,18
**mean (76)**
7:23;13:8,10;25:16;
29:11;30:9;33:4,19;
35:20;36:8;38:10;
40:12;41:3;42:4,10;
44:2,5,8,19;46:6,8,12,
17,23,24;48:5,17;
52:22;55:23;56:23;
57:16;58:21;60:21;
61:9;64:3,20;67:12,21,
22;71:5;74:4;77:11;
79:14;81:1,12,21;82:1,
12;85:15;87:7;88:14;
89:13;91:21,22;93:4,

19,24;96:19;97:2;
101:19;103:14,24;
104:9;106:12,17;
109:8;111:8;115:18,
19;116:15;117:10;
118:2,10;120:21;
123:4,7
**meaning (3)**
97:16,25;122:10
**meant (4)**
41:11;83:17;84:2,4
**measuring (1)**
56:24
**memory (1)**
8:6
**mention (3)**
68:18,19,24
**mentioned (6)**
11:1;37:24;38:2;
68:16;86:23;112:6
**mentioning (2)**
68:22;75:20
**merely (1)**
113:3
**methods (1)**
117:9
**Michigan (2)**
81:6;85:9
**Microsoft (3)**
10:5,6;53:1
**might (8)**
42:1,10,10;58:10;
76:25;84:2;111:11;
112:8
**millions (1)**
8:11
**mine (3)**
39:2,5,6
**minute (3)**
7:18;16:9;121:18
**minutes (1)**
74:22
**missing (1)**
49:3
**misstated (1)**
113:9
**mistaken (1)**
103:6
**mistakes (2)**
17:16,17
**mobile (1)**
18:13
**model (6)**
29:1;37:15;46:16;
49:11;117:16;123:5
**models (1)**
118:2
**modification (1)**
122:18
**modifications (4)**
83:24;84:23;108:13;
123:24
**modified (3)**

82:4;83:11;123:19
**modify (1)**
123:10
**moment (2)**
17:7;39:17
**money (1)**
56:6
**monies (1)**
35:12
**monthly (6)**
48:22;49:13,19;
50:13,18,21
**months (3)**
24:23;26:8;104:10
**more (7)**
19:21;21:15;40:19;
42:2;54:25;55:13;
84:14;87:14;99:10,23;
100:2;101:21;102:20;
103:10;106:7;123:12,
23
**morning (1)**
5:4
**most (7)**
53:7;58:12;82:1,23;
84:17;89:22;107:14
**mostly (1)**
115:1
**move (2)**
42:8;69:20
**moved (1)**
10:14
**much (9)**
56:6;68:21;91:16,19,
21,21,25;102:20;
103:17
**multiple (6)**
18:14;42:15,17,20;
100:17;101:3
**must (3)**
38:18,21;40:6
**myself (4)**
29:12;59:13;60:4;
123:3
**MySQL (3)**
10:21,24;11:2

## N

**name (8)**
5:4,19;6:9,12,14;
15:20;78:18;79:5
**names (1)**
78:15
**natural (1)**
107:10
**nature (2)**
75:12;123:2
**necessarily (2)**
20:3;120:15
**need (7)**
7:9;19:9;32:2;33:10;
83:23;100:10;123:4

**needed (7)**
82:7,15;83:4,15;
84:8;94:23,25
**NET (4)**
10:5,6,16,20
**new (9)**
42:7;54:20;55:1,2;
82:9;83:8;106:1;
123:10,20
**news (1)**
116:6
**newspaper (7)**
114:21;116:4,6,7;
117:21,22;118:14
**newspapers (3)**
114:18,22;118:8
**nice (1)**
77:8
**nickname (1)**
6:13
**night (1)**
62:19
**nobody (1)**
79:17
**Noe (1)**
21:2
**N-o-e (1)**
21:3
**none (1)**
111:22
**nor (3)**
27:14;98:14;108:15
**normal (1)**
56:21
**normalization (7)**
56:17,20;57:3,5;
108:24;109:2;110:8
**norms (2)**
118:11,13
**note (1)**
79:7
**notes (2)**
16:1,5
**notion (1)**
57:3
**November (2)**
67:5;96:4
**Number (10)**
5:11;41:12;64:19;
66:8;94:16;95:20;96:8;
98:5;106:21;110:14
**numbers (1)**
55:25

## O

**oath (8)**
5:23;36:21;68:17,22;
69:2;75:19,20;86:20
**Object (49)**
18:5;19:2;21:22;
25:5,22;28:16;30:18;
32:19;34:1;37:3;38:15;

40:7;44:16;50:5;51:12;
54:5;55:9;66:19;67:19;
68:3,23;72:1;73:7,21;
74:20;76:24;77:6;
79:20;82:18;83:19;
84:10,13;86:14,25;
88:5,12;92:24;93:3;
106:5;107:6;111:2,5,
25;112:15;113:7;
119:12,15;120:7,11
**objection (7)**
31:1;34:2,13;65:20;
67:3;112:3;113:15
**observe (2)**
110:18,24
**obtain (1)**
26:24
**obtained (4)**
26:25;71:6;101:2,4
**obvious (1)**
47:5
**obviously (7)**
11:12;23:2;95:14;
100:2;101:4;114:7;
117:10
**occasionally (1)**
7:8
**off (13)**
7:14,18;8:6;34:19;
39:16,20,20;70:1;78:3;
94:10;114:9;121:20;
124:22
**offense (1)**
91:14
**offer (2)**
33:7;122:4
**offered (2)**
63:1;108:11
**offering (4)**
33:12;107:4,16,19
**offers (3)**
35:1;37:6;49:11
**office (1)**
33:20
**officer (1)**
23:5
**oftentimes (1)**
113:22
**oil-based (1)**
33:4
**onboard (2)**
90:14;95:17
**onboarding (1)**
95:11
**Once (4)**
32:7;24;62:14;
121:13
**one (37)**
9:7;16:5,20;19:21;
22:3;31:3,24;42:8;
46:17;52:24;59:10;
63:13,18;65:3,24;
76:14;77:25;78:2;

82:21;85:9;87:16;
93:18;94:15;99:15;
101:4,5;104:3,4;105:1,
2,5,6;106:3;116:23;
117:10;119:5,6
**ones (3)**
21:6,19,20
**online (3)**
27:5;49:12;53:17
**only (7)**
92:23;106:2;110:22;
112:13,13;117:22;
118:20
**operate (1)**
101:18
**operates (1)**
119:21
**opined (4)**
45:19;76:13;78:1;
109:5
**opinion (26)**
20:10;30:1,20,23;
31:7,9;35:17;37:4;
50:6;51:2;53:11;56:1;
60:9;63:14;70:4;71:13,
18;76:18,18;78:3;
81:15;86:11;87:1,17;
105:25;113:1
**opinions (6)**
31:3;52:8;58:24;
63:18;78:7
**opportunity (2)**
96:2;100:22
**opposed (5)**
46:22;57:13;58:15;
112:14;122:13
**Oracle (1)**
82:24
**order (13)**
24:14;25:11;42:8;
70:23;82:17;85:4;87:5;
91:17;98:22;99:6,18;
100:11;123:5
**ordering (1)**
124:18
**others (1)**
93:9
**other's (1)**
69:16
**otherwise (1)**
43:2
**out (10)**
24:24;46:10;49:21;
52:22;67:8;71:16,17;
84:8;109:14;118:21
**out-bound (1)**
89:3
**outside (1)**
103:21
**over (4)**
9:3;10:15;91:5;
118:8
**owed (1)**

118:1
**owing (1)**
117:1
**own (4)**
43:1;53:1;54:14;
87:8

**P**

**page (21)**
16:11;17:8;19:18;
20:4;22:12,13;27:19;
29:14;40:14;42:22;
47:23;49:7,22;58:6;
61:1,21;81:4;82:14;
85:23;98:17;105:19
**pages (3)**
20:18;40:19;92:22
**paid (2)**
117:14,20
**painter (1)**
33:5
**painting (1)**
33:4
**Paper (10)**
26:21;37:17,20;38:6,
17;40:5,12;47:23;49:4;
115:3
**paragraph (1)**
47:22
**parse (1)**
82:20
**part (22)**
6:24;7:2;10:2,19;
15:22;36:9;46:23;47:5;
53:8;59:17;68:25;75:8;
76:25;79:19;86:10;
87:11,12;98:24;
105:16;107:20;109:13,
21
**particular (4)**
54:21;109:24;
113:23,24
**Particularly (1)**
103:1
**parties (1)**
5:15
**partner (1)**
42:25
**parts (1)**
123:14
**party (5)**
41:21;46:17,19;51:6;
122:10
**passengers (1)**
106:21
**past (6)**
9:4;60:10;74:22;
91:5;99:15;107:9
**patent (14)**
79:8,9,13,18,24;80:3,
8,10,12,12,14,16,21,25
**patented (1)**

79:18
**patrons (1)**
34:25
**Pay (9)**
36:7;47:3,4,21;
115:6;116:10,16,22;
117:22
**paying (1)**
46:18
**payment (23)**
7:15;9:6,10,11,16;
11:22;12:19;13:15;
28:14,18;35:1,5;36:25;
37:6,21;114:25;
115:16;116:14,19,24,
25;117:9;118:1
**payments (6)**
36:5;55:22;117:12;
122:14;123:1;124:3
**PayPal (10)**
34:24;35:1,3,8;36:3,
7,13,18;37:1,6
**PayPal's (3)**
35:18,25;36:22
**pays (3)**
46:2,3;116:5
**penalty (1)**
69:3
**pending (4)**
79:8,10,11;80:3
**people (6)**
14:22;23:12;52:23;
101:2,4;112:6
**per (2)**
86:8;88:9
**percent (3)**
7:6,6;54:18
**percentage (3)**
7:2;91:25;92:3
**perform (4)**
41:21;60:22;107:25;
108:19
**performed (3)**
23:16,19;24:6
**performing (2)**
41:14;95:7
**perhaps (1)**
55:12
**period (5)**
26:10,15;95:7;100:9;
117:1
**perjury (1)**
69:3
**person (1)**
104:2
**personally (1)**
13:4
**pertaining (1)**
93:15
**PhD (1)**
14:16
**phone (2)**
14:25;104:10

**phones (1)**
68:6
**phrase (1)**
109:9
**physically (1)**
119:9
**picking (1)**
119:9
**piece (1)**
55:11
**pilot (1)**
82:15
**place (5)**
5:8;48:24;68:21;
76:19;108:2
**places (2)**
63:20;102:23
**plaintiff (2)**
5:14,18
**Plaintiff's (5)**
15:11;94:17;95:21;
96:9;98:8
**plans (1)**
92:9
**platform (3)**
10:9,10,10
**plausible (5)**
42:11;83:1,11;84:20;
88:25
**please (8)**
5:15,17;6:9;25:2;
65:5;71:23;72:3;76:6
**point (10)**
34:20;48:24;59:11,
12;60:1,7;73:2;74:9;
75:3,14
**pointed (1)**
24:24
**pointing (8)**
37:5;47:23;49:21;
58:5;63:22;71:16,17;
110:4
**points (3)**
22:13;72:18;110:18
**portal (1)**
66:18
**portion (1)**
123:16
**position (5)**
6:19,22;34:6;50:10;
52:3
**positions (1)**
87:8
**possible (9)**
37:8;61:11,14;62:3;
69:11;70:1,19;82:10;
84:5
**postdocs (1)**
14:16
**posted (1)**
123:1
**potentially (6)**
52:5;53:9;57:20;

61:4,10;111:14
**precise (1)**
53:8
**precisely (1)**
23:9
**prefaced (1)**
121:3
**prepare (2)**
108:15,20
**prepared (1)**
108:9
**present (1)**
106:2
**presented (6)**
78:2,11,22;91:1
**pretty (5)**
50:7;52:16;62:18;
73:5;106:10
**previous (1)**
49:22
**price (2)**
51:10,20
**Pricewaterhouse (2)**
12:11,21
**PricewaterhouseCoopers (2)**
12:6,9
**prior (12)**
12:23;14:20;15:5;
30:12,16;42:15,20;
43:6;51:8;63:2;91:8;
124:7
**privacy (2)**
53:23;55:15
**probabilities (1)**
106:1
**probability (3)**
106:8,10,11
**Probably (6)**
16:16;46:13;52:24;
53:7;84:4;123:15
**problem (1)**
96:21
**proceedings (4)**
39:22;94:12;114:11;
121:22
**process (6)**
30:3,10;43:12,16;
44:13;100:11
**processes (38)**
11:4,5;12:12,13,14,
24;13:7,10,10,13,15,
23;19:5;21:23;28:7;
30:2,6;32:14;35:23;
36:4,24;43:12,16,18;
44:4,5,7,7,19;52:13;
53:22;55:14,21;89:10;
118:22;119:11,18;
120:5
**processing (20)**
7:12,15,21,22;8:1,4,
9,13;9:10,11;11:18;
13:2;17:24;18:25;
28:18;33:22;44:13,15;

53:5;90:3
**produce (1)**
106:2
**produced (3)**
95:5;112:12;113:2
**produces (1)**
116:7
**product (1)**
106:3
**products (2)**
101:20;110:2
**professional (1)**
18:1
**professor (4)**
6:16,17,20;121:16
**professors (1)**
20:2
**profitable (2)**
38:11;56:6
**program (1)**
11:8
**programming (5)**
10:1;9;80:20,24;
101:10
**programs (1)**
13:20
**prohibition (1)**
40:22
**project (1)**
92:9
**pronouncing (1)**
15:20
**proofread (1)**
17:20
**proper (1)**
55:5
**properly (1)**
82:20
**proprietary (47)**
13:23;14:6;37:1;
51:11,14,17,25;52:1,
11,14,21;53:9,14;54:3;
55:7;56:17;57:6;58:24;
60:14,18,20;61:4,13,
22;62:4;71:11,14,20;
72:6,10,13;73:9;76:22;
78:3,9;80:7,17,19,24;
92:17;108:24;109:2,5,
7,18,22,22
**protect (1)**
118:20,22;119:18
**protected (2)**
94:5;113:3
**prove (1)**
67:1
**provide (16)**
21:24;27:2;52:25;
53:20;54:22,23,24;
102:22;106:7,13,16,18,
23;107:1;109:23;122:6
**provided (18)**
21:19,25;22:2;25:21;
26:9,13;27:8;30:20,23;

31:3;43:2;47:24;52:23;
63:13;85:16;100:13;
101:17;106:25
**provider (1)**
63:1
**Providers (1)**
40:16
**provides (9)**
34:25;52:19;53:6;
110:8,8,9;117:13;
123:8,9
**providing (17)**
24:18,25;25:14;
26:11,16;30:5;40:20;
46:18;53:11;55:3;78:4;
81:5,14,16;87:17;
102:16;108:6
**provisions (2)**
93:11,16
**public (21)**
35:19,20,23,25;36:2,
22,25;43:13,17;44:14;
45:8,12,14,17;47:8,10,
16;57:3;58:17;69:14;
114:7
**publically (1)**
72:12
**publicly (6)**
36:19;44:9;45:1;
57:17;65:8;68:1
**published (2)**
38:6;80:9
**purchase (1)**
43:9
**purely (1)**
65:13
**purpose (6)**
93:22;96:3,16;97:11,
16,25
**purposes (2)**
12:17;20:2
**put (12)**
7:16;8:6;9:1;32:21;
39:10,12;51:16;
109:18,20;113:25;
119:18,18

## Q

**qualify (3)**
60:14,17;75:1
**quality (1)**
61:4
**quantity (4)**
56:16,20;57:5;118:8
**quite (1)**
80:22

## R

**rather (1)**
16:6
**read (8)**

16:7;35:10,13;72:2,
4;96:19;110:14;124:17
**reading (6)**
17:15;24:1;35:14;
48:1;49:15;59:10
**reality (1)**
54:12
**really (27)**
7:5;11:9;46:12,24;
47:4;48:18;52:6;56:10;
58:9;60:9;61:10;70:18;
73:1;81:12;82:19,20,
20;83:6,16;84:4;
103:16,18,19;107:23;
109:6,21;110:12
**reason (5)**
29:16,20;67:9;102:7;
103:10
**reasonable (1)**
87:15
**reasons (2)**
38:12;93:25
**rebutting (1)**
78:7
**recall (4)**
12:20;26:5;49:1;
96:6
**recognize (3)**
15:17;80:23;111:22
**recollect (13)**
20:23;22:25;23:9,12;
24:3;26:7;59:10;77:7;
93:17;97:7;99:20;
103:23;118:5
**recollection (6)**
93:19;104:6,12,15,
16,17
**reconciliation (1)**
79:23
**record (13)**
5:16;16:22;39:16,21,
23;94:10,13;98:12;
114:9,12;121:20,23;
124:22
**refer (3)**
63:12;66:6;84:3
**reference (10)**
15:15;17:4;26:20;
62:8;63:7;71:9;95:12;
102:7,24;103:3
**referenced (2)**
64:11,19
**references (1)**
49:23
**referred (1)**
48:6
**referring (3)**
30:8;59:16;77:1
**refine (1)**
55:20
**regarding (5)**
26:10,15;27:7;71:10;
92:14

**regardless (1)**
72:24
**register (1)**
117:2
**regular (1)**
83:10
**regulated (39)**
13:2,2;24:15,20;
25:1,12;29:7;31:14,22;
32:6,14;33:18;37:15;
38:8;85:11;87:12;
89:18;90:6,18;91:17;
92:14;96:5,17;98:23;
99:7,19;100:5;102:17;
107:8;114:25;115:16,
23;116:21;117:6;
118:16;122:4,17;
123:11;124:12
**regulating (3)**
12:24;13:15;85:5
**regulation (2)**
43:2;47:25
**regulations (8)**
86:9;88:10;115:2,5;
116:16;122:24,25;
124:4
**related (6)**
76:5;80:20,23;110:3;
121:10;124:2
**relates (2)**
43:8;95:6
**relevant (4)**
18:10;21:14;70:19;
71:4
**relied (3)**
27:11;71:19;101:5
**remain (1)**
73:16
**remember (31)**
7:14,17;9:4;12:22;
23:3,23,25;24:1,2,9,11,
16,17;26:3;34:23;
37:22;38:1,4;40:2;
47:19;49:2;58:8;59:9,
24,25;61:25;102:13;
104:10,20,24;105:13
**remembering (1)**
60:3
**remind (1)**
40:3
**removed (2)**
43:7;51:7
**rendering (1)**
20:10
**repeat (10)**
7:9;25:7;26:12;
30:14;34:9;43:14;
64:16;69:23;93:12;
108:25
**report (80)**
14:25;15:20,22,24;
16:15,24;17:3,8;20:4,
13;21:7,11;22:5,10,

26:20;27:10,12,19;
34:20,22,24;36:14;
37:18,25;38:3,4,19,22;
39:12;46:15;48:20,25;
49:1,17;50:10;51:10;
52:6,11;55:24;59:1,1;
61:2,15,24;62:5;63:7,
12;66:4,7,8,13,14;71:9;
78:1;79:7;81:4;85:16,
18,24;90:22;100:17;
102:8,23;103:3,6,11;
105:3,5,6,7,17,17,20;
107:20;108:18;110:11,
12;115:19;122:19,22
**reporter (10)**
5:22,25;6:5;15:12;
22:16;94:18;95:22;
96:10;98:6,9
**Reporters (1)**
5:6
**reporting (8)**
51:20;53:12;63:8,15,
17,21,23;64:6
**reports (10)**
52:14;55:21;63:11;
64:2;65:9,13,19,23,24;
66:3
**represent (1)**
95:6
**representative (1)**
110:20
**representatives (1)**
33:21
**request (2)**
27:14;92:11
**requested (1)**
27:15
**requests (2)**
88:23;89:6
**require (5)**
40:23;41:6,15,17;
42:7,11
**required (8)**
14:17;55:20;82:25;
93:8,14,23;117:5;
123:24
**requirement (1)**
28:14
**requirements (7)**
28:18;33:22;40:13;
86:6;109:13;123:11,20
**requires (2)**
73:18;75:6
**research (4)**
9:8;13:9,9,17
**reservation (1)**
53:16
**resolve (2)**
116:18,18
**resources (1)**
49:12
**respect (12)**
20:17;25:21;30:19;

35:22;44:14;63:17;
64:7;65:17;89:25;
104:5;113:8;118:25
**restriction (1)**
120:5
**rests (1)**
86:13
**retail (2)**
50:22;91:16
**retailer (12)**
41:23;43:8;46:3;
47:3,21;62:9,22;64:10,
15,18;116:5,9
**retailers (19)**
35:2;40:14;42:15,19;
48:22;49:13,19;50:12,
19,25,25;51:8;59:18;
85:10,20;88:24;
114:21;122:7,11
**retailing (1)**
122:14
**retained (2)**
15:1,8;105:8
**return (1)**
106:20
**reused (3)**
123:15,18,19
**review (14)**
20:19,22,24;21:2,18,
21;26:9;34:21;37:12;
38:19,22;40:19;48:4;
95:10
**reviewed (20)**
20:21;21:11;27:6,11;
29:22;36:9;37:6;45:22;
48:13;55:24;61:18;
68:11;92:7;96:23;
97:19;98:14,15,18;
100:15,24
**reviewing (1)**
96:5
**Richard (1)**
5:17
**right (95)**
6:23;8:16;10:4;11:6,
23;16:11,25;17:9,11;
19:21;20:6;22:2,7;
26:23;27:22,25;28:4,
13;32:22;34:23;35:8;
36:16;41:24;43:5,6;
45:13,24;48:3,17;
49:14,16;52:25;53:2,
22;58:14,21;61:9,18;
63:12;69:4;70:11,14,
17;71:22;72:22;73:3,
12,19;74:18;76:3,13;
80:5;81:1,8;82:11;
83:18;85:8;86:4,12,22;
88:18;90:8;91:1;93:21;
95:2;97:7;98:18;100:3,
20,21;102:12;103:5;
105:11,16,22,25;
107:22;109:15;110:17;

111:22;113:12,19;
114:24;115:7,13;
116:15;117:7;118:5;
120:21;121:8,17;
122:12,15;123:22;
124:10
**Robert (1)**
21:2
**rolling (1)**
84:8
**room (3)**
110:20;111:15;112:7
**rounding (3)**
95:16;96:17,21
**rule (1)**
47:18

## S

**Sam (5)**
5:13,24;6:10,12;
124:21
**same (37)**
19:17;31:1;34:13;
42:1,5;53:10,14,15;
54:19;55:2,2,3,3,12;
67:3;70:19;78:15,18;
81:23,24;84:15;86:17;
87:14,14;89:22;93:25;
101:18;104:5;106:2,7,
7,23;112:3;113:15;
116:8;122:3,8
**Sanderson (11)**
22:14,19;23:15;24:5;
93:9,14;102:8;103:4,
12,15,22
**satisfy (4)**
122:23;123:10,20;
124:4
**saw (2)**
58:9;77:9
**saying (19)**
19:10,14;29:17;35:1;
41:7;43:21;47:2;49:1;
54:7;61:9,10;65:22;
67:23;68:5,22;79:16;
120:2,3;121:4
**SBAR (79)**
5:19,19;16:1,4,7;
18:5;19:2;21:22;22:3;
25:5,22;28:16;30:18;
31:1;32:19;34:1,3,13;
37:3;38:15;39:2,5,8,11,
13,15;40:7;44:16;50:5;
49:6;86:2;98:1
**secure (2)**
9:12,16
**secured (1)**
9:6
**security (2)**
9:7;18:12
**seeing (1)**
43:24

9,25;112:3,5,15,17,23;
113:7,15;119:12,15;
120:7,11;121:19;
124:17,19
**scalable (1)**
53:8
**scan (2)**
116:4,5
**scan-based (18)**
28:25;30:2;37:14;
87:11;91:16;108:2;
114:16,19;115:9,23;
116:3,25;117:16;
122:16;123:5;124:6,
11,12
**scanned (1)**
117:1
**scans (2)**
53:4;114:23
**scene (1)**
60:22
**scheme (1)**
84:4
**school (1)**
6:20
**science (2)**
20:15;33:8
**sciences (1)**
6:21
**scope (5)**
97:5,17,25;98:15;
100:1
**scrape (3)**
69:11;70:1,24
**scraping (3)**
68:15,16;71:2
**SEAL (1)**
14:12
**search (8)**
52:18,20;53:1,1,8,
15;54:1,22
**searching (3)**
52:18,23;54:21
**second (4)**
75:8;76:17;105:6,15
**secrecy (2)**
53:23;55:15
**secret (6)**
55:16;60:24,24;
93:10,15;110:1
**secrets (1)**
81:3
**section (7)**
22:11;40:15,15,18;
49:6;86:2;98:1
**serve (3)**
66:19;67:3,19;68:3,23;
72:1;73:7,21;74:20;
76:24;77:6;79:20;
82:18;83:19;84:10,13;
86:14,25;88:5,12;
92:24;93:3;94:24;
105:12,13;106:5;
107:6;110:19;111:2,5,

**seem (3)**
49:24;82:3;107:10
**seemed (2)**
87:12,15
**seems (10)**
40:20;50:16;52:10;
82:25;83:7;84:20;
88:25;96:20;102:15,20
**sees (1)**
54:20
**select (1)**
21:10
**selected (2)**
21:18,20
**sell (2)**
114:22;117:23
**send (1)**
73:9
**sending (1)**
72:11
**sends (1)**
72:25
**sense (3)**
23:5;84:1;117:16
**sentence (1)**
86:1
**sentences (1)**
104:20
**separate (2)**
59:16;76:11
**separately (1)**
27:5
**separating (1)**
79:11
**served (3)**
7:20;8:17;9:5
**server (1)**
10:21
**service (26)**
48:4,5,16,16,22;
49:19;50:13,18,21;
59:3,14,19,23;60:2;
71:7;72:15;73:10,17;
74:17;75:5,21;76:2,3,7,
8,12
**services (28)**
23:15,21;24:6;25:14,
21;26:11,16;27:7;30:5;
34:25;35:2,5,10;37:6;
40:15;81:5,14;95:8;
97:6,17,23;98:1,15;
102:16;106:14,16;
122:3,6
**serving (3)**
6:25;85:11,20
**servlet (1)**
58:5
**set (2)**
84:3;116:22
**setting (1)**
33:16
**several (1)**
24:22

**shall (1)**
6:1
**share (3)**
47:18;64:23;120:4
**sharing (1)**
73:19
**shop (2)**
82:4;83:9
**shops (1)**
84:18
**show (3)**
66:4,5;71:20
**shower (1)**
94:25
**showing (1)**
64:6
**shown (6)**
50:15;63:24;64:10,
15,18;66:13
**side (8)**
43:8;100:5;103:16;
108:2;118:10;124:11,
12,12
**sign (5)**
14:17;93:9,15,23;
94:1
**signed (3)**
17:7,10,12
**significance (1)**
76:19
**similar (2)**
107:1;122:6
**simple (2)**
46:24;57:14
**simply (3)**
86:7;88:8;119:8
**single (1)**
81:5
**sit (1)**
66:2
**sitting (2)**
58:8;91:4
**situation (3)**
28:3;46:2;113:23
**skills (1)**
18:10
**slightly (1)**
19:20
**soaked (1)**
94:21
**software (135)**
7:14,15,22,24,25;
8:10,11,12,20,21,23;
9:7,9;10:3,9,16,18;
11:4,18,25;12:5,8,11,
13,14,15,18;13:1,4,18,
23;17:24;18:2,9,9,11,
16,25;19:5,11,13;
20:15;21:16;24:14,18;
25:10,14,18;29:12;
32:3,7,8,9,16;33:23;
41:4,7;44:6;45:16;
46:6;48:9,19;55:11;

56:7,9;59:2;62:4;65:3;
80:20,24;81:2,11,20,
24;82:2,3,4,7,9,25;
83:8,9,10,11,14;84:16,
17,18,24;85:2;87:9,10,
13;88:16;89:12,24;
91:16,19;92:8;98:22;
99:6,18,25;101:8,14,
14,17;102:14;104:2;
109:4,8,10,13,15,21;
110:2,7,8,8,9;113:21;
119:1,2,6,17,21;
120:13,23;121:5,6;
123:14;124:1,7,10,10
**softwares (1)**
101:15
**sold (1)**
116:6
**solely (1)**
64:22
**solemnly (1)**
5:25
**somebody (9)**
21:12;54:13;68:21;
70:2,21,25;105:12;
112:23;123:3
**somehow (2)**
54:14;111:17
**someone (5)**
22:22;27:2;69:11;
119:10;120:10
**sometime (1)**
105:10
**sometimes (1)**
58:2
**somewhat (1)**
106:13
**sophisticated (1)**
82:3
**Sorry (11)**
26:12;30:22;31:16;
60:15;64:12,16;67:15;
80:22;93:12;105:15;
117:17
**sort (9)**
41:6;44:4;46:1;56:9;
102:13;104:2;114:19;
116:11;117:16
**source (76)**
37:7,8,12;41:7,9,15,
17,20,22;42:7,8,12;
44:2,3,8,9,11,22,24,25;
45:2,5;46:7,9,13;47:9,
10,12,16;52:4;61:17;
64:25;69:12;70:3,5,6,9,
9,20,22,25;85:7;92:7;
100:19,22,23,24;101:5,
11,20;102:1,10;103:13,
17,20;104:1,8,13,18;
110:25;111:23;112:14;
113:5;118:18,20,23,24;
119:1,9,11,19;120:6,
15;121:9;122:7,8

**Spartan (5)**
29:4,15,19;81:15;
85:10
**speak (6)**
22:18,22;96:2;103:7;
111:8;112:5
**speaking (3)**
51:19,22;80:8
**specific (23)**
11:10;18:15;23:19;
33:8,13,22;38:23;
43:11,15,18;47:15;
48:24;58:14;60:12,16;
61:2,12;74:14;86:9;
88:10;104:6;108:13;
123:12
**specifically (9)**
20:17;32:6;59:19;
65:18;89:25;99:21;
100:4;122:21;123:23
**specifics (5)**
26:3;84:25;88:21;
89:5,15
**speculate (4)**
8:16;38:10;68:4;
114:2
**speculating (2)**
77:11;111:18
**speculation (3)**
38:13;111:19;112:11
**spell (1)**
22:15
**spin (1)**
68:21
**spoken (1)**
27:17
**stand (2)**
31:5;61:7
**standalone (1)**
59:17
**standard (1)**
71:14
**standards (4)**
38:21;40:5;118:11,
13
**standpoint (1)**
21:16
**Starbucks (15)**
71:10,21;72:21;
75:25;76:5,12,16,17,
21;77:17,18,19,24;
78:6,14
**start (2)**
31:12,18
**started (3)**
91:10;107:8,19
**state (22)**
5:25;6:9;19:8,12,14,
16;27:23;33:21;43:2;
46:10;47:24;48:20;
49:17;81:23;86:8;
88:10;100:17;113:3;
116:15;117:5;122:24;

124:4
**stated (6)**
14:25;19:13;50:7,14;
99:16;122:19
**state-forced (1)**
122:25
**statement (12)**
61:7;66:5,6,7;85:23;
86:23;88:8;101:1,21;
103:22;104:7,15
**statements (3)**
102:24;103:4,23
**states (9)**
18:23;37:21;40:22,
22;42:15,20;115:4,4,5
**stating (1)**
81:13
**status (1)**
80:11
**statute (2)**
43:2;47:24
**steal (2)**
79:15,17
**steps (6)**
17:12;38:17;55:5;
81:9;98:20;99:1
**still (1)**
61:7
**stolen (1)**
54:7
**stop (2)**
76:21;77:5
**structure (3)**
33:1;84:4;123:16
**student (3)**
120:4;121:4,17
**students (6)**
10:2;14:16;32:4,13;
119:5,6
**subject (8)**
24:10;58:16;72:15;
73:10,17;74:16;80:16;
121:4
**sufficient (1)**
85:4
**suggest (2)**
49:12;61:17
**suggesting (1)**
54:9
**SUNDAY (1)**
5:1
**suppliers (1)**
90:14
**supports (2)**
17:24;18:25
**supposed (1)**
47:1
**Sure (26)**
7:10;15:19,22;16:18;
17:16;25:8;31:8;39:18;
41:2,5;46:8,12;48:18;
50:7;54:6,18;62:18;
73:5;81:12;82:12;83:6;

97:13;103:16;115:25,
25;120:1
**surprise (1)**
62:2
**suspect (1)**
82:1
**suspicions (1)**
56:11
**suspicious (1)**
56:4
**swear (1)**
5:22
**sweeping (1)**
100:2
**system (27)**
10:18;35:18,25;
36:22;40:21,23;41:16;
42:8;44:21;48:21,21;
49:18,18;50:11,11,12;
58:7;78:16;83:12;
89:18;90:5,9;107:23;
108:22;119:21;120:23;
122:16
**systems (31)**
7:15,22,23,24,25;8:9,
10,11,12,20,21,23;9:6,
9,10,17;10:3;11:16,20,
21;12:24;13:18,19;
18:9,16;19:5;52:13;
101:8,18;113:21;
120:17

---

# T

**table (2)**
32:23;113:25
**talk (10)**
10:19;15:3,9;23:1,5,
12;63:21;82:25;86:17;
100:4
**talked (17)**
22:14;23:11,24;24:2,
10,16;26:3;37:17;
56:14;86:16;88:23;
91:7;102:4,5;115:3;
117:25;118:18
**talking (17)**
43:23;48:8,18,19;
51:21;54:12,19;59:7,
22,23;70:5,6;96:6;
99:15;119:19,19,20
**talks (4)**
40:12;52:6;112:13;
123:17
**tasks (1)**
21:15
**taught (8)**
9:19;10:4,8,11,14,15,
21,24
**teach (13)**
10:2,23;11:10,10,13,
16;32:1,2,4,7,13,16;
33:8

**teaches (1)**
33:9
**teaching (3)**
9:19;32:21,23
**technical (3)**
23:4,5;100:10
**techniques (1)**
18:12
**Technologies (7)**
5:10;11:8,11;32:2;
101:7,9,12
**technology (7)**
10:17,17;58:3;79:8,
12;80:3;123:17
**teleconference (1)**
103:25
**telephone (1)**
104:22
**telling (6)**
19:8;28:10;67:4;
99:16;116:2;121:14
**temporally (1)**
12:2
**tenured (1)**
6:22,23
**term (3)**
41:5;48:15;82:20
**terms (18)**
9:19;20:13;35:22;
36:1;46:2,6,6;47:13,
14;48:6,9,11;57:14;
110:12;113:4;115:5;
116:16;120:1
**testified (17)**
7:11,13;8:3,10;9:16;
18:24;29:14,17;36:21;
61:21;68:17;75:19,20;
82:14;83:14;86:20;
124:5
**testify (2)**
77:19;84:22
**testifying (3)**
7:20;68:20,20
**testimony (29)**
6:1;17:6;36:23;
43:11,15;44:12;47:6;
57:8;59:15;60:1;62:17,
20;63:10;64:1,9,14,17;
65:12,16;68:12,25;
69:8;72:14;73:9;74:15;
83:16;86:11;100:8;
113:9
**therefore (1)**
83:25
**thinking (1)**
105:4
**third (3)**
41:21;51:6;122:10
**third-party (7)**
38:18,21;40:6,16,25;
41:19,23;63:1;122:8
**though (3)**
32:23;60:12;81:18

**thought (8)**
22:10,25;25:3;41:11;
71:24;87:19;111:17;
117:24
**thousands (1)**
92:22
**three (3)**
102:5,6;105:6
**ticket (1)**
106:17
**tickets (1)**
106:17
**time- (1)**
108:8
**timeline (5)**
107:21;108:9,16,17,
20
**timelines (2)**
92:9;107:18
**times (5)**
18:14;30:7;91:23;
100:17;109:17
**timing (3)**
116:24;117:4;118:1
**Title (36)**
27:21,23;28:1,3,5,8,
14;29:1,3,15,18;30:12,
16;31:13,19;32:1,5,14;
33:17,25;34:5,12,15,
25;35:3,6,8,15;36:11;
40:23;41:16;43:13,17,
21;44:13;45:9
**titles (1)**
29:20
**today (8)**
36:21;68:25;81:23;
85:5,22;91:3,4,6
**Today's (2)**
5:7;124:20
**together (1)**
56:25
**told (3)**
89:5;99:10;102:9
**took (4)**
38:8;67:1,18;107:10
**tool (1)**
90:18
**top (3)**
7:14,19;34:19
**topics (1)**
13:9
**towards (1)**
19:22
**trade (6)**
55:16;60:24;81:3;
93:10,15;110:1
**trading (11)**
29:1;30:2;37:14;
42:25;114:16,19;
115:9,23;116:25;
122:17;124:7
**training (1)**
123:5

**transaction (13)**
9:6,17;24:19;25:1;
28:9;29:10;35:7;43:1;
46:20,21,22;47:1;
81:14
**transactional (2)**
26:14;51:8
**transactions (19)**
17:25;19:1;27:24;
29:4,19;42:14,19;43:8,
12,16;44:13;45:7,12;
66:9;81:10,25;100:11;
122:11,17
**transcript (1)**
100:14
**transfer (3)**
13:15;41:16;107:25
**transferred (2)**
116:21;118:21
**transferring (1)**
119:10
**transfers (8)**
30:12,16;33:25;
34:12;36:25;38:7;
55:21;115:16
**trial (4)**
31:6;67:1;88:3;
112:20
**tried (1)**
17:17
**trouble (1)**
39:10
**true (3)**
48:21;49:18;50:11
**truth (3)**
6:2,2,2
**try (3)**
7:17;109:14;117:17
**trying (8)**
31:16;56:22,25;
58:14;67:8;75:1,7;
104:15
**two (21)**
10:15;28:8,11;72:18;
87:13;91:5;100:24;
101:8,8,15,20;104:10,
24,25;105:5;110:15;
117:8,19,20,22;121:18
**type (11)**
10:17;11:5,6;28:9;
35:6,7;45:11;58:3,3;
66:7;100:6
**types (7)**
8:22;13:18;18:8;
19:4;33:9,22;89:1
**typically (1)**
82:23
**typographical (1)**
17:18

**U**

**UC (4)**

9:23;10:13,13,15
**UCI (4)**
11:1;31:24;32:12;
33:8
**UI (1)**
107:25
**UIs (1)**
87:14
**under (21)**
36:21;49:6;68:17,22;
69:2,2;72:24;73:13,15;
74:6,10,23;75:2,5,9,11,
16,19,20;78:6;86:20
**under- (1)**
33:3
**undergraduate (2)**
11:24;13:19
**underlying (2)**
101:7,9
**Understood (2)**
94:24;116:1
**unfair (1)**
119:25
**uninformed (1)**
123:3
**unit (3)**
56:22;57:1,1
**units (1)**
57:11
**universities (2)**
11:9,16
**University (3)**
6:18;10:14;19:18
**unless (3)**
43:1;69:11;70:2
**up (5)**
7:9;33:16;55:1;84:3;
109:17
**update (1)**
55:21
**upload (1)**
90:18
**upon (4)**
66:25;76:20;86:13,
24
**upside (1)**
43:4
**URL (2)**
58:2,5
**use (12)**
12:13;19:23;29:20;
44:5;48:6,9,11;71:10;
77:10,10;101:14;
104:18
**used (29)**
7:7;10:17;11:21;
29:4,15,18;35:22;
52:13;58:3;69:12;70:2,
21,24,25;81:24;82:23;
85:2;87:9,10;91:16,19,
23;92:1,4;101:8,13;
104:13;123:17;124:12
**useful (1)**

54:25
**user (3)**
66:17;108:1;123:18
**users (1)**
54:25
**uses (4)**
43:12,16,18;64:22
**using (14)**
12:14;28:6,7;30:12,
16;44:13;53:25;57:13;
64:24;70:20;76:22;
77:5;81:24;85:8
**usually (9)**
19:25;44:6,6;79:13;
109:25,25;113:21,22;
119:17
**utilized (7)**
12:11;34:5;100:18;
101:25;102:9;103:13;
104:7
**utilizes (2)**
11:4,18

**V**

**vaguely (1)**
60:3
**value (1)**
23:21
**various (13)**
12:9;20:15;35:2;
40:13;49:12,23;65:23;
75:15;86:8;87:6;88:9;
93:5;107:19
**vendor (6)**
38:18,21;40:6;41:1,
19;106:1
**vendors (1)**
51:6
**version (3)**
84:9;124:8,9
**versions (1)**
19:20
**versus (2)**
5:11;118:14
**video (2)**
62:22,22
**VIDEOGRAPHER (12)**
5:4,5,21;39:20,23;
94:10,13;114:9,12;
121:20,23;124:20
**videos (2)**
49:23;62:10
**videotaped (1)**
5:13
**view (9)**
69:12;70:3,5,6,9,9,
20,22,25
**vividly (1)**
24:17
**voice (1)**
7:9
**void (1)**

59:1

**W**

**Wait (1)**
16:9
**waited (4)**
66:16;67:9,22,22
**waiting (2)**
67:14,16
**walking (1)**
118:21
**water (1)**
94:21
**waterproof (1)**
68:7
**way (33)**
28:10;32:21;44:15,
23;46:8;50:15;51:22;
54:21,24,24;55:4,13,
13;60:6,22,23;71:5;
76:14;77:25;78:2;88:2;
94:21;97:21;101:16,
18;106:13;109:9,9,24;
118:6,13;121:17;124:3
**ways (1)**
55:2
**web (11)**
10:1;19:18;52:18,19,
24;53:5,15;57:17;58:1,
18;70:13
**web-based (2)**
33:10;90:17
**website (50)**
20:1,1;26:25;36:11;
37:5;45:10;47:12;
48:10,11,19;51:16;
53:17;57:17;59:7,15,
20,21,23;60:2;62:9,13,
14,16,19,23;63:11,16,
22;64:2;65:10,23;
66:12;68:1,15,16;
69:12,14,16;70:2,3,11,
12,23,24;76:3,9;
109:20;110:6,6;114:7
**websites (3)**
48:7;49:23;63:20
**week (1)**
105:7
**weeks (2)**
105:5,6
**weren't (1)**
100:13
**What's (2)**
34:2;43:25
**whatsoever (1)**
99:5
**whereas (1)**
117:20,21
**White (10)**
26:21;37:17,20;38:6,
17;40:5,12;47:23;49:4;
115:3

**whole (3)**
6:2;63:19;115:20
**widely (1)**
82:23
**William (1)**
20:24
**willing (1)**
46:9
**within (15)**
35:18,23,25;51:7;
53:4;103:20;106:6,22,
24;107:9;117:25;
118:23;119:11,24;
120:6
**Without (8)**
8:8,14;9:2;35:14;
70:20;79:16;90:14;
122:18
**witness (53)**
5:22;6:4,25;7:4;
8:17;9:5;18:6;19:3;
21:23;25:23;28:17;
30:19;31:2;32:20;34:9,
14;37:4;39:6,9,18;
40:8;44:17;50:6;51:13;
54:6;55:10;65:21;
66:20;67:4,20;68:4,24;
72:5;73:22;74:21;
76:25;77:7;79:21;
82:19;83:20;84:14;
86:15;87:1;88:14;
92:25;93:4;106:6;
107:7;112:4,16;113:8;
119:16;120:12
**witnesses (1)**
111:14
**wood (1)**
33:1
**word (3)**
44:5;52:12;64:24
**words (3)**
17:20;68:9;119:5
**work (5)**
15:2;18:18;57:13,18;
95:16
**worked (13)**
7:24;8:19;9:3;11:19,
25;12:5,7;14:2,4;
18:17;19:11;20:16;
65:15
**working (3)**
12:4,10;14:15
**works (8)**
40:21;43:24;44:4;
45:25;46:4;114:16;
115:16;120:17
**world (2)**
36:8;80:9
**write (3)**
13:8;18:15;82:9
**written (4)**
13:6,12,14,20
**wrong (3)**

69:18,21;104:24
**wrote (2)**
17:14;82:24

## Y

**yards (1)**
56:24
**year (2)**
7:5,5
**years (7)**
9:4;10:15;38:8;
55:19;56:5;91:5;107:9
**Ygor (1)**
95:11

## Z

**Zatkovich (7)**
49:9,24;50:15;51:23;
71:17;76:14;78:1
**Z-a-t-k-o-v-i-c-h (1)**
49:10
**Zatkovich's (8)**
15:19;55:24;58:25;
61:15;78:8;105:17;
108:18;110:12

## 1

**1 (3)**
15:10,11;17:1
**1.1 (1)**
22:11
**10 (2)**
42:22;47:23
**10:28 (1)**
94:11
**10:35 (1)**
94:14
**100 (1)**
54:18
**11 (1)**
61:1
**11:01 (1)**
114:10
**11:09 (1)**
114:13
**11:18 (1)**
121:21
**11:24 (1)**
121:24
**11:27 (2)**
124:21,23
**12 (2)**
106:2;107:4
**13 (2)**
81:4;85:23
**14 (1)**
17:10
**14th (1)**
105:3
**150 (1)**

10:2
**17 (2)**
6:10;84:24
**18800 (1)**
5:8
**19 (4)**
5:1,7;17:8;124:22

## 2

**2 (2)**
94:16,17
**2001 (1)**
12:3
**2001/2002 (1)**
12:3
**2007 (3)**
26:22;37:18;38:6
**2013 (27)**
23:17;24:7,22;66:16;
67:10;79:4;81:6,25;
82:8;83:5,25;84:20,24;
85:3,8;88:18;89:3,8,16,
19;90:9,12,16,22;96:5;
124:7,9
**2015 (10)**
23:17;24:8;29:19;
42:15,20;43:6;51:8;
63:2;66:17;67:11
**2017 (4)**
5:1,7;17:10;124:22
**21 (1)**
65:17
**25 (2)**
62:5;105:19
**26 (1)**
62:6
**29 (3)**
64:7,19;65:17

## 3

**3 (3)**
40:15;95:20,21

## 4

**4 (4)**
22:12,13;96:8,9
**43 (1)**
61:21

## 5

**5 (7)**
20:4,18;47:1,3;98:6,
7,8
**50 (2)**
7:6,6
**53 (1)**
29:14
**55 (1)**
82:14

## 6

**6 (2)**
20:18;98:17
**60 (2)**
7:6,6

## 7

**7 (2)**
27:19;40:14

## 8

**8 (1)**
49:7
**8:15-CV-02784-JSM-AEP (1)**
5:12
**8:32 (2)**
5:2,8

## 9

**9:16 (1)**
39:21
**9:22 (1)**
39:24
**92612 (1)**
5:9
**92617 (1)**
6:11